**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| EARTH FARE, INC., *et al.*,[1] | ) | Case No. 20-10256 (KBO) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

**DECLARATION OF CHARLES GOAD IN SUPPORT
OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

I, Charles Goad, hereby declare under penalty of perjury that the following is true and correct:

1.    I am the Chief Restructuring Officer (the "**CRO**") of EF Investment Holdings, Inc., a Delaware corporation, and Earth Fare, Inc. ("**Earth Fare**"), a North Carolina corporation (each a "**Debtor**" and, collectively, the "**Debtors**" or the "**Company**").  In July 2019, FTI was retained to provide temporary employees to provide certain financial services.  At that time, I was appointed as Chief Performance Officer reporting to the Chief Executive Officer and the Board of Directors.  On January 31, 2020, I was appointed as CRO of the Debtors.

2.    I have over twenty years of experience in corporate finance and accounting, having assisted senior management teams and parties-in-interest in developing and implementing strategic alternatives, revenue-enhancement initiatives and cost-reduction programs.  Over the years, I have assisted companies and creditors in a variety of situations, including RadioShack, where I represented the company in a successful restructuring and asset-sale process, and American Apparel, then the largest apparel manufacturer in the United States, as financial advisor

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Earth Fare, Inc. (3936) and EF Investment Holdings, Inc. (8084).  The mailing address for each of the Debtors is 220 Continuum Drive, Fletcher, North Carolina 28732.

in both of its Chapter 11 bankruptcies.  I have also provided services to Berkline/Benchcraft, a $500 million furniture manufacturer; Trident Microsystems, a provider of semiconductors for digital home entertainment; and Delta Woodside, a $700 million textile manufacturer, among others.  I received an Accounting Degree from Appalachian State University.  I am a Certified Public Accountant and a Certified Insolvency and Restructuring Advisor.  I am also a member of the American Bankruptcy Institute, the Association of Insolvency & Restructuring Advisors, and the Turnaround Management Association.

3.      On the date hereof (the "**Petition Date**"), the Debtors filed voluntary petitions with the Court for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "**Bankruptcy Code**").  The Debtors intend to operate their business and manage their properties as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

4.      I submit this declaration (this "**Declaration**") to assist the Court and parties-in-interest in gaining an understanding of the circumstances that led to the commencement of these chapter 11 cases (collectively, the "**Chapter 11 Cases**"), and in support of the Debtors' petitions and motions requesting various forms of "first day" relief (collectively, the "**First Day Motions**"), which have been filed to minimize the adverse effects of filing for chapter 11 protection and enhance the Debtors' ability to maximize value for the benefit of their estates and creditors.

5.      If called as a witness, I could and would competently testify to the matters set forth herein based on my personal knowledge.  In my capacity with the Debtors, I am familiar with the Debtors' day-to-day operations, business affairs, financial condition, and books and records.  The facts set forth in this Declaration are based on my service with the Debtors, my review of the Debtors' books and records and other relevant documents, and my review of

25666160.12

2

information compiled and communicated to me by other employees of the Debtors and the Debtors' professional advisors.

6.      Prior to the commencement of the Chapter 11 Cases I, among other things, (i) reviewed and discussed the Debtors' strategy regarding the development of potential restructuring and sale alternatives; (ii) supervised the preparation of the documentation needed to implement the restructuring initiatives contemplated during the Chapter 11 Cases; and (iii) consulted on a regular basis with the Debtors' other senior management members and outside advisors with respect to the foregoing.

7.      This Declaration provides an overview of the Company's business and corporate history, as well as a discussion of the events that compelled the commencement of the Chapter 11 Cases, a description of the Company's capital structure, its strategy to maximize the value of the business, and the efforts to obtain debtor-in-possession financing.  The Declaration also affirms and incorporates the facts that support the relief requested in the First Day Motions.

## A.      Overview of the Company

### i.      Company History and Corporate Structure

8.      The Company is a leading natural and organic food retailer with store locations in the Southeastern, Mid-Atlantic, and Midwestern United States.  Founded in Asheville, North Carolina in 1975 as a modest, natural food store, then named "Dinner for the Earth," the Company has over the last half century built a leading reputation in the natural and organic supermarket industry by offering a carefully curated selection of organic, natural, fresh, and wellness products guided by a unique food philosophy that ensures the cleanest assortment and the highest quality standards in the industry.

9.      In 2012, the Company's current majority equity sponsors and co-investors acquired their majority equity interest in the Company.  EF Investment Holdings, Inc. is a holding company and the direct parent of Earth Fare, owning 100% of the equity in Earth Fare.  A chart detailing the organizational structure of the Debtors as of the Petition Date is attached hereto as Exhibit A.

ii.    *Business Operations*

10.      Now headquartered in Fletcher, North Carolina (the "**Headquarters**"), the Company operates fifty (50) stores in ten (10) states in the Southeastern, Mid-Atlantic, and Midwestern United States, emphasizing a consistent "full shop" experience—stocking roughly 18,500 SKU's in line with consumer trends and preferences—with a focus on selection, convenience and competitive pricing. The Debtors lease their Headquarters and all of their store locations.

11.      The Company is committed to providing healthy food that is convenient and affordable, boasting a wide assortment of organic and locally sourced products and the most stringent food philosophy in the industry.  Indeed, the Company's unique and dedicated approach to high-quality food standards, health and wellness includes a "Boot List" of ingredients, including added hormones, artificial fats, trans fats, antibiotics, and artificial preservatives, that are banned from all products sold at the Company's stores.  In addition, the Company employed a Chief Medical Officer to oversee a health and wellness strategy to ensure that the Company offers the healthiest possible assortment of foods.

12.      As of the Petition Date, the Debtors employed, in the aggregate, approximately 3,270 employees.  Approximately 1,637 employees work on a full-time basis, while the remainder work on a part-time basis.  There are approximately 138 employees that work at the

25666160.12

Headquarters and approximately 3,132 store-level employees.  The Debtors' employees are not covered by a collective bargaining agreement.

**B.    The Prepetition Capital Structure**

13.    On April 16, 2010, Earth Fare entered into that certain credit and guaranty arrangement with Fifth Third Bank ("**Fifth Third**") as Administrative Agent, Swing Line Lender, L/C Issuer and Sole Lead Arranger and the other participating lenders thereunder (collectively with Fifth Third, the "**Prepetition Revolving Loan Lenders**" and such agreement, the "**Prepetition Revolving Loan Agreement**"), pursuant to which the Prepetition Revolving Loan Lenders provided a revolving line of credit to finance the Company's operations with initial commitments of $40,000,000 in the aggregate.  On April 9, 2012, the Prepetition Revolving Loan Agreement was amended and restated to provide for, among other things, an increase in the Prepetition Revolving Loan Lenders' aggregate lending commitments to $65,000,000, and a guaranty of Earth Fare's obligations under the Prepetition Revolving Loan Agreement (the "**Guaranty**") by EF Investment Holdings, Inc. (the "**Guarantor**").

14.    On May 15, 2017, Earth Fare executed revolving notes under the terms of the Prepetition Revolving Loan Agreement with (i) Fifth Third, in the original principal of $43,333,333.33, and (ii) Wells Fargo Bank, National Association ("**Wells Fargo**"), in the original principal amount of $21,666,666.67.  As of the Petition Date, the outstanding balances owed to Fifth Third and Wells Fargo under the Prepetition Revolving Loan Agreement were $41,994,962 and $20,997,478, respectively, in each case inclusive of accrued and unpaid interest (all such amounts, the "**Prepetition Revolving Loan Obligations**").

15.    The Prepetition Revolving Loan Obligations are secured by a first-priority lien on and security interest in substantially all of Earth Fare's assets, including accounts

receivable, cash and cash equivalents, chattel paper, deposit accounts, equipment and fixtures, general intangibles, goods, inventory, investment property, contract rights and other rights to payment, software, trademarks, copyrights, and the proceeds and products thereof (the "**Collateral**").

16.     On July 16, 2019, Earth Fare entered into a second lien credit and guaranty agreement with the lender party thereto (the "**Prepetition Term Loan Lender**" and such agreement, the "**Prepetition Term Loan Agreement**"), pursuant to which the Prepetition Term Loan Lender extended to Earth Fare a loan in the original principal amount of $14,800,000 and incremental capacity for an additional $4,000,000 in loans.  As of the Petition Date, the Debtors' obligation under the Prepetition Term Loan Agreement is approximately $14,800,000, inclusive of accrued but unpaid interest (all such amounts the "**Prepetition Term Loan Obligations**").  The Prepetition Term Loan Obligations mature on June 30, 2020, and are secured by a second-priority lien on and security interest in the Collateral, subject to the Intercreditor Agreement (as defined below).

17.     Earth Fare, Fifth Third, as lender and agent under the Prepetition Revolving Loan Agreement, and the Prepetition Term Loan Lender are parties to that certain intercreditor agreement dated as of July 16, 2019 (as amended, restated, supplemented or otherwise modified from time to time, the "**Intercreditor Agreement**"), which governs the respective rights, obligations and priorities of the Prepetition Revolving Loan Lenders and the Prepetition Term Loan Lender with respect to the matters referred to therein, including the lenders' relative rights in the Collateral.

18.    Lastly, as a grocery chain with fifty (50) stores, the Debtors have certain obligations in respect of their leased facilities.  In addition, the Debtors' books and records list approximately $60 million in outstanding trade liabilities and other unsecured obligations.

**C.    Circumstances Leading to the Commencement of The Chapter 11 Cases**

*i.    Circumstances Leading to Current Liquidity Challenges*

19.    Following its formation in 1975, Dinner for the Earth evolved and expanded, becoming Earth Fare in 1994, and opening new locations in South Carolina and Florida in 1997 and 2010, respectively.  Ultimately, Earth Fare grew into a business with more than fifty locations in the Midwest, Mid-Atlantic, and Southeast United States and approximately $465,000,000 in annual revenues.

20.    Earth Fare was committed to realizing the growth and expansion of its operations into new markets with a multi-faceted strategy including: (i) remodeling efforts to implement a new store format featuring wider aisles, a superior product mix, and a new layout design; (ii) in-store initiatives such as grab-and-go meals, affordable family meals, enhanced marketing, order automation, and inventory tracking; (iii) an e-commerce campaign which included Earth Fare's Instacart rollout, completed in December 2018; and (iv) a loyalty program offering approximately 1.3 million customers competitive pricing and rewards, while providing Earth Fare with enhanced data to be used for further improvement of the customer experience and more efficient marketing capabilities.

21.    These efforts improved Earth Fare's appearance, efficiency, profitability, and customer relations.  While many of the Company's expansions have been successful, others have struggled for a variety of reasons unique to store location or competition in certain markets. At the same time, many of Earth Fare's legacy stores required significant capital improvements,

which caused a strain on liquidity.  All of these factors coincided with the maturity of the Company's Prepetition Revolving Loan Obligations at the end of 2019, resulting in the significant liquidity challenges currently facing the Company.

     ii.    *Prepetition Marketing and Restructuring Efforts*

     22.    Cognizant of its liquidity challenges as well as the maturity of the Prepetition Revolving Loan Obligations at year-end, the Company, with the support of its equity sponsor, spent a significant amount of time engaged in a process of soliciting interest in a refinancing of the Company's secured indebtedness, or a sale of substantially all of the Company's assets.

     23.    The Company was able to obtain numerous extensions of the maturity date under the Prepetition Revolving Loan Obligations.  On May 15, 2017, the Company entered into an amendment to the Prepetition Revolving Loan Agreement that provided for a reduction in the commitments thereunder and extended the maturity date to April 9, 2019.  As a condition precedent to the closing of the amendment, the equity sponsors contributed an additional $10 million in capital to the Company.

     24.    On August 29, 2018, the Company entered into another amendment to the Prepetition Revolving Loan Agreement that further reduced the commitments thereunder, provided for certain accommodations with respect to the financial covenants, and extended the maturity date to July 9, 2019.  As a condition precedent to the closing of the amendment, the equity sponsors contributed an additional $9 million in capital to the Company.

     25.    On April 12, 2019, the Company entered into another amendment to the Prepetition Revolving Loan Agreement that suspended testing under the financial covenants.  As a condition precedent to the closing of the amendment, the equity sponsors contributed an

additional $5 million in capital to the Company and were required to retain Piper Jaffray & Co. ("**Piper**") as financial advisor to solicit interest from new lenders or co-investors and explore potential refinancing options.  Piper's retention was completed in March 2019, and the terms of the engagement were amended in December 2019 to reflect current circumstances and to remove certain provisions no longer relevant to the Company's financing process.

26.    In April 2019, Piper began investor outreach (the "**Refinancing Effort**") in connection with the Company's refinancing effort, which included contacting approximately ninety (90) potential investors.  A confidential information memorandum and financial model were prepared and made available to potential investors who signed a non-disclosure agreement.  Then in November 2019, Piper launched a second capital raising process featuring an updated confidential information memorandum, financial model, and other due diligence information for parties who signed a non-disclosure agreement. In this process, Piper reached out to approximately seventy-five (75) potential capital providers (some of which were contacted and active during the first round of outreach as well).  Ultimately, the Company received three (3) proposals across both rounds of outreach.  The Company considered the proposals and ultimately determined not to proceed with any proposal, given none were for an amount of capital sufficient to refinance its existing indebtedness.

27.    In May 2019, the Company informally engaged Deutsche Bank Securities Inc. ("**Deutsche Bank**") as their investment banker to assist the Company in exploring potential strategic transactions, including a potential sale of substantially all of the Company's assets (the "**Sale Process**"), as an alternative to the Refinancing Effort.  Also in May, Deutsche Bank held introductory meetings with two major retailers to discuss a potential sale.

28.     In June 2019, the Company formally engaged Deutsche Bank as their investment banker.  Beginning in September 2019, Deutsche Bank contacted forty-one (41) parties, consisting of eighteen (18) financial buyers and twenty-three (23) strategic buyers, concerning a potential purchase of all or a portion of the Company's assets.  A confidential information memorandum and financial model were prepared and made available to twenty-two (22) potential investors who signed a non-disclosure agreement, from September through December.  In November 2019, Deutsche Bank delivered management presentations to two potential investors.  One of the investors later submitted a proposal to the Company for the purchase of a significant portion of the Company's assets and held advanced negotiations with the Company to provide a going-concern bid.  However, as discussed in further detail below, these negotiations ultimately proved unsuccessful.

29.     In addition to the Refinancing Effort and Sale Process undertaken by Piper and Deutsche Bank, respectively, the Company engaged FTI in July 2019 to provide certain financial advisory services and to assist the Company with an analysis of their capital needs and the development and implementation of budgeting and other operational initiatives to improve financial performance and liquidity.  On July 16, 2019, the Company also entered into another amendment to the Prepetition Revolving Loan Agreement providing for suspension of testing under certain financial covenants, permitting the Company to enter into the Prepetition Term Loan Agreement, which provided the Company with an additional $14.8 million in capital, and extending the maturity date to December 31, 2019.

30.     In November 2019, the Company engaged Young Conaway Stargatt & Taylor, LLP ("**Young Conaway**") as counsel in connection with a potential out-of-court restructuring or chapter 11 filing.

31.     In December 2019, facing tightening liquidity and the imminent maturity of the Prepetition Revolving Loan Obligations, the Company initiated the sale of [five (5)] of its underperforming stores.  The proceeds of these sales, as well as other cost-saving operational initiatives, provided the Company with sufficient liquidity to continue canvassing the market for potential strategic partners for a refinancing or going concern sale.

   *iii.*  *The Store Closing Sales*

32.     As discussed above, the Debtors negotiated tirelessly with potential acquisition partners with respect to agreements for the sale of substantially all of the Debtors' store locations as a going concern.  On January 8, 2020, the Debtors received a non-binding term sheet from a potential purchaser (the "**Potential Bidder**") for the acquisition of thirty-three of the Debtors' stores as well as the Debtors' Headquarters operations.  The Debtors and Potential Bidder engaged in significant additional negotiations and conducted various rounds of additional diligence in the subsequent weeks, including an in-person meeting at the Debtors' Headquarters on January 28, 2020 in hopes of finalizing the terms of a definitive agreement.  However, late in the day on January 29, 2020, the Potential Bidder advised the Debtors that it was no longer interested in any transaction to acquire the Debtors' assets as a going concern.

33.     At the same time as the Debtors were negotiating with the Potential Bidder, the Debtors also had reached out to four nationally recognized liquidation firms so that such parties could provide proposals for the liquidation of the inventory at the Debtors' stores in the event that the Sale Process was not consummated.  The Debtors provided the liquidation firms with access to a data room with all of the relevant information necessary to build a liquidation model and for the liquidation firms to evaluate the potential transaction. The Debtors obtained two proposals from liquidators.

34.    Swiftly after obtaining notice from the Potential Bidder that it no longer intended to pursue a going-concern bid, the Debtors retained Malfitano Advisors, LLC ("**Malfitano**") on January 30, 2020 to serve as asset disposition advisor and consultant to negotiate optimal liquidation proposals from the liquidators.  The Debtors, through Malfitano, sent a request for proposals ("**RFP**") to the bidding groups, providing the deadline to submit final, binding bids and related materials (the "**Bid Deadline**").  The RFP set forth particular instructions for submitting bids, including the structure and format for such bids.  After evaluating the bids and providing each of the bidders with the opportunity to submit their best and final proposals, the Debtors determined that the bid submitted by a contractual joint venture comprised of Hilco Merchant Resources, LLC and Gordon Brothers Retail Partners, LLC (together, the "**Agent**") was in the best interests of the Debtors and their estates.  The Debtors made this determination after considering numerous factors, including, but not limited to, (i) the Agent's prior experience handling the liquidation of various similar retailers, (ii) the amount and experience of supervisors designated by the Agent to handle the project, (iii) potential upside that could be realized under a "fee" based structure, (iv) the ability of the Agent to source and supplement the Debtors' inventory with staples such as milk, bread, eggs, meat, *etc.* (the "**DSD Merchandise**"), and (v) overall economics.  The Debtors and the Agent entered into that certain Consulting Agreement (the "**Consulting Agreement**") on January 30, 2020 and store-closing sales began on February 3, 2020.

35.    In short, the Debtors determined that entering into the Consulting Agreement and commencing store closing sales immediately was essential to ensure that the liquidation of the Store Assets is managed efficiently and effectively.  This became even more important when, on January 31, 2020, the Debtors' largest supplier advised them that it would no longer be shipping goods to the Debtors on account of the unpaid balances owed.  The lack of new

supply in the closing stores created additional pressure to engage a third-party liquidator like the Agent who has the ability to immediately source and supplement the Debtors' inventory with DSD Merchandise.

36.     The Debtors negotiated the terms and conditions of the Consulting Agreement in good faith and at arms' length, and entered into the Consulting Agreement on January 30, 2020.  In order to avoid, among other potential negative outcomes, a disorganized "self-liquidation" scenario, *i.e.*, a scenario in which more desirable items sell faster than items with a slower turnover, the closing sales began on February 3, 2020.

37.     The Debtors anticipate that, given the nature of the Debtors' inventory, the closing sales will take less than a month to complete.  By moving expediently, the Debtors hope to maximize overall recovery for the estates while minimizing the Debtors' liabilities.  In addition, the Debtors intend to seek authority to engage A&G Realty Partners, LLC to help the Debtors market and sell locations and Hilco IP Services, LLC d/b/a Hilco Streambank to market and sell the Debtors' intellectual property.

**D.      Objectives for Chapter 11**

38.     Unfortunately, due to the challenges discussed herein, the Company has been unable to service its senior secured debt obligations in the ordinary course and is facing near-term liquidity issues.  To address these challenges, and in an effort to maximize value for the benefit of their creditors and other stakeholders, the Company and their professional advisors, after considering all available strategic options, determined that the best course to maximize value was to initiate the Chapter 11 Cases with the goal of (i) conducting store closing sales at the Debtors' retail locations pursuant to the Consulting Agreement; (ii) realizing potential value from the

balance of the Debtors' assets for the benefit of their creditors; and (iii) minimizing estate obligations to the extent possible.

39.     In addition, to avoid incurring any unnecessary administrative expenses with respect to certain facilities where the Debtors are no longer operating and retain no assets of value, the Debtors have sought to reject the related leases *nunc pro tunc* to the Petition Date.  The Debtors will also take a number of steps to reduce their expenses moving forward, including filing additional contract and lease rejection motions, pursuant to which the Debtors will seek to reject store leases and contracts that the Debtors and their advisors have determined are unlikely to be assumed and assigned and will no longer be necessary to the Debtors' business operations.

40.     Finally, as the Chapter 11 Cases progress, the Debtors will continue to analyze their asset portfolio and available disposition alternatives with respect to all available assets to preserve and maximize estate value.

**E.     Support for Relief Requested in First Day Motions**

41.     Concurrently with the filing of their chapter 11 petitions, the Debtors filed a number of First Day Motions seeking relief that the Debtors believe is necessary to enable them to maximize the value of their estates while the Chapter 11 Cases are pending.  The facts set forth in the First Day Motions are incorporated herein in their entirety.

42.     I am familiar with the contents of each First Day Motion (including the exhibits to such motions) and believe that the relief sought in each First Day Motion:  (i) will enable the Company to transition into chapter 11; (ii) is critical to the Company's efforts to maximize value through the Chapter 11 Cases and minimize expense; and (iii) best serves the interests of the Company's creditors and other stakeholders.  It is my further belief that the relief

sought in the First Day Motions is, in each case, narrowly tailored and necessary to achieve the goals identified above.

43.    The Debtors are seeking approval of the First Day Motions to ensure that value is preserved during the transition into chapter 11.

44.    To this end, the Debtors have filed the following First Day Motions:

  i.    *Debtors' Motion for an Order Authorizing the Joint Administration of the Debtors' Chapter 11 Cases;*

  ii.   *Debtors' Application for Entry of an Order (I) Approving the Retention and Appointment of Epiq Corporate Restructuring, LLC as the Claims and Noticing Agent to the Debtors, Effective* Nunc Pro Tunc *to the Petition Date and (II) Granting Related Relief;*

  iii.  *Debtors' Motion for Interim and Final Orders (I) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Utility Services, (II) Deeming Utility Companies Adequately Assured of Future Payment, (III) Establishing Procedures for Determining Additional Adequate Assurance of Payment, and (IV) Setting a Final Hearing Related Thereto;*

  iv.   *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Payment of Prepetition Obligations Incurred in the Ordinary Course of Business in Connection with Insurance Programs, Including Payment of Policy Premiums, and (II) Authorizing Banks to Honor and Process Check and Electronic Transfer Requests Related Thereto;*

  v.    *Debtors' Motion for Entry of Interim and Final Orders Authorizing (I) the Debtors to Pay Certain Prepetition Taxes and Fees and Related Obligations and (II) Banks to Honor and Process Check and Electronic Transfer Requests Related Thereto;*

  vi.   *Debtors' Motion for an Order (A) Authorizing (I) Payment of Prepetition Employee Wages, Salaries and Other Compensation; (II) Reimbursement of Prepetition Employee Business Expenses; (III) Contributions to Prepetition Employee Benefit Programs and Continuation of Such Programs in the Ordinary Course; (IV) Payment of Workers' Compensation Obligations; (V) Payments for Which Prepetition Payroll Deductions Were Made; (VI) Payment of All Costs and Expenses Incident to the Foregoing Payments and Contributions; and (VII) Payment to Third Parties of All Amounts Incident to the Foregoing Payments and Contributions; and (B) Authorizing Banks to*

*Honor and Process Check and Electronic Transfer Requests Related Thereto;*

vii.  *Debtors' Motion for an Order Authorizing (I) the Debtors to Honor Prepetition Obligations Related to Customer Programs and Otherwise Continue Customer Programs in the Ordinary Course of Business and (II) Banks to Honor and Process Check and Electronic Transfer Requests Related Thereto;*

viii.  *Debtors' Motion for Entry of an Order (I) Authorizing and Approving (A) Continued Use of Cash Management System and (B) Use of Prepetition Bank Accounts and Business Forms; (II) Authorizing Banks to Honor Certain Transfers and Charge Certain Amounts; (III) Waiving the Requirements of Section 345(b) of the Bankruptcy Code on an Interim Basis; (IV) Granting Administrative Expense Status to Postpetition Intercompany Claims; and (V) Granting Related Relief;*

ix.  *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Payment of Prepetition Claims Arising Under the Perishable Agricultural Commodities Act and the Packers and Stockyards Act of 1921, and (II) Authorizing Banks to Honor and Process Checks and Electronic Transfer Requests Related to the Foregoing;*

x.  *Debtors' First Omnibus Motion for Entry of an Order Authorizing the Debtors to Reject Certain Unexpired Leases* Nunc Pro Tunc *to the Petition Date;*

xi.  *Debtors' Motion for Interim and Final Orders (A) Authorizing Postpetition Use of Cash Collateral, (B) Granting Adequate Protection, (C) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001(b), and (D) Granting Related Relief;*

xii.  *Debtors' Emergency Motion for Interim and Final Orders (A)(1) Confirming, on an Interim Basis, that the Store Closing Agreement Is Operative and Effective and (2) Authorizing, on a Final Basis, the Debtors to Assume the Store Closing Agreement, (B) Authorizing and Approving Store Closing Sales Free and Clear of All Liens, Claims, and Encumbrances, (C) Approving Dispute Resolution Procedures, (D) Authorizing Customary Bonuses to Employees of Closing Stores, and (E) Approving the Debtors' Store Closing Plan.*

45.     I have reviewed each of the First Day Motions, and the facts stated therein

are true and correct to the best of my belief with appropriate reliance on corporate officers and

advisors.  It is my belief that the relief sought in each of the First Day Motions constitutes a critical

element in the successful implementation of the Debtors' efforts to maximize creditor recoveries, is necessary for a smooth transition into Chapter 11 and will help to preserve the value of the Debtors' estates.  It is my further belief that, with respect to those First Day Motions requesting the authority to pay specific prepetition claims or continue selected prepetition programs, *i.e.*, the First Day Motions seeking relief related to the Debtors' obligations to their employees, taxing authorities, vendors, service providers, customers, banks, and insurers, the relief requested is necessary to avoid immediate and irreparable harm to the Debtors' estates.

46.    The success of the Chapter 11 Cases depends upon the Debtors' ability to successfully implement the value-maximizing transactions described herein.  The relief requested in the First Day Motions is a critical component of maintaining business operations and the confidence of key constituencies necessary to implement a successful chapter 11 process.

## CONCLUSION

47.    I believe approval of the relief requested in the First Day Motions is in the best interests of all stakeholders and respectfully request that the Court grant all relief requested in the First Day Motions and such other relief as may be just.

Dated:  February 4, 2020

*/s/ Charles Goad*

Charles Goad
Chief Restructuring Officer

25666160.12

**EXHIBIT A**

**Organizational Chart**

```
┌─────────────────────────────────────┐
│   EF Investment Holdings, Inc.,      │
│     a Delaware corporation           │
└─────────────────────────────────────┘
                  │  100%
┌─────────────────────────────────────┐
│        Earth Fare, Inc.,             │
│       a North Carolina               │
│          corporation                 │
└─────────────────────────────────────┘
```