# EXHIBIT 1

# MEMORANDUM OF LEASE

Instrument Prepared And Recording Requested By:

Marion M. Goodyear, P.A.
101 N. Main Street, Suite 1502
Greenville, SC 29601
Attention: Marion M. Goodyear, Esq.

After Recording, Return to:

Marion M. Goodyear, P.A.
101 N. Main Street, Suite 1502
Greenville, SC 29601
Attention: Marion M. Goodyear, Esq.

MEMORANDUM OF LEASE, dated ___March 21___, 2008, by and between TURNHART ACQUISITION CORPORATION, a ___Virginia___ corporation ("Landlord"), and EARTH FARE, INC., a North Carolina corporation ("Tenant"), covering that certain premises (the "Premises") described on the Site Plan attached hereto as Exhibit "A" located in the shopping center (the "Shopping Center") located in the City of Boone, County of Watauga, State of North Carolina, which Shopping Center is more particularly described on Schedule "B", attached hereto and made a part hereof by reference.

AGREEMENT

1.    For good and valuable consideration, Landlord leases the Premises, together with all easements, rights, improvements and appurtenances thereto, to Tenant and Tenant hires the same from Landlord for the term and under the provisions contained in the unrecorded Lease dated __March 21__, 2008 between Landlord and Tenant (the "Lease").

2.    The terms, provisions, covenants, conditions and agreements set forth in said Lease are by this reference incorporated herein.

3.    As a material inducement for Tenant to execute this Lease, Landlord covenants, represents, warrants and agrees that no portion of the Shopping Center (excluding the Premises and/or the pharmacy in operation  within the Shopping Center as of the date hereof), or any expansion thereof, as same is now and may hereafter be constituted, shall be used as or for the purpose of a grocery store, natural foods store, natural pharmacy, health food store, coffee shop, restaurant, health food restaurant, delicatessen, or a store with a department selling groceries, meats, fish, fruits, vegetables, produce, dairy products, health and beauty aids, health care products, cosmetic, beer and/or deli items, provided, however that neither (i) a self-serve caf9; deli-sandwich shop or bakery with less than 2,500 square feet, nor (ii) a sit-down casual dining restaurant with wait staffs shall be prohibited hereunder. Landlord represents and warrants to Tenant Landlord has not heretofore leased any other space within the Shopping Center for such use, nor does any other lease affecting any other space within the Shopping Center permit such other space to be used for such use. The parties agree that in the event of any breach of this covenant at any time during the term of this Lease, the total actual damages proximately resulting to Tenant therefrom will be extremely difficult or impractical to ascertain. Therefore,  Tenant, at Tenant's election, may in the event of any such violation during the continuance of such violation: (a) cease the payment of Minimum Annual Rent, percentage rent and all other charges due Landlord from Tenant hereunder; or (b) terminate this Lease at any time during the continuance of such violation upon thirty (30) days' written notice to Landlord. In addition to the above remedies, and due to the nature of the violation, Tenant may also seek any and all other appropriate and available legal and/or equitable relief.

4.    The term of the Lease will commence on June 1, 2010 and shall end on May 31, 2015. Tenant has the right to extend the term of the Lease for two (2) consecutive options of five (5) years each.

5.    This Agreement is executed for recording purposes only and is not intended to be a summary of the Lease, and is subject to the terms of that said Lease. In the event of conflict between this Agreement and the said Lease, the said Lease shall control.

6.    This Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective heirs, representatives, successors and assigns.

        IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first above written.

**LANDLORD:**                                    **TENANT:**

**TURNHART ACQUISITION CORPORATION,**            **EARTH FARE, INC.,**
a _Virginia_ **corporation**                      **a North Carolina corporation**

BY: _Douglas R Ratliff_                          BY: _[signature]_

ITS: _President_                                 ITS: _CEO_


BY:_____                       BY:_____

ITS:_____                      ITS:_____


[ALL SIGNATURES REQUIRED HEREON MUST BE NOTARIZED]

State of NORTH CAROLINA  )
  ) ss
County of __Henderson__  )

    On this __21st__ day of __March_____, 2008 before me, __Mindy J.__ __Harvey_____, the undersigned Notary Public, personally appeared __John E.__ __Murphy_____, personally known to me as the person who executed the <u>Memorandum of Lease</u> as __CEO_____, of Earth Fare, Inc., a North Carolina corporation; and the foregoing instrument for the purposes therein contained, by signing the name of the corporation by himself as such officer.

    IN WITNESS WHEREOF, I hereunto set my hand and official seal the day and year aforesaid.

[SEAL]                  __Mindy Harvey_____
                      Notary Public     comm exp 9/25/11

----------------------------------------------------------------

State of ___Virginia_____  )
  ) ss
County of ___Tazewell_____  )

    On this __26th__ day of ___March_____, 2008 before me, __Deborah C.__ __Fields_____, the undersigned Notary Public, personally appeared __Douglas R.__ __Ratliff_____, personally known to me as the person who executed the Memorandum of Lease as __President_____, of Turnhart Acquisition Corporation, a ___Virginia___ corporation; and the foregoing instrument for the purposes therein contained, by signing the name of the corporation by himself as such officer.

    IN WITNESS WHEREOF, I hereunto set my hand and official seal the day and year aforesaid.

[SEAL]                  __Deborah C. Fields_____
                      Notary Public
                      My Commission Expires: 2/28/11

**Schedule "A"**

Tenant Name:_____

Premises:

# LEASE AGREEMENT

## BETWEEN

## TURNHART ACQUISITION CORPORATION

## "LANDLORD"

## AND

## EARTH FARE, INC., A NORTH CAROLINA CORPORATION

## "TENANT"

## TABLE OF CONTENTS

**ARTICLE**                                                                                              **PAGE**

1    FUNDAMENTAL LEASE PROVISIONS.................................................................................1
2    PREMISES...................................................................................................................................2
3    TERM ..........................................................................................................................................2
4    RENTAL .......................................................................................................................................3
5    USE OF PREMISES ....................................................................................................................5
6    CONSTRUCTION OF PREMISES .............................................................................................5
7    TAXES..........................................................................................................................................6
8    INSURANCE ...............................................................................................................................8
9    UTILITIES....................................................................................................................................9
10   PARKING AND COMMON AREAS ..........................................................................................9
11   REPAIR AND MAINTENANCE ...............................................................................................13
12   ALTERATIONS..........................................................................................................................14
13   MECHANICS' LIENS ...............................................................................................................14
14   DAMAGE AND DESTRUCTION.............................................................................................14
15   EMINENT DOMAIN .................................................................................................................15
16   TENANT'S DEFAULT ...............................................................................................................16
17   LANDLORD'S DEFAULT..........................................................................................................16
18   SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT ......................................16
19   ASSIGNMENT AND SUBLETTING........................................................................................17
20   INDEMNIFICATION.................................................................................................................18
21   QUIET POSSESSION AND TITLE OF LANDLORD .............................................................19
22   SIGNS AND PROMOTIONS.....................................................................................................19
23   WARRANTY AGAINST EXCLUSIVES ..................................................................................19
24   RESTRICTIVE COVENANT.....................................................................................................20
25   CO-TENANCY ...........................................................................................................................20
26   HOLDING OVER .......................................................................................................................20
27   REMOVAL OF FIXTURES AND PERSONAL PROPERTY ...................................................20
28   HAZARDOUS MATERIALS .....................................................................................................21
29   FORCE MAJEURE .....................................................................................................................22
30   NOTICE ......................................................................................................................................23
31   MISCELLANEOUS....................................................................................................................23


**EXHIBITS**

Exhibit A     - Site Plan of the Shopping Center
Exhibit B     - Legal Description of the Shopping Center
Exhibit C     - [Intentionally Deleted]
Exhibit D     - Delivery Condition
Exhibit E     - [Intentionally Deleted]
Exhibit F     - Subordination, Non-Disturbance and Attornment Agreement
Exhibit G     - Tenant's Sign Plan
Exhibit H     - Estoppel Certificate
Exhibit I     - Memorandum of Lease

THE SUBMISSION OF THIS DOCUMENT FOR EXAMINATION AND NEGOTIATION DOES NOT CONSTITUTE AN OFFER TO LEASE. THIS DOCUMENT BECOMES EFFECTIVE AND BINDING ONLY UPON EXECUTION AND DELIVERY HEREOF BY TENANT. NO ACT OR OMISSION OF ANY EMPLOYEE OR AGENT OF TENANT OR OF TENANT'S BROKER, IF ANY, SHALL ALTER, CHANGE OR MODIFY ANY OF THE PROVISIONS HEREOF.

# LEASE

THIS LEASE is made as of this day of <u>March 21,</u> 2008, by and between <u>TURNHART ACQUISITION CORPORATION</u> ("Landlord"), and **EARTH FARE, INC., a North Carolina Corporation** ("Tenant").

In consideration of the rents and covenants hereinafter set forth, Landlord hereby leases to Tenant and Tenant hereby rents from Landlord the following described real property and improvements, hereinafter called the "Premises", upon the following terms and conditions:

1. **FUNDAMENTAL LEASE PROVISIONS**

   1.1    This Article 1 is an integral part of this Lease and all of the terms, dates and requirements set forth in this Article 1 are incorporated in this Lease in all respects. In addition to the other provisions which are elsewhere defined in this Lease, the following terms, whenever used in this Lease, shall have the meanings set forth in this Article 1, subject to adjustments thereto or more detailed definitions set forth elsewhere in this Lease. If there is any conflict between any of the Lease provisions set forth in this Article 1 and any other provisions of this Lease, the latter shall control.

   1.2    <u>Premises:</u>    _____

   |  |  |
   |---|---|
   | Address: | 510 E. King Street |
   | City: | Boone |
   | County: | Watauga |
   | State: | North Carolina |

   Floor Area of Premises: 21,240 square feet illustrated on Exhibit "A".
   (ARTICLE 2)

   1.3    <u>Term:</u>

   Initial Term:    Commencing on June 1, 2010 and ending May 31, 2015
   Option Terms:  Two (2) consecutive terms of five (5) years each
   (ARTICLE 3)

   1.4    <u>Minimum Annual Rent:</u>

   The Minimum Annual Rent shall commence on June 1, 2010 (the "Rent Commencement Date") and shall be:

   Lease Years 1-5: $185,850.00/yr.; $15,487.50/mo.   8.75
   OPTION 1(Lease Years 6-10):$212,400.00/yr.; $17,700.00/mo. 10
   OPTION 2(Lease Years 11-15):$233,640.00/yr.; $19,470.00/mo. 11
   (ARTICLE 4)

   1.5    <u>Percentage Rent:</u>    One and one-half percent (1.5%) of Tenant's Gross Sales in each Lease Year in excess of $10,000,000.00. (ARTICLE 4)

   1.6    <u>Pylon Sign Rights:</u>    (ARTICLE 22)

   1.7    <u>Address For Notices:</u>

   To Landlord:    Turnhart Acquisition Corporation
                   <u>2506 South Front Street</u>
                   <u>Richlands, VA  24641</u>
                   <u>Attn:  Douglas R. Ratliff, President</u>

   To Tenant:      Earth Fare, Inc.
                   145 Cane Creek Industrial Park Drive, Suite 150
                   Fletcher, North Carolina 28732
                   Attn:  _____,
                         Title: _____
   (ARTICLE 30)

2. **PREMISES**

   The "Premises" demised and leased hereunder are described in Article 1 hereof and are cross-hatched, outlined or otherwise shown or marked on the Site Plan (the "Site Plan") attached hereto as Exhibit "A" and incorporated herein by this reference, and include the non-exclusive right to use all

parking areas, driveways, sidewalks, roads, alleys and means of ingress and egress and other common areas available to the tenants of the Shopping Center (as hereinafter defined). If the square footage of the Premises is less than that stated on Page 1 hereof, a proportionate reduction shall be made to the rents and other charges due Landlord from Tenant hereunder. The Premises, together with and including other property owned by Landlord, comprise a shopping center and commercial development referred to hereinafter and throughout this Lease as the "Shopping Center". The legal description of the Shopping Center is attached as Exhibit "B" and incorporated herein by this reference. The general layout showing, among other things, the buildings and other improvements which comprise the Shopping Center are also shown on Exhibit "A".

3.   **TERM**

3.1    The initial term of this Lease (the "Initial Term") shall commence on June 1, 2010 and shall be of the duration set forth in Article 1.

3.2    Tenant is hereby granted two (2) consecutive options to extend the Initial Term of this Lease as set forth in Article 1 hereof by giving to Landlord written notice of its exercise of each such option at least ninety (90) days before the expiration of the Initial Term, or prior option term, as the case may be.

4.   **RENTAL**

4.1    Tenant covenants and agrees to pay as rental for the use and occupancy of the Premises, at the times and in the manner hereinafter provided, the following sums:

A.    Minimum Annual Rent: Minimum Annual Rent as set forth in Article 1 hereof is payable in twelve (12) equal monthly installments, in advance, on the first day of each calendar month during each year of the term of the Lease.

B.    Percentage Rent: In addition to the Minimum Annual Rent, Tenant shall pay to Landlord for each "Lease Year" (as hereinafter defined) a percentage rental equal to the amount that the percentage rent set forth in Article 1 multiplied by "Gross Sales" (as hereinafter defined) exceeds the Minimum Annual Rent attributable to such period. Such percentage rent shall be computed and payable annually, within sixty (60) days after the end of each Lease Year. Within sixty (60) days after the end of each Lease Year, Tenant shall submit to Landlord a statement indicating the amount of its Gross Sales for said Lease Year. Tenant shall accompany such statement with a payment of the percentage rental due, if any.

4.2    "Gross Sales" is defined as the selling price of all merchandise sold in or from the Premises by Tenant, its subtenants, licensees and concessionaires, whether for cash or for credit, excluding, however, the following:

A.    The sales price of all merchandise returned and accepted for full credit or the amount of the cash refund or allowance made thereon;

B.    The sums and credits received in settlement of claims for loss or damage to merchandise;

C.    The difference between the sales price of all merchandise purchased by credit card and the actual amount received by Tenant from the credit card issuer.

D.    Sales taxes, so called luxury taxes, excise taxes, gross receipt taxes and other taxes now or hereafter imposed upon the sale of merchandise or services, whether added separately to the selling price of the merchandise or services and collected from customers or included in the retail selling price;

E.    Promotional markdown coupons to the extent no consideration is received therefrom;

F.    Receipts from public telephones and vending machines;

G.    Interest, carrying charges or other finance charges in respect of sales made on credit;

H.    Sales of fixtures, trade fixtures or personal property that are not merchandise held for retail sale in the normal course of business;

I.    The proceeds from any sale of all or substantially all of the inventory in the Premises in connection with the sale of all or any part of Tenant's business;

-2-

J.      Sales to employees at discount;

K.      Uncollectible debts;

L.      Transfers of merchandise between stores or to affiliated stores or companies;

M.      Revenue received from delivery or other services performed for minimal or no profit for the benefit of customers;

N.      Revenue received from lottery tickets sanctioned by the state in which the Premises are located;

O.      Service charges on bad checks;

P.      Revenues generated from video games, in-store automated teller machines, telefax, telecopy and photocopy machines or other similar machinery and equipment;

Q.      Accommodation sales such as the sale of postage stamps, government bonds, saving stamps, money orders or similar items;

R.      Receipts from sales of salvage cartons, meat scraps, suet and other salvage merchandise; and

S.      Receipts from sales to hospitals and charitable organizations.

4.3     Tenant shall maintain adequate records for a period of two (2) years after the close of each Lease Year for the purpose of allowing Landlord to verify the reported Gross Sales for such particular Lease Year. At any time within said two (2) year period, Landlord or its agents may inspect such records during normal business hours upon at least seventy-two (72) hours' written notice. In the event an inaccuracy is disclosed and percentage rent is due Landlord, an appropriate adjustment shall be made. In the event Tenant's Gross Sales inaccuracy requires Tenant to pay in excess of three percent (3%) more than Tenant originally paid, then Tenant shall reimburse Landlord for Landlord's actual reasonable expenses incurred in establishing the inaccuracy, up to a maximum of Two Thousand Five Hundred and 00/100 Dollars ($2,500.00).

4.4     Should the Rent Commencement Date occur on a date other than January 1, then the percentage rent, if any, shall be computed based on the following time periods which shall be called "Lease Year" or "Lease Years":

A.      The first Lease Year shall extend from the Rent Commencement Date of the Lease to the first December 31. The computation of percentage rent shall be made as follows:

(i)     The total Gross Sales for the period from the Rent Commencement Date of the Lease to twelve (12) months thereafter shall be totaled and a daily average derived therefrom (the "Average Daily Sales Figure").

(ii)    The Average Daily Sales Figure shall be  multiplied by the number of days from the Rent Commencement Date to the first January 1 of the Lease term.

(iii)   The product of the above calculation shall be the Gross Sales for the first Lease Year.

B.      The second Lease Year shall commence on the first January 1 to occur following the Rent Commencement Date and terminate the following December 31. Thereafter, each Lease Year shall coincide with the calendar year.

C.      The final Lease Year period shall terminate on the termination date of the Lease, if other than December 31. For purposes of computing percentage rent, the Average Daily Sales Figure for the twelve (12) month period prior to the termination date shall be calculated. This figure shall then be multiplied by the number of days that have elapsed since the last December 31 of the Lease term. This figure shall represent Gross Sales for the final Lease Year.

4.5     It is understood and agreed by Landlord that Tenant has made no representations of any kind as to minimum or maximum annual volume of Gross Sales which Tenant may or shall make in any Lease Year during the term of the Lease or whether, when or if Landlord will ever receive any percentage rent from Tenant. Further, nothing herein shall be deemed to be a covenant of Tenant to open, conduct business or continue its business. Landlord agrees not to divulge to any person or persons,

governmental agency, firm or corporation, the amount of retail sales made by Tenant from the Premises or the rent or other charges paid by Tenant pursuant to this Lease, except that Landlord shall be entitled to reveal such information to lenders, bona fide purchasers and/or as may otherwise be required by law.

5. **USE OF PREMISES**

5.1     The Premises may be used and occupied for the operation of a grocery store/supermarket marketing and selling organic and natural groceries and products which may include the display and retail sale of health foods, natural body care and cosmetics, health and beauty aids, beer and wine making materials, beer and wine sales for on and off Premises consumption and the operation of a restaurant selling and serving food for on and off Premises consumption; and any other lawful retail purpose.

5.2     Tenant shall have no obligation to open for business or, if Tenant opens for business, to continuously operate its business in the Premises. Landlord acknowledges that this Lease contains no express or implied covenant by Tenant to conduct business in the Premises, continuously or otherwise, or to operate during any particular hours.

5.3     If Tenant can not operate within the Premises as a grocery store/supermarket marketing and selling organic and natural groceries or products by virtue of a use, ordinance (or similar governmental action) enacted subsequent to the date hereof, this Lease, effective as of the date of such determination, shall be, and shall be deemed to be, at Tenant's election, void and of no further force or effect and Tenant shall have no further obligations hereunder.

6. **DELIVERY CONDITION; CONSTRUCTION OF PREMISES**

Landlord previously has constructed the Premises and the other buildings and parking and common areas surrounding same on the Shopping Center property as shown on Exhibit "A". Landlord covenants and agrees that as of the Rent Commencement Date, the Shopping Center shall be in Delivery Condition (as defined in Exhibit "D", attached hereto) and the common areas of the Shopping Center conform in all material respects to all laws, orders, ordinances, rules, regulations and orders including, but not limited to, all applicable building and zoning codes of all governmental authorities having jurisdiction thereover ("Governmental Requirements"). Further, during the term of this Lease, Landlord shall, at Landlord's expense, comply with all Governmental Requirements, including any governmental retrofit orders, present or future, with regard to the Shopping Center and the Premises except those applicable to Tenant's specific use of the Premises.

7. **TAXES**

7.1     Landlord shall pay, on or before the due date, all taxes levied or assessed against the Shopping Center, including the Premises and shall promptly deliver to Landlord evidence of the satisfied taxes. Commencing on the Rent Commencement Date, Tenant shall reimburse Landlord its Pro-Rata Share (as hereinafter defined) of ad valorem real estate taxes ("Real Estate Taxes") levied and paid by Landlord upon the Shopping Center for each tax year during the term of this Lease. Such Real Estate Taxes shall be payable within thirty (30) days after receipt by Tenant of a true copy of the actual real estate tax bill and a statement in writing from Landlord setting forth the amount of Tenant's Pro-Rata Share. In no event shall Tenant be obligated to pay Landlord Tenant's Pro-Rata Share of Real Estate Taxes more than thirty (30) days before delinquency. Under no circumstances shall Tenant be liable for any interest, penalty or surcharge of any kind if Landlord has failed to timely pay such Real Estate Taxes. As used herein, "Tenant's Pro-Rata Share" shall mean that fraction of which the numerator is the number of square feet of Floor Area in the Premises as set forth in Article 1 and the denominator of which is the total gross leasable square feet in the entire Shopping Center. Such computation shall be made separately for each tax year. In the event any portion of the Shopping Center is separately assessed and any tenant or other occupant of the Shopping Center is obligated to pay such separate assessment, then the amount of any such separate assessed parcel shall be excluded from the total Real Estate Taxes of the Shopping Center and the total gross leasable square feet of such separately assessed parcel shall be excluded in determining Tenant's Pro-Rata Share of Real Estate Taxes. In the event any Real Estate Taxes may be paid in installments, Landlord agrees to pay same in installments over the longest period of time permitted by law and Tenant shall pay its Pro-Rata Share of only those installments which shall be properly allocable to the term of this Lease. Any such installments due and payable in the years in which the term of this Lease commences or terminates shall be prorated proportionately.

7.2     Tenant shall pay, prior to delinquency, any and all personal property taxes levied against Tenant's leasehold improvements, fixtures, equipment, furniture and other personal property located within the Premises. In the event such taxes are levied against Landlord or together with personal property owned by Landlord, Tenant shall pay Tenant's just and proportionate share thereof within twenty (20) days after Tenant's receipt of a tax bill therefor and an itemized breakdown of the items included therein, together with a statement from Landlord as to the amount of Tenant's share thereof.

7.3     Excluded from Real Estate Taxes to which Tenant contributes shall be any increase in Real Estate Taxes caused by improvements for other tenants and any assessments, special or otherwise, including, but not limited to, assessments incurred or levied as a result of the initial development and any subsequent redevelopment of the Shopping Center. In addition, Real Estate Taxes to which Tenant is obligated to contribute shall be reduced by (i) any amounts paid toward such taxes by third parties (excluding tenants) who may use all or a portion of the Shopping Center, and (ii) any abatements, refunds or rebates made thereof and any discounts available to Landlord with respect thereto. Real Estate Taxes shall include any additional real property taxes assessed as a result of Tenant's improvements to the Premises.

7.4     Any rebates, refunds or abatements of Real Estate Taxes received by Landlord subsequent to payment of taxes by Tenant shall be refunded to Tenant on a pro-rata basis within twenty (20) days of receipt thereof by Landlord.

7.5     Tenant shall have the right to contest the validity or amount of Real Estate Taxes either in its own name or in the name of Landlord, in either case with Landlord's full cooperation, but at no expense to Landlord. Any resultant refund, rebate or reduction shall be used first to repay the expenses of contesting such taxes.

7.6     Nothing contained in this Lease shall be deemed or construed to require Tenant to pay or discharge any tax which may be levied upon the income, profits, rental, gross receipts or business of Landlord or any personal property taxes, franchise, inheritance or estate taxes which may be levied against the estate or interest of Landlord.

8.     **INSURANCE**

8.1     Landlord shall maintain at all times during the term of this Lease a policy or policies of Special Form Property Insurance on all buildings and other improvements in the Shopping Center. Such insurance shall be in the full amount of one hundred percent (100%) replacement value, without deduction for physical depreciation, against all risks normally covered by such a policy or policies. Such policy or policies shall provide a maximum deductible of Ten Thousand Dollars and No/100 ($10,000.00) and the proceeds of said policy or policies shall be used, to the extent necessary and required, for repair and reconstruction of the Shopping Center and the Premises as required by this Lease notwithstanding anything to the contrary contained in any mortgage, deed of trust, deed to secure debt or other security instrument which may at any time be in lien upon the Shopping Center.

8.2     Landlord shall at all times during the term hereof keep in force a combined single limit policy or policies of Commercial General Liability Insurance or an endorsement on a blanket liability insurance policy or policies insuring against any and all damages and liability on account of, or arising out of, injuries or damage to persons or property within the Shopping Center, in the amount of Three Million and 00/100 Dollars ($3,000,000.00) on an occurrence basis.

8.3     Commencing on the Rent Commencement Date, Tenant shall reimburse Landlord for its proportionate share of the premium costs of the insurance described in Sections 8.1 and 8.2 above within twenty (20) days after receipt by Tenant of a true copy of the insurance premium billing therefor and a statement in writing from Landlord setting forth the amount of Tenant's proportionate share. Tenant's proportionate share shall be that certain fraction the numerator of which is the number of square feet of Floor Area in the Premises as set forth in Article 1 and the denominator of which is the total gross leasable square feet in the entire Shopping Center or improved structure covered by the insurance policy which is the subject of the premium, whichever is applicable; provided, however, that in no event shall Tenant's proportionate share of the cost of such insurance include any contribution toward earthquake or flood coverage. Tenant shall be named as an additional insured on all policies of insurance for which Tenant is obligated to pay its proportionate share pursuant to the requirements of this Section 8.3.

8.4     Tenant shall at all times during the term hereof be self-insured for, or maintain in effect a policy or policies of insurance covering, its leasehold improvements, trade fixtures, equipment, merchandise and other personal property located within the Premises, together with storefront plate glass, against any peril customarily covered by standard Special Form Property Insurance.

8.5     Tenant shall at all times during the term hereof keep in force a combined single limit policy of liability insurance, or an endorsement on a blanket liability insurance policy or policies, against any and all damages and liability on account of, or arising out of, injuries or damage to persons or property in the Premises, resulting from acts or omissions of Tenant, its agents or representatives, in the amount of at least Three Million and 00/100 Dollars ($3,000,000.00).

8.6     Landlord and Tenant each agree to deliver to the other certificates of insurance evidencing the existence in force of the policies of insurance described in this Article 8 upon the written request of the other party.  All of the policies of insurance required to be maintained hereunder shall be

issued by an insurer licensed to do business within the state in which the Premises are located, which insurer is rated "A-X" or better in Best's Insurance Reports and which certificate shall provide that such insurance shall not be canceled or materially amended unless ten (10) days' prior written notice of such cancellation or amendment is given to the other party.

8.7     During the term hereof, Landlord covenants to maintain the insurance required under Sections 8.1 and 8.2 hereof at rates which are comparable for similar shopping centers located in the county in which the Shopping Center is located.

8.8     A.     Tenant, on behalf of itself and its insurer(s), hereby waives and releases any and all right of recovery against Landlord, including Landlord's employees and agents, arising during the term of this Lease, for any and all loss or damage to any property located within the Premises, which loss or damage arises from the perils required to be insured against by Tenant under Section 8.4 hereof.

B.     Landlord, on behalf of itself and its insurer(s), hereby waives and releases any and all right of recovery against Tenant, including Tenant's employees and agents, arising during the term of this Lease, for any and all loss or damage to the Premises or Shopping Center, which loss or damage arises from perils actually insured or required to be insured against by Landlord under Section 8.1 or 8.2 hereof.

C.     Landlord and Tenant shall give written notice to its insurers of the provisions of this waiver and release and have its insurance policies endorsed to prevent invalidation of insurance coverage by reason of this waiver and release. Should an insurer of one party require an additional premium or cost in consideration of inclusion of the endorsement, it will be the responsibility of the party benefitting therefrom to pay such additional costs and, if not paid, such benefitting party will lose the benefit of this Section 8.8.

9.     **UTILITIES**

Tenant shall pay for all water, gas, power and electric current and all other utilities used by Tenant on the Premises. Landlord agrees that the Premises shall have readily available to it electric, water, gas, telephone, sewerage and other necessary utility lines, as well as refuse  collection service, all sufficient to adequately service Tenant's needs, but in no event of less capacity than as may be required by law or regulation.

10.     **PARKING AND COMMON AREAS**

10.1     The Premises are a part of the Shopping Center depicted on Exhibit "A" which includes parking areas, landscaping and other areas and facilities intended for the common use of the occupants of the Shopping Center and their agents, employees and customers. Tenant, as well as its agents, employees and customers, shall have the non-exclusive right to use all such areas which are collectively referred to herein as "common areas". To the extent expressly provided below, Tenant at Tenant's expense shall maintain all such common areas in good condition, repair and cleanliness (normal wear and tear excepted: Sweeping the driveways and parking areas of the Shopping Center and keeping the common areas in a reasonably clean condition (but in no event shall Tenant be responsible for removing trash or other waste generated by other tenants of the Shopping Center).

If in Tenant's reasonable opinion the parking lots and/or driveways of the Shopping Center need to be repaved, capped or overlayed, the Tenant shall be responsible for completing such work. Tenant shall be responsible for Tenant's Pro Rata Share of such work and shall bill Landlord for the balance of such cost. Landlord shall pay such balance within thirty (30) days of the date of receipt of Tenant's bill. If Landlord fails to pay Tenant's bill within the time provided herein, Tenant may, in addition to any other remedies available to it, offset the amount due from Landlord against Minimum Annual Rent until such billing is satisfied.

In no event shall Tenant have any responsibility for any other maintenance activities with respect to the Shopping Center including, without limitation, maintaining, repairing or replacing (i) any other building which comprises a part of the Shopping Center; (ii) any utilities which serve the Shopping Center or any part thereof; or (iii) the portion of the building which contains the Premises which are the responsibility of Landlord pursuant to Section 11.2 hereof. In no event shall Tenant be responsible for causing the common areas of the Shopping Center to be in compliance with applicable Governmental Requirements.

10.2     Landlord covenants that during the term, the Shopping Center shall be operated as a single mercantile unit, and that no buildings, structures, improvements, fences, barriers or other obstructions, except improvements which are incidental to the operation and maintenance of the common areas, shall be placed, constructed or maintained in the Shopping Center except as currently depicted on Exhibit "A". Landlord shall keep all walkways, driveways, doorways, parking areas, and other common areas open and accessible at all times, except for temporary closing to make repairs, maintain and

resurface. In no event shall: (a) the number of parking spaces available for cars be reduced below the parking spaces shown on the Site Plan; (b) there be any interference in the access to the Premises from the abutting public thoroughfares and/or the common areas; and/or (c) the visibility of the Premises from the common areas and/or from the abutting public thoroughfares be obstructed in any way.

10.3    Tenant has entered into this Lease in reliance upon representations by Landlord that the Shopping Center as shown on Exhibit "A" is and will remain retail in character. Landlord consents and agrees that no part of the Shopping Center shall be used as a gymnasium, health club, spa, dance hall, billiard or pool hall, massage parlor, movie or live theater, bowling alley, skating rink, automobile dealership, car wash, catering establishment (except catering incident to a restaurant use), assembly hall, entertainment or amusement facility (such as a video arcade or comedy club), night club, tavern or bar (except incidental to a full service restaurant), laundromat, dry cleaning plant, flea market or adult bookstore [which is defined as a bookstore, a substantial portion of the inventory of which is not available for sale to children under eighteen (18) years of age because it explicitly deals with or depicts human sexuality].

10.4    In the event of a violation of any provision of Sections 10.2 or 10.3 during the term hereof, Tenant shall have the right, upon thirty (30) days' written notice to Landlord, to terminate this Lease or cease the payment of Minimum Annual Rent and all other charges due Landlord from Tenant hereunder and in lieu thereof until the time that the event giving rise to such violation is abated, Tenant shall pay the lesser of one-half (1/2) monthly Minimum Rent or one percent (1%) of all Gross Sales, monthly thirty (30) days in arrears.

11.    **REPAIR AND MAINTENANCE**

11.1    Tenant shall, at its sole cost and expense, maintain the interior of the Premises and the storefront thereof (except to the extent some of the storefront maintenance is the obligation of Landlord under Section 11.2 hereof), in good repair and good condition, reasonable wear and tear and damage by casualty excepted, and will so deliver the Premises to Landlord at the expiration or earlier termination of this Lease. Tenant shall be responsible for maintaining or, if reasonably necessary, replacing the heating, ventilating and air conditioning system serving the Premises ("HVAC") in good repair. If Tenant installs at its expense a new HVAC which is not fully depreciated (based on a straight line eight year depreciation schedule) at the time Tenant vacates the Premises, then Landlord shall have the option of purchasing the HVAC for the undepreciated value thereof as of the date Tenant vacates. If Landlord does not elect to purchase the HVAC, then Tenant may either leave the HVAC on the Premises or remove the HVAC. If Tenant removes the HVAC, it shall repair any damage done to the Premises in connection with its removal. Upon Tenant's request to Landlord, Landlord will supply to Tenant and enforce for Tenant's benefit all available warranties by contractors, subcontractors, suppliers, manufacturers and materialmen for construction of that portion of the Premises which is Tenant's responsibility. Notwithstanding anything contained to the contrary herein, in no event shall Tenant have any obligation to repair any damage or defects caused by the acts or omissions of Landlord or its agents or contractors.

11.2    Landlord shall, at its sole cost and expense, not subject to reimbursement by Tenant, maintain, repair and replace the foundation (including separation of floor covering due to the foundation splitting), roof (including damages to the interior of the store, and ceiling tiles damaged as a result of water leakage), exterior walls and structural elements of the Premises, fire safety sprinkler system, gutters and downspouts and all wiring, plumbing, pipes, conduits and other utilities which are not exclusively located within the Premises. Except in the event of an emergency, Landlord shall give Tenant at least fifteen (15) days prior written notice of any work it is required to perform pursuant to this Section 11.2 which may affect Tenant's use and/or occupancy of the Premises. All repairs and maintenance performed by Landlord pursuant to this Section 11.2 shall be performed at such time as to minimize the disruption to the conduct of Tenant's business and in the event such repairs or maintenance disrupt Tenant's business, Tenant's Minimum Annual Rent obligations hereunder shall cease during the continuation of such repairs and maintenance. Landlord's repairs hereunder shall comply with all Governmental Requirements. In the case of an emergency, if Landlord fails to immediately undertake to repair or maintain the Premises or common areas as required under this Lease, after oral notice from Tenant, Tenant may perform the repairs or maintenance and deduct the cost thereof from the rentals next falling due hereunder, until the entire amount is absorbed, in addition to any other remedies Tenant may have hereunder or at law or in equity. In no event shall Landlord be responsible for the cost of any of the maintenance, repair or replacement activities set forth in this Section 11.2 result from the negligence of Tenant or its agents, contractors or invitees.

12.    **ALTERATIONS**

Except as hereinafter provided, Tenant may make non-structural alterations or improvements to or within the Premises in a good and workmanlike manner, and in conformity with all Governmental Requirements, without Landlord's prior consent. In so altering or improving the Premises, Tenant may remove all of the fixtures and equipment in the Premises provided Tenant shall replace any of

–7–

the aforesaid with new fixtures or equipment. Tenant shall not make any alterations to the foundation, roof, exterior walls, gutters and downspouts, marquees or any structural portions of the Premises without first obtaining the written consent of Landlord, which shall not be unreasonably withheld. Landlord shall give Tenant fifteen (15) days prior written notice of any alterations which may affect Tenant's use and/or occupancy of the Premises. Upon termination of this Lease, Landlord will accept the Premises as altered without any further obligation upon Tenant to restore the Premises to its former condition.

### 13.    **MECHANICS' LIENS**

13.1    Tenant shall pay or cause to be paid prior to delinquency all costs for work done by it or caused to be done by it on the Premises and Tenant will keep the Premises free and clear of all mechanics' liens and other liens on account of work done by or for Tenant relating thereto. Tenant shall hold Landlord harmless from and indemnify and defend Landlord against any and all liens, claims, demands, liability, loss, cost and expense (including, without limitation, reasonable attorneys' fees) on work performed for or materials or supplies furnished to Tenant, which relate to the Premises.

13.2    If Tenant shall desire to contest any claim of lien, it shall furnish Landlord reasonable security of the value or amount of the lien, plus estimated costs and interest. If a final judgment establishing the validity or existence of a lien for any amount is entered by any court of competent jurisdiction, Tenant shall pay and satisfy the same at once.

13.3    Landlord shall keep the Premises free and clear of all mechanics' liens and other liens on account of work done by or for Landlord relating thereto.  Landlord shall hold Tenant harmless from and indemnify and defend Tenant against any and all liens, claims, demands, liability, loss, cost and expense (including, without limitation, reasonable attorney's fees) on work performed for or materials or supplies furnished to Landlord, which relate to the Premises.

### 14.    **DAMAGE AND DESTRUCTION**

14.1    If, during the term of this Lease, the Premises are damaged or destroyed by a casualty to the extent that rebuilding or repairs cannot reasonably be completed within one hundred eighty (180) days from the date of damage Tenant may, at its option, terminate this Lease effective on the date of damage or destruction, by notice to Landlord within thirty (30) days of such damage or destruction. If Tenant does not so terminate this Lease, or if the improvements are damaged or destroyed such that rebuilding or repairs may be completed within one hundred eighty (180) days from the date of damage or destruction, then this Lease shall not terminate, and Landlord shall proceed forthwith to rebuild or repair such improvements to substantially the condition in which they existed immediately prior to any damage or destruction. If the entire Premises are damaged or destroyed or so much of the Premises are damaged or destroyed such that Tenant, in Tenant's reasonable business judgment, elects not to continue its business, all Minimum Annual Rent and other charges due hereunder shall abate from the date of damage or destruction to the earlier of (i) one hundred twenty (120) days after the date on which Landlord's architect or contractor in charge of the rebuilding or repair certifies to Tenant in writing that the Premises have been substantially completed to the same condition as existing prior to the casualty loss and Landlord has redelivered the Premises to Tenant, or (ii) the date on which Tenant reopens for business in the Premises.

14.2    In the event less than the entire Premises are damaged or destroyed and Tenant shall elect to do business in the Premises during the period of such repair or rebuilding, Tenant's Minimum Annual Rent obligations hereunder shall cease during such period and Tenant shall be liable to Landlord for rent in the amount of one percent (1%) of Tenant's Gross Sales in lieu thereof. In addition, any other charges based upon the square footage of the Floor Area of the Premises shall be proportionately abated from the date of damage or destruction to the earlier of (i) sixty (60) days after the date on which Landlord's architect or contractor in charge of the rebuilding or repair certifies to Tenant in writing that the portion of the Premises so affected has been substantially completed and Landlord has received all approvals which may be required from any governmental agency relating thereto or (ii) the date on which Tenant reopens for business in the portion of the Premises so affected.

14.3    Landlord shall not be required to rebuild or repair any damage to the Premises occurring during the final twelve (12) months of the Initial Term unless Tenant exercises in writing, within thirty (30) days after receipt of Landlord's written notice that it intends not to effect repairs or rebuilding, any option to extend given Tenant hereunder. If Tenant does not elect to extend within such thirty (30) day period, this Lease shall terminate effective as of the date of damage or destruction.

14.4    If more than twenty-five percent (25%) of the gross leasable area in the Shopping Center or building of which the Premises form a part, or if a substantial part of the common areas, including, without limitation, twenty-five percent (25%) or more of the parking areas, is damaged or destroyed, Tenant shall have the right to terminate this Lease by written notice to Landlord within thirty (30) days after the date of such damage or destruction. In the event Tenant does not elect to terminate this Lease as above provided, Tenant's obligations to pay Minimum Annual Rent and all other charges due

–8–

Landlord from Tenant hereunder shall cease effective as of the date of such damage or destruction and Tenant shall pay Landlord in lieu thereof the lesser of one-half (1/2) of Minimum Annual Rent otherwise due or one percent (1%) of Tenant's Gross Sales, monthly, thirty (30) days in arrears until the property so affected is rebuilt or restored.

### 15.   EMINENT DOMAIN

If, during the term of this Lease, as a result of a condemnation proceeding or transfer in lieu thereof, a substantial or material portion of the Shopping Center or building of which the Premises form a part including, without limitation, any part of the Premises, is taken, Tenant may, within thirty (30) days following the date of such taking, terminate this Lease upon written notice to Landlord, which termination shall be effective as of the date of such taking. In the event of a taking of a portion of the Premises where Tenant does not elect to terminate this Lease, Landlord shall promptly and diligently restore the Premises to as near their  condition prior to such taking as is reasonably possible, and the Minimum Annual Rental and other charges due hereunder shall be suspended until the earlier of (i) one hundred twenty (120) days after written certification from Landlord's architect or contractor that the Premises have been substantially completed and are ready for occupancy by Tenant or (ii) the date on which Tenant re-opens for business in the portion of the Premises so affected. Minimum Annual Rent and any other charges due from Tenant under this Lease which are based upon the square footage of the Floor Area of the Premises shall thereafter be reduced in proportion to the square footage eliminated or taken from the Premises. Nothing herein contained shall prevent Landlord and Tenant from prosecuting claims in any condemnation proceedings for the value of their respective interests. Landlord shall be entitled to the condemnation award attributable to the real property, and Tenant shall be entitled to the condemnation award attributed to the value of Tenant's leasehold interest hereunder and for the taking of its fixtures and equipment, leasehold improvements, relocation expenses, goodwill, loss of business or other award not related to the value of the real property. As used in Articles 14 and 15 of this Lease, a "substantial part" or "substantial portion" of the premises, Shopping Center or common areas, as the case may be, means a portion of the applicable area, the taking or damage of which, in Tenant's good faith determination, may result in a material disruption of the conduct of Tenant's business on the Premises.

### 16.   TENANT'S DEFAULT

If Tenant should be in default in the performance of any of its obligations under this Lease, which default continues for a period of more than thirty (30) days [or more than ten (10) days in the event of a default resulting from non-payment of a sum due from Tenant to Landlord hereunder], after receipt of written notice from Landlord specifying such default, or if such default is of a nature as to require more than thirty (30) days to remedy and continues beyond the time reasonably necessary to cure, Landlord may, in addition to any other remedy available at law or equity, upon written notice, terminate this Lease and retake possession of the Premises and remove all persons and property therefrom.

### 17.   LANDLORD'S DEFAULT

If Landlord should be in default in the performance of any of its obligations under this Lease, which default continues for a period of more than thirty (30) days after receipt of written notice from Tenant specifying such default, or if such default is of a nature to require more than thirty (30) days for remedy and continues beyond the time reasonably necessary to cure [unless Landlord has undertaken procedures to cure the default within such thirty (30) day period and diligently pursues such efforts to cure to completion], Tenant may, at its option, upon written notice, terminate this Lease, or may incur any expenses necessary to perform the obligation of Landlord specified in such notice and deduct such expense from the rents next falling due, until the entire credit is absorbed, in addition to any other remedies Tenant may have hereunder or at law or in equity.

### 18.   SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT

18.1    Tenant shall, upon Landlord's request, subordinate this Lease by written agreement ("SNDA") to any lien placed by Landlord upon the Premises, or the Shopping Center or building of which the Premises form a part; provided, that such lien, by its terms or by separate written agreement with Tenant, provides that if Tenant is not then in  default under this Lease, this Lease shall not terminate as a result of the foreclosure of such lien, or any deed or other transfer in lieu thereof and Tenant's rights under this Lease shall continue in full force and effect and Tenant's possession of the Premises shall be undisturbed except in accordance with the provisions of this Lease. Tenant will, upon request of the lienholder, be a party to an SNDA; if such SNDA does not alter or modify this Lease, and will agree that if such lienholder succeeds to the interest of Landlord, Tenant will attorn to said lienholder (or successor-in-interest of the lienholder) as its landlord under the terms of this Lease.  The form of SNDA attached hereto as Exhibit "F" shall be deemed acceptable to Tenant.

18.2    In the event as of the date hereof the Shopping Center and Premises are subject to a mortgage or deed of trust or other similar security instrument, Landlord shall, at Landlord's expense, obtain from the lender prior to the Rent Commencement Date, an SNDA, which is in recordable form and

signed and acknowledged by such lender. If Landlord fails to timely deliver such SNDA, Tenant shall have the right to terminate this Lease on written notice to Landlord or cease the payment of Minimum Annual Rent and all other charges due Landlord from Tenant hereunder and Tenant shall pay Landlord in lieu thereof, the lesser of one-half (1/2) Minimum Annual Rent otherwise due or one percent (1%) of Tenant's Gross Sales, monthly, thirty (30) days in arrears until such time that such SNDA is delivered to Tenant.

19.    **ASSIGNMENT AND SUBLETTING**

19.1    Tenant shall have the right to assign or sublet the Premises or any portion thereof, without the consent of Landlord:

A.    To any corporation with which Tenant may merge or consolidate; or

B.    To any corporation which acquires any of the following:

(i)    majority of Tenant's other stores; or

(ii)    a majority of Tenant's stores in the State in which the Premises are located; or

(iii)    all or substantially all of the shares of stock or assets of Tenant; or

C.    To any corporation which is a parent or subsidiary of Tenant; or

D.    To any corporation which is the successor corporation in the event of a corporate reorganization; or

E.    To any concessionaire, franchisee, or licencee (collectively or individually referred to as a "Concessionaire") of Tenant, for the operation of a portion of the business to be conducted in the Premises.

19.2    Except with respect to transfers pursuant to Section 19.1 above, any proposed assignment or sublease shall be subject to Landlord's prior written consent which consent shall not be unreasonably withheld or delayed. In the event Landlord objects to any proposed assignment or sublease pursuant to this Section 19.2, Landlord shall deliver written notice to Tenant within fifteen (15) days after Landlord's receipt of Tenant's request for Landlord's consent to any proposed assignment or sublease (which notice shall specify the name of the proposed transferee and shall be accompanied by a current financial statement and operating history of the proposed transferee), which shall specify the reasonable grounds for Landlord withholding its consent and the reasonable terms and/or conditions pursuant to which Landlord would be willing to provide Landlord's consent to such assignment or sublease. Failure of Landlord to object to such proposed assignment or sublease as and when required above shall be deemed consent of Landlord to the proposed assignment or sublease.

19.3    Notwithstanding any assignment or subletting with respect to the Premises or any part thereof, Tenant shall remain liable for its obligations under this Lease.

20.    **INDEMNIFICATION**

20.1    With respect to its use, occupancy and maintenance of the Premises, Tenant shall hold Landlord harmless from and indemnify and defend Landlord against any and all liens, claims, demands, liability, loss, cost and expense (including, without limitation, reasonable attorneys' fees) to any person or property caused or claimed to be caused by or resulting from an act, omission or negligence of Tenant or its employees or agents; provided, that Landlord shall, upon becoming aware of any such event, promptly notify Tenant of same.

20.2    With respect to its maintenance of the Premises, its operation and maintenance of the common areas and the manner of design and construction of the Shopping Center including, but not limited to, the Premises, Landlord shall hold Tenant harmless from and indemnify and defend Tenant against any and all liens, claims, demands, liability, loss, cost and expense (including, without limitation, reasonable attorneys' fees) to any person or property caused or claimed to be caused by or resulting from any act, omission or negligence of Landlord or its employees or agents; provided, that Tenant shall, upon becoming aware of any such event, promptly notify Landlord of same.

21.    **QUIET POSSESSION AND TITLE OF LANDLORD**

21.1    Landlord covenants that upon Tenant's paying the rent and performing and observing the agreements and conditions herein contained, Tenant shall peaceably and quietly have, hold

and enjoy the Premises during the term of this Lease without any manner of hindrance or interference with its quiet enjoyment and possession of the Premises.

21.2   Landlord represents and warrants that it is the fee simple owner of the Premises and that Landlord has full right and lawful authority to enter into and perform Landlord's obligations under this Lease; that Landlord has good marketable title to the Shopping Center and to the Premises, free and clear of any matters of record and/or any Governmental Requirements including, without limitation, use limitations, zoning codes or ordinances, which prevent the Shopping Center or the Premises from being used as set forth in this Lease. Further, Landlord represents and warrants that there are no physical or legal conditions and/or impediments, including without limitation objectionable odors or noise levels emanating from other tenants' premises in the Shopping Center, affecting the Premises that would now, or in the future, have the effect of disrupting, impairing or prohibiting, in any way, Tenant's intended use of the Premises.

22.   **SIGNS AND PROMOTIONS**

22.1   Tenant shall have the right, at its own expense, to  maintain within the interior of the Premises any signs and advertising matter customary or appropriate in the conduct of Tenant's business. Tenant shall have the exclusive right to the use of the exterior surface of the Premises for its standard  exterior building sign and such other advertising matter, banners, lettering, decal signs or decorations of any kind whatsoever as such signage or advertising may change from time to time; provided, however, that the same shall be subject to the requirements of any governmental authorities having jurisdiction thereof. Landlord hereby expressly approves Tenant's exterior building sign as set forth in Exhibit "G" attached hereto and incorporated herein by this reference ("Tenant's Sign Plan").

22.2   Tenant shall have the right to have its trade name included on any Shopping Center monument signs and/or pylon sign(s) in accordance with the renderings attached hereto as a part of Exhibit "G".  Landlord shall be responsible for the installation of such monument and pylon signs in the locations indicated on the Site Plan (and all utilities required to operate such signs).  Tenant shall be responsible to the installation, maintenance and replacement of its sign panels on the pylon sign.

22.3   If Landlord changes the fascia of Tenant's building, so that it materially or detrimentally affects the appearance of Tenant's exterior sign(s), then Landlord shall reimburse Tenant's reasonable costs and expenses to change its exterior sign(s).

23.   **WARRANTY AGAINST EXCLUSIVES**

Landlord warrants to Tenant that while operating the Premises for the purposes set forth in Section 5.1 of this Lease Tenant will not be in violation of any prohibited or exclusive use agreements or clauses or other agreements which Landlord may have with other tenants, lenders, governmental authorities or any other parties. Landlord shall hold Tenant harmless from and indemnify and defend Tenant against any and all liens, claims, demands, liability, loss, cost and expense (including, without limitation, reasonable attorneys' fees) suffered or claimed to be suffered as a result of any such alleged violations pertaining to Tenant's use of the subject Premises.

24.   **RESTRICTIVE COVENANT**

As a material inducement for Tenant to execute this Lease, Landlord covenants, represents, warrants and agrees that no portion of the Shopping Center (excluding the Premises and/or the pharmacy in operation within the Shopping Center as of the date hereof), or any expansion thereof, as same is now and may hereafter be constituted, shall be used as or for the purpose of a grocery store, natural foods store, natural pharmacy, health food store, coffee shop, restaurant, health food restaurant, delicatessen, or a store with a department selling groceries, meats, fish, fruits, vegetables, produce, dairy products, health and beauty aids, health care products, cosmetic, beer and/or deli items, provided, however that neither (i) a self-serve café; deli-sandwich shop or bakery with less than 2,500 square feet, nor (ii) a sit-down casual dining restaurant with wait staffs shall be prohibited hereunder. Landlord represents and warrants to Tenant Landlord has not heretofore leased any other space within the Shopping Center for such use, nor does any other lease affecting any other space within the Shopping Center permit such other space to be used for such use. The parties agree that in the event of any breach of this covenant at any time during the term of this Lease, the total actual damages proximately resulting to Tenant therefrom will be extremely difficult or impractical to ascertain. Therefore,  Tenant, at Tenant's election, may in the event of any such violation during the continuance of such violation: (a) cease the payment of Minimum Annual Rent, percentage rent and all other charges due Landlord from Tenant hereunder; or (b) terminate this Lease at any time during the continuance of such violation upon thirty (30) days' written notice to Landlord. In addition to the above remedies, and due to the nature of the violation, Tenant may also seek any and all other appropriate and available legal and/or equitable relief.

25.   **[Intentionally Deleted]**

26. **HOLDING OVER**

If Tenant shall remain in possession of the Premises or any portion thereof after the expiration of the term of this Lease then, in the absence of an agreement in writing between Landlord and Tenant, the party remaining in possession shall be deemed a tenant at sufferance, until acceptance of rent by Landlord, at which time the person in possession shall become a tenant from month-to-month at 125% of the Minimum Annual Rent and under the same terms and conditions as existed immediately prior to the expiration of the Lease.

27. **REMOVAL OF FIXTURES AND PERSONAL PROPERTY**

At any time during or at the expiration or other termination of the Term of this Lease, or any Option Term(s) thereof, Tenant shall have the absolute and unrestricted right to remove from the Premises any or all trademark items, trade fixtures, equipment (including without limitation audio-visual units, walk-up audio-visual units, signs, safes, racks, and removable partitions), furniture and other personal property installed or paid for by Tenant, howsoever affixed to the Premises. At Landlord's request, Tenant shall repair any material damage to the Premises resulting from the removal of such trade fixtures.

28. **HAZARDOUS MATERIALS**

Notwithstanding any other provision in this Lease, in the event that any investigation, removal, remediation, clean-up or other action in connection with Hazardous Materials (as defined below), is required by any federal, state or local environmental, health and/or safety related law, regulation, standard, court decision, ordinance, rule, code, judicial or administrative order or decree, directive, guideline, permit or permit condition (collectively, "Environmental Laws") applicable to the Premises or the Shopping Center, during the term of this Lease, Landlord shall be responsible for promptly performing such required investigation, removal, remediation, clean-up or other action at Landlord's sole expense, no part of which expense shall be passed through to Tenant. Landlord hereby agrees to indemnify, defend and hold harmless Tenant, its officers, directors, employees, agents and each of their respective successors and their assigns (collectively, "Indemnities") from and against any and all losses, damages, claims, judgments, liabilities, fines, penalties, fees, costs and expenses (including, without limitation, attorneys' fees) which arise during or after the term of this Lease as a result of the presence or suspected presence of any Hazardous Materials in, on, under or about the Premises or the Shopping Center, except only those Hazardous Materials present in, on, under or about the Premises or the Shopping Center due to the activities of Tenant. Tenant hereby agrees to indemnify, defend and hold Landlord harmless from and against all losses, damages, claims, judgments, liabilities, fines, penalties, fees, costs and expenses (including, without limitation, attorneys fees) which arise during or after the term of this Lease as a result of the presence or suspected presence of any Hazardous Materials in, on or under the Premises or Shopping Center in violation of applicable Environmental Laws which have been introduces by Tenant. As used herein, the term "Hazardous Materials" means any chemical, substance, material, object, condition or waste, or combination thereof, which (a) is defined as a hazardous substance, hazardous material, hazardous waste, pollutant, toxic material or contaminant under any Environmental Law, (b) is a petroleum hydrocarbon, including crude oil or any fraction thereof, (c) may be hazardous to human health or safety of the environment due to its harmful or potentially harmful properties or effects, including, toxicity, corrosivity, flammability, explosivity, infectiousness, radioactivity, carcinogenicity or reproductive toxicity, or (d) is regulated pursuant to any Environmental Law.

29. **FORCE MAJEURE**

In the event of any act of *Force Majeure*, the act of *Force Majeure* shall serve to extend performance by such party for a period of time equal to such prevention, delay or stoppage, unless a shorter period is specifically provided for in this Lease. As used in this Lease, the term "*Force Majeure*" shall include, but not be limited to, the prevention, delay or stoppage encountered by either party hereto due to fire or other casualty, bad weather, inability to secure materials, strikes or labor disputes (over which said party has no direct or indirect bearing, in the resolution thereof, or if either party hereto does have said bearing, said dispute occurs despite either party's attempt to resolve same via good faith bargaining) directly affecting the performance of the party's obligations under this Lease, acts of God, acts of the public enemy or other hostile governmental action, civil commotion, and/or governmental restrictions, regulations or controls affecting the party obligated to perform (or of its contractors or subcontractors).

30. **NOTICE**

Whenever under this Lease a provision is made for any demand, notice or declaration of any kind or where it is deemed desirable or necessary by either party to give or serve any such notice, demand or declaration to the other, it shall be in writing and served personally, or sent by registered mail or certified mail, return receipt requested, with postage prepaid, or sent by a nationally recognized

overnight carrier with receipt signed  therefore, addressed to Tenant or Landlord, as the case may be, at the address specified in Article 1 hereof. Either party may by like notice at any time and from time to time designate a different address to which notices shall be sent.

31.   **MISCELLANEOUS**

31.1   Interest. Except as otherwise provided herein, any sum accruing to Landlord or Tenant under the provisions of this Lease  which shall not be paid when due shall bear interest at the rate of ten percent (10%) per annum from the date written notice specifying such non-payment is served upon the defaulting party.

31.2   Partial Invalidity/Severability. If any term, covenant, condition or restriction of this Lease is held by a court of competent jurisdiction to be invalid, void or unenforceable, the remainder of the provisions hereof shall remain in full force and effect and shall in no way be affected, impaired or invalidated thereby.

31.3   No Partnership. Nothing contained in this Lease shall be deemed or construed by the parties hereto or by any third person to create the relationship of principal and agent, or of partnership, or of joint venture, or of any other association between the parties other than Landlord and Tenant.

31.4   Term Definition. All references to the "term" of this Lease shall include any extension of such term.

31.5   Time of the Essence. Time is of the essence of the performance of each provision of this Lease.

31.6   Waiver. The waiver of performance of any covenant, term or condition of this Lease by Landlord or Tenant shall not be  construed as a waiver of any subsequent breach of the same covenant, term or condition.

31.7   Gender and Captions. Words of gender used in this Lease shall be deemed to include other genders, and singular and plural words shall be deemed to include the other, as the context may require. Paragraph headings in this Lease are for convenience only, are not a part of the agreement of the parties, and shall not be used to interpret this Lease.

31.8   Successors. The terms, conditions and covenants herein contained shall inure to the benefit of and be binding upon the heirs, assigns and other successors-in-interest of the parties hereto. The benefits of this Lease and burdens of this Lease, shall inure to the benefit of and will be binding upon parties hereto and their successors, personal representatives, and assigns. The term "successors" is used herein in its broadest possible meaning and includes, but is not limited to, every person succeeding to any interest in this Lease or the Premises of Landlord or Tenant herein, whether such succession results from the act or omission of such party.

31.9   Accounting Terms. All accounting terms not specifically defined in this Lease shall be construed in accordance with generally accepted accounting principles ("GAAP") and interpretations of the American Institute of Certified Public Accountants or its successors, consistently applied, as in effect from time to time, including, without limitation, applicable statements, bulletins and interpretations issued by the Financial Accounting Standards Board and bulletins, opinions, interpretations and statements issued by the American Institute of Certified Public Accountants or its committees.

31.10   Headings. Paragraph headings, numbers and underscoring have been set forth herein for convenience only, do not define or limit the provisions hereof, and have no significance whatsoever. The order in which the paragraphs appear in this Agreement has no significance whatsoever.

31.11   References. References in this Lease to "Sections", "Subsections", "Paragraphs", "Subparagraphs", "Exhibits", and "Schedules" are to sections, subsections, paragraphs, subparagraphs, exhibits and schedules herein and hereto unless otherwise indicated. References to agreements and other contractual instruments shall be deemed to include all subsequent amendments and other modifications thereto. References to statutes or regulations are to be construed as including all statutory and regulatory provisions consolidating, amending or replacing the statute or regulation.

31.12   Consent. Wherever in this Lease Landlord or Tenant is required to give its consent or approval to any action on the part of the other, such consent or approval shall not be unreasonably withheld or delayed.

31.13   Prompt Billing. All charges due from Tenant to Landlord for which Tenant must be billed by Landlord must be so billed within eighteen (18) months of the date the charge is incurred by Landlord or Landlord will have waived its right to reimbursement thereof.

31.14   Attorney's Fees. If either party hereto shall file any action or bring any proceeding against the other party arising out of this Lease or for the declaration of any rights hereunder, the prevailing party therein shall be entitled to recover from the other party all costs and expenses, including reasonable attorneys' fees, incurred by the prevailing party as determined by the court, an arbitrator or by settlement. If either party ("secondary party") without its fault is made a party to litigation instituted by or against the other party ("primary party"), the primary party shall pay to the secondary party all costs and expenses, including reasonable attorneys' fees, incurred by the secondary party in connection therewith.

31.15   Estoppels. Within fifteen (15) days after a request by Landlord or Tenant, as the case may be, Landlord or Tenant shall execute and deliver to the other an estoppel statement. Such statement shall include representations (i) that this Lease is in full force and effect, (ii) that there are no uncured defaults in the other party's performance hereunder, and/or (iii) that not more than one (1) monthly installment of the Minimum Annual Rent has been paid in advance. Tenant may satisfy its obligations under this Section by delivering to Landlord a completed Estoppel Certificate in the form as attached hereto as Exhibit "H".

31.16   Site Plan. At any time throughout the term of this Lease within ten (10) days after Tenant's written request therefor, Landlord shall provide Tenant with a copy of the most current available site plan of the Shopping Center, which shall reflect: (a) the square footage of each individual premises currently leased therein; and (b) the names and exact locations of the respective tenants thereof; and (c) those premises in the Shopping Center, if any, which are not then currently occupied and open for business. If the circumstances existing shall be the same as existing at the time of the prior request, then Landlord shall certify that the state of events remain unchanged. Failure of Landlord to provide said information within the period allowed shall result in the suspension of the payment of Minimum Annual Rent.

31.17   Change of Ownership. Landlord shall promptly notify Tenant in writing of any change in the ownership of the Shopping Center or of the Premises, and shall give the name and address of the new owner and instructions regarding the payment of rent. In the event of any change in or transfer of title of Landlord in and to the Shopping Center or the Premises, whether voluntary or involuntary, or by act of Landlord or by operation of law, Tenant shall be under no obligation to pay rents thereafter accruing to the new owner until Tenant shall have been duly notified of such change and given satisfactory proof thereof. In the event of any such transfer, the transferor shall be freed of all liability thereafter accruing hereunder provided that the new landlord shall assume all of the obligations on Landlord's part to be performed hereunder and a copy of such assumption is delivered to Tenant.

31.18   Memorandum of Lease. The parties hereto agree that neither shall record this Lease, but each shall execute the  Memorandum of Lease attached hereto as Exhibit "I", which shall be recorded in the land records of the County where the Premises are located.

31.19   Brokers. Landlord and Tenant hereby represent and warrant that neither party has employed the services of a real estate broker in connection with the lease transaction created hereby, and that there are no claims for brokerage commissions or finder's fees in connection with the execution of this Lease. Each party hereby holds the other harmless from and shall indemnify and defend the other against any and all liens, claims, demands, liability, loss, cost and expense (including, without limitation, reasonable attorneys' fees) in connection with any claim for such commissions or fees by any third party.

31.20   Preparer of the Lease. This Lease has been prepared by Tenant, and its professional advisors, and reviewed by Landlord and its professional advisors. Landlord, Tenant, and their separate advisors believe that this Lease is the product of all of their efforts, that it expresses their agreement, and that it should not be interpreted in favor of either Landlord or Tenant or against either Landlord or Tenant merely because of their efforts in preparing it.

31.21   Entire Agreement. Any agreements, warranties or representations not expressly contained herein shall in no way bind either Landlord or Tenant, and Landlord and Tenant expressly waive all claims for damages by reason of any statement, representation, warranty, promise or agreement, if any, not contained in this Lease. This Lease supersedes and cancels any and all previous negotiations, arrangements, brochures, agreements and understandings, whether written or oral, between Landlord and its agents and Tenant and its agents with respect to the Premises, building, common areas, Shopping Center or this Lease. This Lease constitutes the entire agreement between the parties hereto and no addition to, or modification of, any term or provision of this Lease shall be effective until and unless set forth in a written instrument signed by both Landlord and Tenant.

31.22   Choice of Law. This Lease shall be construed and enforced in accordance with the laws of the State in which the Premises are located.

31.23  <u>Landlord's Exculpatory Clause</u>.  It is specifically understood and agreed that there shall be no personal liability of Landlord in respect to any of the covenants, conditions or provisions of this Lease.  In the event of a breach or default by Landlord of any of its obligations under this Lease which results in a monetary judgment against Landlord, Tenant shall look solely to any right of offset allowed by law against any amount due from Tenant hereunder or to the equity of Landlord in the Shopping Center for the satisfaction of such judgment.  This exculpation provision shall not, however, limit Tenant's right to pursue other remedies against Landlord, including equitable rights, which may be available pursuant to the terms of this Lease.

[SIGNATURE PAGE TO FOLLOW]

EXHIBIT "A"

SITE PLAN OF THE SHOPPING CENTER

[TO BE ATTACHED]

**SIGNATURE PAGE**
**FOR**
**LANDLORD AND TENANT**

Dated this _26th_ day of
_March, 2008_ .

_____
WITNESS

_____
WITNESS

Dated this _21st_ day of
_March_ , 2008 .

_____
WITNESS

"LANDLORD"

**TURNHART ACQUISITION CORPORATION, a**
_Virginia_       **corporation**

BY: _Douglas K Ratliff_ (SEAL)

ITS: _President_ _____

BY:_____ (SEAL)

ITS:_____

"TENANT"

**EARTH FARE, INC., a North Carolina Corporation**

BY:_____ (SEAL)

ITS: _CEO_ _____

NOTICE TO PERSON(S) OBTAINING SIGNATURE(S) OF LANDLORD: If Landlord is a corporation, the authorized officers must sign on behalf of the corporation, and indicate the capacity in which they are signing. The Lease must be executed by the President or Vice President and the Secretary or Assistant Secretary, unless the By-Laws or a resolution of the Board of Directors is otherwise provided, in which event the By-Laws or a certified copy of the resolution, as the case may be, must be attached to this Lease. Also, the appropriate corporate seal must be affixed by Landlord.

**EXHIBIT "B"**

**LEGAL DESCRIPTION OF THE SHOPPING CENTER**

[TO BE ATTACHED]

**EXHIBIT "C"**

**[Intentionally Deleted]**

**EXHIBIT "D"**

**DELIVERY CONDITION**

<u>Shopping Center</u>.  Subject to normal wear and tear, all common areas of the Shopping Center shall be in good repair and/or good working order including, without limitation, driveways and parking areas; pylons, directional and monument signage; landscaping; stormwater drainage systems; dumpster and trash receptacles; utility lines and facilities serving the Shopping Center; and exterior area and security lighting at 4-5 average foot candles.

**EXHIBIT E**

**[Intentionally Deleted]**

**EXHIBIT F**

**SUBORDINATION NON-DISTURBANCE AND ATTORNMENT AGREEMENT**

**THIS SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT** (the "Agreement") is executed as of the ____ day of _____, 2004, by and between **EARTH FARE, INC,** a North Carolina corporation, whose address is 145 Cane Creek Industrial Park Drive, Suite 150, Fletcher, NC 28732 (the "Tenant") and _____, whose address is _____ _____ (the "Lender").

**W I T N E S S E T H:**

WHEREAS, Lender has made or will make a mortgage loan to _____, a _____ (the "Borrower") which will be secured by a Deed of Trust, Security Agreement and Fixture Financing Statement from Borrower to Lender (the "Mortgage") covering that certain parcel of land, with improvements now or hereafter constructed thereon, described more fully on Exhibit "A" attached hereto and incorporated herein (the "Property"); and

WHEREAS, the Tenant has entered into a Lease Agreement with Borrower dated _____, 200__, a Memorandum of which has been or will be recorded in the Office of the _____ for _____ County, _____ (collectively, the "Lease"), wherein and whereby Borrower has leased certain space within the Property to Tenant as more fully described in the Lease (the "Demised Premises"); and

WHEREAS, Tenant and Lender wish to set forth herein certain agreements hereinafter pertaining to the various rights of said parties with respect to the Property, the Mortgage, and the Lease.

NOW, THEREFORE, in consideration of the mutual covenants set forth hereinafter, Tenant and Lender hereby agree as follows:

1.    Consent.  Lender hereby consents to, approves, accepts and recognizes the Lease and the terms thereof, including without limitation all renewal and extension rights and options set forth therein, and covenants and agrees that the exercise by Tenant of any of the rights, remedies and options therein contained shall not constitute a default under the Mortgage.

2.    Subordination.  Tenant agrees that the Lease shall at all times be subject and subordinate to the lien of the Mortgage, and to any modifications, extensions or renewals of the Mortgage, with the same force and effect as if the Mortgage had been executed and delivered prior to the execution and delivery of the Lease and without regard to the order of priority of recording the Mortgage; subject, however, to the provisions of this Agreement. Tenant shall take such steps and execute such documents from time to time hereafter as Lender may reasonably request in order to carry into effect the provisions and intent of this Agreement and to confirm the subordination of Lease to the lien of the Mortgage, upon and subject to the terms of this Agreement.

3.    Notice And Right To Cure.  Before exercising any remedies available to it under the Lease, Tenant shall, simultaneously with the giving of any notices to Borrower, send copies to Lender, at its address above and in the manner provided in the Lease, of all written notices pursuant to which Tenant asserts that Borrower has defaulted or is in default under the Lease. Lender shall have the right, but not the obligation, to cure any such default on the part of Borrower under the terms of the Lease, and Tenant agrees to accept any performance by Lender on behalf of Borrower which shall cure such default or claimed default on the part of Borrower under the terms of the Lease. In no event shall Lender be deemed to have assumed or become personally liable to Tenant or otherwise for any obligations of Borrower for which Lender attempts to effectuate a cure.

4.    No Lease Prepayments Or Modifications.  Tenant agrees that Lender shall not be bound by Tenant's prepayment of any rent to Borrower for more than one (1) month in advance of accrual thereof, nor by any amendment of or modification to the Lease, without in any instance Lender's prior written approval.

5.    Non-Disturbance. So long as Tenant is not in default under the Lease beyond any applicable cure period set forth therein, Lender agrees that Tenant's possession of the Demised

Premises under the Lease shall not be disturbed, affected or impaired by, nor will the Lease or Tenant's rights thereunder be otherwise affected, by any foreclosure of the Mortgage or deed in lieu thereof, or by any judicial or non-judicial sale or execution of the Property pursuant to the Mortgage, or by any other suit, action or proceeding upon the Mortgage or any obligation secured thereby. Lender further agrees that in the event of any foreclosure of the Mortgage or deed in lieu thereof, Lender or the successful purchaser of the Property, as the case may be, shall accept the attornment of Tenant thereafter upon and subject to the terms and provisions set forth herein, unless and until Tenant be thereafter in default beyond any applicable cure period set forth in the Lease. Except as may be procedurally required by law, Tenant shall not be named or joined as a party or otherwise in any suit, action or proceeding for the foreclosure of the Mortgage or to enforce any rights under the Mortgage or any other obligations secured thereby. Neither the Mortgage nor any other security instrument executed in connection therewith shall cover or be construed as subjecting in any manner to the lien thereof, any trade fixtures, equipment, inventory or other personal property at any time furnished or installed by or for Tenant in the Demised Premises unless the same shall be permanently affixed to the Property; provided, that Tenant agrees that upon removal of any of its trade fixtures, equipment, inventory or other personal property at any time furnished or installed by or for Tenant in the Demised Premises, Tenant shall at its expense repair all damage to the Demised Premises caused by such removal.

6.       Attornment. So long as Tenant is not in default under the Lease, Lender agrees that in the event it or any other person or entity acquires possession and/or title to the Property pursuant to the exercise of any remedy provided in the Mortgage, or by virtue of any deed in lieu of foreclosure or otherwise, the Lease shall not be terminated or affected by such foreclosure, conveyance or sale of the Property or by any other proceeding; the Lease shall continue in full force and effect as a direct Lease between Tenant and Lender or such purchaser upon all of the terms, covenants and conditions set forth therein; and Tenant shall attorn to and accept such person or entity as its landlord under the Lease for the balance then remaining on the term of the Lease (including any extensions or renewals, if exercised) upon all terms and conditions set forth therein.

7.       Insurance Proceeds. Lender agrees that all casualty insurance proceeds paid with respect to policies required under the Lease shall be made available for disposition as required by the terms of this Lease.

8.       Notices. All notices, requests, demands and other communications allowed, made or required to be made pursuant to the terms of this Agreement shall be in writing. The Effective Date of Notice shall be the date upon which such notice is given or made when personally delivered (including personal delivery by Federal Express or other comparable overnight private courier service) or when deposited in the United States Mail registered or certified, postage prepaid, return receipt requested, addressed in any such event to the party to whom such communication is directed at such address as is set forth for such party hereinabove or at such other address as may hereafter be designated in writing by the respective parties hereto.

9.       Binding Effect. This Agreement shall bind and inure to the benefit of the successors in interest of the parties hereto and the agreements of Lender shall specifically be binding upon any person or entity who may acquire title to the Property as a result of any exercise of the rights or remedies of Lender under the terms of the Mortgage.

Executed by and among the parties hereto on the day and year first written above.

**EARTH FARE, INC.,**
a North Carolina corporation

BY:      _____

ITS:     _____ -
                    as Tenant


_____

BY:      _____

TITLE: ______________________________
as Lender

STATE OF _____    )
                              )          **ACKNOWLEDGEMENT**
COUNTY OF _____       )

     I, _____, a Notary Public in and for the County and State aforesaid, certify that _____, the duly authorized _____ of EARTH FARE, INC., a North Carolina corporation, the Tenant, personally appeared before me this day and acknowledged the execution of the foregoing instrument on its behalf.

     WITNESS my hand and official stamp or seal this _____ day of _____, 200__.

                       _____
                       Notary Public for _____
                       My Commission Expires: _____


STATE OF _____      )
                             )           **ACKNOWLEDGMENT**
COUNTY OF _____       )

     I, _____, a Notary Public in and for the County and State aforesaid, certify that _____, the duly authorized _____ of _____, the Lender, personally appeared before me this day and acknowledged the execution of the foregoing instrument on its behalf.

     WITNESS my hand and official stamp or seal this _____ day of _____, 200__.

                       _____
                       Notary Public for _____
                       My Commission Expires: _____

State of _____)
                                  ) ss        **[INDIVIDUAL]**
County of _____)

On _____, 20___ before me, _____,  personally
appeared _____ personally known to me to be the person whose
name is subscribed to the within instrument and acknowledged to me that the/she executed the same in his
authorized capacity, and that by his signature on the instrument the person or entity upon behalf of which
the person acted, executed the instrument.

       WITNESS my hand and official seal.

[SEAL]                         Signature_____

---

State of _____)
                                  ) ss        **[CORPORATION]**
County of _____)

       On this _____ day of _____, 20____, before me, _____
_____, the undersigned Notary Public, personally appeared _____
_____, personally known to me as the person who executed the _____
_____ as _____, of _____
_____, a corporation; and the foregoing instrument for the purposes therein contained, by signing the
name of the corporation by himself as such officer.

       IN WITNESS WHEREOF, I hereunto set my hand and official seal the day and year aforesaid.

[SEAL]                  _____
                               Notary Public

---

State of _____)
                                  ) ss        **[PARTNERSHIP]**
County of _____)

       On this _____ day of _____, 20____, before me _____
_____, a Notary Public of said State, duly commissioned and sworn, personally
appeared _____, known to me (or proved to me on the oath of __
_____) to be a general partner of a limited partnership that executed the within
instrument, and acknowledged to me that such partnership executed the same.

[SEAL]                  _____
                               Notary Public

**EXHIBIT "G"**

**TENANT'S SIGN PLAN**

**[TO BE ATTACHED]**

## EXHIBIT "H"

### ESTOPPEL CERTIFICATE

This Estoppel Certificate is made this ___ day of ,
20_____, by <u>EARTH FARE, INC.</u> ("Tenant").

Tenant hereby acknowledges that it is the tenant of certain premises described on Schedule "A" attached hereto (the "Premises") located in _____
pursuant to a lease dated _____, 20_____ (the "Lease") by and between Tenant and _____ ("Landlord").

Tenant understands that for purposes of transferring its interests in the property of which the Premises is a part, (the "Property"), or for purposes of securing a new lender on the Property, Landlord has requested the following representations and certification by Tenant:

1.     The Lease is in full force and effect in accordance with its terms and has not been modified, amended, supplemented, or changed in any respect, except as set forth on Schedule "A" attached hereto.

2.     The present term of the Lease commenced on _____ and will expire on _____
_____. The Lease provides Tenant with _____ (
_____) consecutive options to renew the Lease for _____ (_____)years each.

3.     To the best of Tenant's current actual knowledge, Landlord is not in default under the Lease as of the date hereof and no notice of default has been given which has not been cured, except as set forth on Schedule "A" attached hereto.

4.     The current monthly installment of Minimum Annual Rent payable by Tenant to Landlord as of this date is $_____.

5.     All Minimum Annual Rent, percentage rent, and any additional rent or charges due Landlord from Tenant pursuant to the Lease have been paid through the payment period last ending prior to the date hereof, except as set forth on Schedule "A" attached hereto. No rent or charge has been paid more than thirty (30) days in advance of its due date.

IN WITNESS WHEREOF, the undersigned has executed this Estoppel Certificate as of the date and year above written.

**TENANT**:

EARTH FARE, INC.,
a North Carolina corporation


BY:_____

ITS:_____

## EXHIBIT "I"

## MEMORANDUM OF LEASE

Instrument Prepared And Recording Requested By:

Marion M. Goodyear, P.A.
101 N. Main Street, Suite 1502
Greenville, SC 29601
Attention:  Marion M. Goodyear, Esq.

After Recording, Return to:

Marion M. Goodyear, P.A.
101 N. Main Street, Suite 1502
Greenville, SC 29601
Attention:  Marion M. Goodyear, Esq.

MEMORANDUM OF LEASE, dated _____, 20___, by and between TURNHART ACQUISITION CORPORATION, a _____ corporation ("Landlord"), and EARTH FARE, INC., a North Carolina corporation ("Tenant"), covering that certain premises located in the _____ _____ Shopping Center located in the City of Boone, County of Watauga, State of North Carolina (the "Premises"), which Shopping Center is more particularly described on Schedule "A", attached hereto and made a part hereof by reference.

AGREEMENT

1.      For good and valuable consideration, Landlord leases the Premises, together with all easements, rights, improvements and appurtenances thereto, to Tenant and Tenant hires the same from Landlord for the term and under the provisions contained in the unrecorded Lease dated _____ _____, 20___, between Landlord and Tenant (the "Lease").

2.      The terms, provisions, covenants, conditions and agreements set forth in said Lease are by this reference incorporated herein.

3.      As a material inducement for Tenant to execute this Lease, Landlord covenants, represents, warrants and agrees that no portion of the Shopping Center (excluding the Premises and/or the pharmacy in operation  within the Shopping Center as of the date hereof), or any expansion thereof, as same is now and may hereafter be constituted, shall be used as or for the purpose of a grocery store, natural foods store, natural pharmacy, health food store, coffee shop, restaurant, health food restaurant, delicatessen, or a store with a department selling groceries, meats, fish, fruits, vegetables, produce, dairy products, health and beauty aids, health care products, cosmetic, beer and/or deli items, provided, however that neither (i) a self-serve caf9; deli-sandwich shop or bakery with less than 2,500 square feet, nor (ii) a sit-down casual dining restaurant with wait staffs shall be prohibited hereunder. Landlord represents and warrants to Tenant Landlord has not heretofore leased any other space within the Shopping Center for such use, nor does any other lease affecting any other space within the Shopping Center permit such other space to be used for such use. The parties agree that in the event of any breach of this covenant at any time during the term of this Lease, the total actual damages proximately resulting to Tenant therefrom will be extremely difficult or impractical to ascertain. Therefore,  Tenant, at Tenant's election, may in the event of any such violation during the continuance of such violation: (a) cease the payment of Minimum Annual Rent, percentage rent and all other charges due Landlord from Tenant hereunder; or (b) terminate this Lease at any time during the continuance of such violation upon thirty (30) days' written notice to Landlord. In addition to the above remedies, and due to the nature of the violation, Tenant may also seek any and all other appropriate and available legal and/or equitable relief.

4.      The term of the Lease commenced on _____, 20____ and shall continue for a period ending on the last day of the month after the day which is _____ years after the Rent Commencement Date (_____, 20____). Tenant has the right to extend the term of the Lease for _ _____(_____) consecutive options of _____(_____) years each.

5.      This Agreement is executed for recording purposes only and is not intended to be a summary of the Lease, and is subject to the terms of that said Lease. In the event of conflict between this Agreement and the said Lease, the said Lease shall control.

6.      This Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective heirs, representatives, successors and assigns.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first above written.

**LANDLORD**:                                                        **TENANT:**

**TURNHART ACQUISITION CORPORATION,**            **EARTH FARE, INC.,**
a _____ corporation                                **a North Carolina corporation**


BY:_____                     BY:_____

ITS:_____                    ITS:_____



BY:_____                     BY:_____

ITS:_____                    ITS:_____


[ALL SIGNATURES REQUIRED HEREON MUST BE NOTARIZED]

**Schedule "A"**

Tenant Name:_____

Premises:

## FIRST AMENDMENT TO LEASE

This **FIRST AMENDMENT TO LEASE** ("Amendment") is made and entered into as of October _15_, 2019 ("Effective Date") by and between Sofield Children's Limited Partnership, a North Carolina limited partnership ("Sofield") and Earth Fare, Inc., a North Carolina corporation (hereinafter referred to as "Tenant").

## R E C I T A L S

A.   WHEREAS, Turnhart Acquisition Corporation, a Virginia corporation ("Turnhart") and Tenant own the interests of Landlord and Tenant respectively under a Lease dated March 21, 2008 (the "Lease"), relating to the premises ("Premises") within a Shopping Center located at E. King Street, Boone, North Carolina (the "Shopping Center"); and

B. WHEREAS, Sofield is currently under contract to purchase the Premises and Shopping Center pursuant to a purchase and sale agreement (the "Purchase Agreement") between Sofield and Turnhart; and

C. WHEREAS, as a condition to acquiring the Premises and Shopping Center, Sofield has requested Tenant enter into this Amendment which shall only become effective upon Sofield's acquisition of the Premises and Shopping Center and satisfaction of the Contingency (as defined herein);

D. WHEREAS, Tenant and Sofield desire to enter into the terms and conditions of this Amendment, which, upon satisfaction of the Contingency shall be binding upon Sofield as "Landlord" pursuant to this Lease and as referenced in this Amendment and Tenant and any references to "Landlord" as set forth in this Amendment shall be deemed to include Sofield as "Landlord" under the Lease; and

NOW, THEREFORE, for good and valuable consideration including the mutual agreements contained herein, it is hereby agreed by and between Sofield and Tenant that the Lease, upon satisfaction of the Contingency, shall be amended as follows:

1.    <u>INCORPORATION OF RECITALS</u>. The Recitals set forth above are hereby incorporated by reference as if fully set forth herein.

2.    <u>EXTENSION OF INITIAL TERM</u>.  Landlord and Tenant agree that the Initial Term of this Lease a set forth in Section 1.3 of the Lease shall be extended for twenty (20) years expiring on May 31, 2040.

3.    <u>MINIMUM ANNUAL RENT</u>.  Section 1.4 of the Lease is hereby amended as follows:

    (i)     Commencing May 1, 2020 through and including April 30, 2025, Minimum Annual Rent shall equal Two Hundred Thirty-Three Thousand Six Hundred Forty and 00/100 Dollars ($233,640.00) be payable in advance in equal monthly installments of Nineteen Thousand Four Hundred Seventy and 00/100 Dollars ($19,470.00) on the first day of each month throughout such period.

    (ii)    For the period of May 1, 2025 through and including April 30, 2030, Minimum Annual Rent shall equal Two Hundred Fifty-Seven Thousand Four and 00/100 Dollars ($257,004.00) payable in advance in monthly installments of Twenty-One Thousand Four Hundred Seventeen and 00/100 Dollars ($21,417.00) on the first day of each month

throughout such period.

(iii)    For the period of May 1, 2030 through and including April 30, 2035, Minimum Annual Rent shall equal Two Hundred Eighty-Two Thousand Seven Hundred Four and 40/100 Dollars ($282,704.40) payable in advance in monthly installments of Twenty-Three Thousand Five Hundred Fifty-Eight and 70/100 Dollars ($23,558.70) on the first day of each month throughout such period.

(iv)    For the period of May 1, 2035 through and including April 30, 2040, Minimum Annual Rent shall equal Three Hundred Ten Thousand Nine Hundred Seventy-Four and 84/100 Dollars ($310,974.84) payable in advance in monthly installments of Twenty-Five Thousand Nine Hundred Fourteen and 57/100 Dollars ($25,914.57) on the first day of each month throughout such period.

(v)    In addition, in consideration of Landlord paying the Tenant Reimbursement (as defined in Section 6 herein, commencing on May 1, 2020 and continuing through April 30, 2040, Tenant shall pay to Landlord as "Additional Annual Rent", the annual sum of Ninety-Four Thousand Three Hundred Five and 60/100 Dollars ($94,305.60) payable in advance in monthly installments of Seven Thousand Eight Hundred Fifty-Eight and 80/100 Dollars ($7,858.80) on the first day of each month throughout such period. Landlord and Tenant acknowledge that the Additional Annual Rent reflects a reimbursement by Tenant for the Tenant Reimbursement with an annual rate of return of seven percent (7%). In no event shall the Additional Annual Rent be payable by Tenant during any of the Option Terms (as provided herein). Notwithstanding the foregoing, in the event Tenant shall receive the Tenant Reimbursement prior to May 1, 2020, Tenant shall be responsible for monthly, interest only payments to Landlord on such Tenant Reimbursement at an annual interest rate of seven percent (7%) until May 1, 2020 in which event Tenant shall no longer be obligated to pay any such separate interest only payments on the Tenant Reimbursement.

4.    OPTION TERM. Section 1.3 of the Lease is hereby modified to provide that Tenant is hereby granted two (2) options ("Options") to further extend the term of this Lease for two (2) additional five (5) year terms (the "Option Terms") immediately following the expiration of the Initial Period, and Tenant shall pay Minimum Annual Rent as follows:

(i)    For the period of May 1, 2040 through April 30, 2045 (the "First Option Term"), Minimum Annual Rent shall equal Three Hundred Forty-Two Thousand Seventy-Two and 32/100 Dollars ($342,072.32) payable in monthly installments of Twenty-Eight Thousand Five Hundred Six and 03/100 Dollars ($28,506.03) on the first day of each month throughout such period.

(ii)    For the period of May 1, 2045 through April 30, 2050 (the "Second Option Term"), Minimum Annual Rent shall equal Three Hundred Seventy-Six Thousand Two Hundred Seventy-Nine and 55/100 Dollars ($376,279.55) payable in monthly installments of Thirty-One Thousand Three Hundred Fifty-Six and 63/100 Dollars ($31,356.63) on the first day of each month throughout such period.

5.    PERCENTAGE RENT. Section 1.5 of the Lease is hereby deleted in its entirety and substituted with the following:

01598522-2

"1.5    Percentage Rent: None."

6.    SECTION 3.2. Section 3.2 of the Lease is hereby deleted in its entirety and substituted with the following:

"3.2    Tenant is hereby granted two (2) consecutive options to extend the Initial Term of this Lease as set forth in Article 1 hereof (the "Option Terms") by giving to Landlord written notice of its exercise of each such option at least ninety (90) days before the expiration of the Initial Term (the "Option Date"), or prior Option Term, as the case may be: provided however, if Tenant shall fail to give any such notice prior to the Option Date, Tenant's right to exercise such option shall nevertheless continue until thirty (30) days after Landlord has given Tenant notice of Landlord's election to terminate the next such option ("Landlord's Option Notice") and Tenant may exercise such option at any time within thirty (30) days following Tenant's receipt of Landlord's Option Notice. The extended periods shall be upon the same terms, covenants, conditions, provisions and agreements applicable to the Initial Term, or prior option term, as the case may be, except that Tenant shall pay to Landlord the Minimum Annual Rent during such extended periods as set forth in Article 1.

Notwithstanding the foregoing, in the event Tenant shall fail to provide written notice to Landlord that Tenant elects not to exercise the next succeeding Option Term on or before the Option Date, the original expiration date of the Initial Term or next succeeding Option Term, if applicable, shall be extended on a per diem basis for each day commencing on the Option Date and continuing until the earlier of (i) the date Tenant sends Landlord written notice that Tenant will not exercise its right to extend the Term or (ii) the thirty-first (31st) day following the date of Landlord's Option Notice.

7.    SECTION 4.1(B). Section 4.1(B) of the Lease is hereby deleted in its entirety.

8.    SECTION 4.2. Section 4.2 of the Lease is hereby deleted in its entirety.

9.    SECTION 4.3. Section 4.3 of the Lease is hereby deleted in its entirety.

10.    SECTION 4.4. Section 4.4 of the Lease is hereby deleted in its entirety.

11.    SECTION 4.5. Section 4.5 of the Lease is hereby deleted in its entirety.

12.    Notwithstanding anything to the contrary contained in the Lease, any references to "Percentage Rent" or "percentage rent" shall be deemed null and void as of the satisfaction of the Contingency set forth herein, provided, however, Landlord and Tenant acknowledge that Landlord and Tenant shall complete any reconciliation of the Percentage Rent payable pursuant to the Lease prior to the satisfaction of the Contingency.

13.    TENANT REIMBURSEMENT.

In consideration for the extension of the Initial Term and revised Minimum Annual Rent schedule as set forth herein and as a partial reimbursement for the costs and expenses incurred by Tenant to perform Tenant's Updated Work (as defined herein), Landlord shall pay to Tenant at Tenant's notice address or such other address specified in writing by Tenant , the sum of One Million and 00/100 Dollars ($1,000,000.00) (the "Tenant Reimbursement"). Landlord shall pay

the Tenant Reimbursement within five (5) days following Tenant's receipt of all necessary building permits to perform Tenant's Updated Work and written notice and invoice from Tenant.

Should Landlord fail to make such payment and such failure shall continue for a period of ten (10) days following written notice from Tenant, interest on the unpaid balance shall accrue interest at the rate set forth in Section 31.1 of the Lease until paid in full. In addition to the foregoing, failure to timely make such payments will trigger an automatic abatement of the Minimum Annual Rent until such amounts are paid in full.

14.    <u>SECTION 12</u>.  The following provision is added to the end of Section 12:

"Notwithstanding anything to the contrary contained herein, Tenant shall (i) remodel the interior of the Premises substantially similar to Tenant's other store located in Johnson City, Tennessee, subject to applicable legal requirements and (ii) renovate the exterior storefront and related improvements substantially similar to Tenant's other store located in Johnson City, Tennessee, subject to applicable legal requirements (items (i) and (ii) are collectively referred to herein as "Tenant's Updated Work"). Landlord hereby consents to Tenant performing Tenant's Updated Work to the Premises."

Notwithstanding Tenant's Updated Work, Landlord shall continue to be responsible for performing its maintenance and repair obligations as well as compliance with applicable legal requirements as set forth in the Lease regardless of whether Tenant's Updated Work shall affect any such obligations. Such obligations shall include, but not be limited to, making all necessary repairs to the exterior of the Premises, including painting (but excluding the front elevation renovation included as part of Tenant's Updated Work) and required renovation and upgrade to the Common Areas, such as lighting, parking lot overlay and parking lot striping. Nothing in this paragraph shall be construed to enlarge or increase the Landlord's obligations under the Lease.

15.    <u>ACQUISITION OF ADJACENT PARCEL</u>.  Simultaneously with the acquisition of the Premises and Shopping Center, as a condition precedent to this Amendment, Sofield shall also acquire from Tenant the parcel adjacent to the Shopping Center currently owned by Tenant containing approximately 0.85 acres identified by Watauga County Tax Map as #2910-08-8308-000 ("Adjacent Parcel") for the amount of One Million Five Hundred and 00/100 Dollars ($1,500,000.00). [Sofield shall be given a credit at the Closing of the Adjacent Parcel of $500,000.00 as consideration for the cross-parking easement set out herein below]. As a condition precedent to the acquisition of the Adjacent Parcel by Sofield, Tenant and Sofield shall use best efforts to agree upon a mutually acceptable cross-parking agreement for the benefit of Tenant parking within the Sofield Parcel which agreement shall also provide that a) the site plan for the Adjacent Parcel when and/or if developed by the Sofield shall be substantially in the layout as shown on Exhibit "A" attached hereto and incorporated herein by reference, and as such the development by Sofield will need no further approvals from Tenant as to the site plan and b) the Adjacent Parcel may be developed as a Coffee Shop, Café', Internet Café' or the like, including but not limited to a Starbucks restaurant, and such use shall not be limited to 2,500 square feet as set out in Section 24 "Restrictive Covenant" of the Lease, but shall be developed according to the parking and zoning approvals for the Town of Boone, subject to the cross-parking agreement as provided herein. Landlord shall be responsible for obtaining any and all necessary governmental approvals relating to the proposed site plan for the Adjacent Parcel as depicted on Exhibit "A".

16.    <u>CAPITALIZED TERMS</u>.  All capitalized terms, if not defined in this Amendment, shall have the

same meaning as defined in the Lease. Wherever the term, "term of this Lease" or "Lease Term" or similar phrase is used in the Lease, such term or phrase shall be deemed to include the Option Terms, if applicable.

17.   ENTIRE AGREEMENT. Except as expressly modified herein, all the terms and conditions of the Lease (as amended and as defined herein) shall remain unmodified and shall continue to be binding on all parties and shall remain in full force and effect during the term of the Lease and any renewal term thereafter. It is understood that there are no oral agreements between the parties hereto affecting the Lease (as amended and as defined herein) and the Lease (as amended and as defined herein) supersedes and cancels any and all previous negotiations, arrangements, brochures, letters of intent, agreements and understandings between the parties hereto or displayed by Landlord to Tenant with respect to the subject matter thereof, and none shall be used to interpret or construe the Lease (as amended and as defined herein). All negotiations and oral agreements acceptable to Landlord and Tenant have been merged into and are included in the Lease (as amended and as defined herein). In the event of a conflict between this Amendment and the Lease, this Amendment shall be deemed controlling.

18.   COUNTERPARTS AND ELECTRONIC SIGNATURE. This Amendment may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Facsimiles, .pdf files or scanned copies shall be deemed an original. Landlord and/or Tenant may elect to execute this document through an electronic signature platform (e.g. DocuSign). By signing through said electronic signature platform, and not solely through e-mail acceptance, Landlord and Tenant agree that they have read and understood the Amendment, agree to be bound by all of its terms and conditions and hereby waive any defense or counterclaim that electronic signature is an invalid form of signature and acceptance under applicable law.

19.   BROKERS. Sofield and Tenant each warrant and represent to the other that it has not dealt with any broker or real estate representative or consultant in connection with this Amendment. Each party shall defend, indemnify and hold the other party harmless from and against any and all such indemnified costs relating to a breach of the foregoing representation by the indemnifying party in bringing about this Amendment.

20.   CONTINGENCY. Sofield and Tenant hereby acknowledge that this Amendment is contingent upon Sofield acquiring (i) fee simple tile to the Premises and Shopping Center (ii) fee simple title to the Adjacent Parcel (the "Contingency"). In the event that Sofield fails to satisfy the Contingency on or before October 18, 2019 (the "Closing Date" and also the "Contingency Date"), then this Amendment shall be deemed null and void and neither party shall have any further obligations pursuant to this Amendment and the Lease shall continue to remain in full force and effect. Sofield agrees to provide periodic updates to Tenant regarding the status of the Contingency following reasonable requests by Tenant.

(Signature blocks on the following page)

01598522-2

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be executed as of the Effective Date.

**SOFIELD:**

Sofield Children's Limited Partnership,
a North Carolina limited partnership

Signature: _____

Printed Name: _____

Title: _____

Date: _____

**TENANT:**

Earth Fare, Inc.,
a North Carolina corporation

Signature: _____

Printed Name: _____Scott Little_____

Title: _____CFO_____

Date: _____10/15/19_____

**SOFIELD:**

STATE OF            )
                         )ss

COUNTY OF          )

I,_____, a Notary Public in and for the County and State aforesaid, do hereby certify that _____, the _____ of **Sofield Children's Limited Partnership**, a _____ limited partnership, personally known to me to be the same person whose name is subscribed to the foregoing instrument as such _____ therein set forth.

GIVEN under my hand and notarial seal this ___day of _____, 2019.

(SEAL)                                      _____
                                                  Notary Public

**TENANT:**

STATE OF    NC        )
                         )ss

COUNTY OF HENDERSON )

I, SAMANTHA CRAWFORD , a Notary Public in and for the County and State aforesaid, do hereby certify that SCOTT LITTLE , CFO of **Earth Fare, Inc.**, a North Carolina corporation, personally known to me to be the same person whose name is subscribed to the foregoing instrument as such SCOTT LITTLE , appeared before me this day in person and acknowledged that he signed and delivered the said instrument as his own free and voluntary act, and as the free and voluntary act of said corporation, for the uses and purposes therein set forth.

GIVEN under my hand and notarial seal this 15 day of OCTOBER , 2019.

(SEAL)                                      _____
                                                  Notary Public

*(Notary seal: SAMANTHA CRAWFORD — NOTARY PUBLIC — JACKSON COUNTY)*

01598522-2



**site data**

jurisdiction: Boone, NC
tax map no.: 2910-08-8308-000
zoning: B3 - General Business
parcel area: 0.85 acres
building area: TOTAL: -
FRONT: -
parking: 62 spaces

north

scale: 1" = 50'

Commercial
Boone, NC

SITE PLAN

SP-1

**blueWATER** civil design
bluewater civil design, llc
19 Washington Park, Suite 100 • Greenville, SC 29601
www.bluewatercivil.com • info@bluewatercivil.com

date:10/31/17

Exhibit "A"

AFTER RECORDING, RETURN TO:
Sofield Children's Limited Partnership
355 Industrial Park Drive
Boone, NC 28607

PREPARED BY:
Vannoy, Colvard, Triplett & Vannoy, PLLC
922 C Street (P.O. Box 1388)
North Wilkesboro, NC 28659

## ASSIGNMENT AND ASSUMPTION OF LEASE

THIS ASSIGNMENT AND ASSUMPTION OF LEASE (this "Assignment") is made and executed as of the _1ST_ day of November, 2019 (the "Effective Date"), by **TURNHART ACQUISITION CORPORATION,** a Virginia corporation, whose address for purposes of this instrument is 2506 South Front Street, Richlands, VA 24641. ("hereinafter referred to as "Assignor"), to and in favor of **Sofield Children's Limited Partnership,** and North Carolina limited partnership, whose address for purposes of this instrument is 355 Industrial Park Drive, Boone, NC 28607 (hereinafter collectively referred to as the "Assignee");

### WITNESSETH:

WHEREAS, Assignor, as landlord, and **Earth Fare, Inc.,** as tenant, entered into that certain Lease dated March 21, 2008 (as amended from time to time, the "Lease"), for that certain property located in Watauga County, North Carolina, more particularly described on **Exhibit "A"** attached hereto and incorporated herein by reference; and

WHEREAS, Assignor and Assignee have entered into a Purchase Agreement for the sale of real estate described on **Exhibit "A"** (hereinafter the "Purchase Agreement"), providing for, among other things, the transfer and assignment of the Lease to Assignee; and

WHEREAS, in accordance with the terms and conditions of the Purchase Agreement, Assignor and Assignee desire to execute this Assignment for the purpose of evidencing the assignment by Assignor to Assignee of the Lease.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound, the parties agree as follows:

1.      Recitals; Defined Terms.  The recitals in this Assignment are true and correct, constitute an integral part of this Assignment, and are incorporated herein by this reference. Capitalized terms used but not otherwise defined in this Assignment shall have the meanings given to them in the Lease.

2.      Assignment of Lease.  Assignor does hereby convey, grant, assign and transfer to Assignee as of the Effective Date all of Assignor's rights, title and interest in and to the Lease, including, without limitation, all of Assignor's right, title and interest as "Landlord" under the Lease.

3.      Assumption of Lease.  Assignee does hereby agree, assume and accept as of the Effective Date to be bound by all the terms and conditions which are the responsibility of Assignor under the Lease, including all obligations of Assignor as "Landlord" under the Lease and all the terms and conditions of all related easements and ancillary agreements with respect to the Lease.

4.      Indemnity.  Assignor agrees to indemnify and hold Assignee harmless, at its sole cost and expense, from any and all losses, costs, claims, liabilities, expenses (including cost of litigation and reasonable attorneys' fees), judgments, proceedings, actions or demands of whatever nature whatsoever of Assignor as Landlord under the Lease arising or accruing on or prior to the Effective Date. Assignee agrees to indemnify and hold Assignor harmless, at its sole cost and expense, from any and all losses, costs, claims, liabilities, expenses (including cost of litigation and reasonable attorneys' fees), judgments, proceedings, actions or demands of whatever nature whatsoever of Assignee as Landlord under the Lease arising or accruing after the Effective Date.

5.      Attorneys' Fees.  In the event of any dispute hereunder or of any action to interpret or enforce this Assignment, any provision hereof or any matter arising herefrom, the prevailing party is entitled to recover its reasonable costs, fees and expenses, including, but not limited to, witness fees, expert fees, consultant fees, attorney (in-house and outside counsel), paralegal and legal assistant fees, costs and expenses and other professional fees, costs and expenses whether suit be brought or not, and whether in settlement, in any declaratory action, in any bankruptcy action, at trial or on appeal.

6.      Other Documentation.  Assignor agrees without additional consideration to execute and deliver to Assignee any and all additional forms of assignment and other instruments and documents that may be reasonably necessary or desirable to transfer or evidence the transfer to Assignee of any of Assignor's right, title and interest to the Lease transferred by this Assignment. Assignor shall within 30 days from the date of Closing deliver an Estoppel Certificate to Assignee free and clear of any exceptions, unless any such exception is allowable under the Lease.

7.      Counterparts; Successors and Assigns.  This Assignment may be executed in separate counterparts, each of which shall be deemed to be an original, and shall be binding upon and inure to the benefit of the parties hereto and their respective successors in interest and title, and assigns.

8.      Notices.  Any notice, communication, request or reply (hereinafter collectively, any "Notice") in this Assignment which is required or permitted to be given shall be given in writing

and shall be deemed to have been delivered and effective to the receiving party as follows: (i) upon deposit, when sent by certified first-class or return receipt requested, postage prepaid, (ii) upon deposit, when sent overnight by nationally recognized courier service, postage prepaid, or (iii) upon delivery when personally delivered to the receiving party (which if other than an individual shall be an officer or other responsible person of the receiving party). All Notices shall be addressed to the parties as set forth below. Either party may change the address to which Notice to be given under this Assignment is to be delivered by giving the other party notice of such change in accordance with this section.

Notices to Assignor shall be addressed as follows:

Turnhart Acquisition Corporation
Attn: Douglas R. Ratliff
2506 South Front Street
Richlands, VA 24641

Notices to Assignee shall be addressed as follows:

Sofield Children's Limited Partnership
Attn: R. Thomas Sofield, Jr.
355 Industrial Park Drive
Boone, NC 28607

9.     Governing Law. This Assignment shall be governed, by, construed under and interpreted and enforced in accordance with the laws of the State of North Carolina without giving effect to any of its conflict of laws principles.

10.     Partial Invalidity. The provisions hereof shall be deemed independent and severable, and the invalidity or enforceability of any one provision shall not affect the validity or enforceability of any other provision hereof.

11.     Interpretation. Should any provision of this Assignment require judicial interpretation, it is agreed that the court interpreting or construing same shall not apply a presumption that the terms hereof shall be more strictly construed against one party by reason of the rule of construction that a document is to be construed more strictly against the party who itself or through its agent prepared same. The parties agree that each has participated equally in the preparation of this Assignment.

12.     Notice Address Under the Lease. The name and notice address of the Landlord under the Lease shall now be as follows:

Sofield Children's Limited Partnership
Attn: R. Thomas Sofield, Jr.
355 Industrial Park Drive
Boone, NC 28607

13.    Entire Agreement; Amendment; Waiver.    This Assignment and the Purchase Agreement (including all amendments thereto) contain the entire understanding and agreement among the parties hereto with respect to the subject matter hereof, and supersedes all prior discussions, understandings, and agreements (whether oral or written) between them with respect thereto.  No amendment to, or modification or waiver of, any of the terms of this Assignment shall be valid unless in writing and signed by the party against whom enforcement of such amendment, modification or waiver is sought.

**[SIGNATURES TO FOLLOW]**

**IN WITNESS WHEREOF**, the parties have executed this Assignment as of the date set forth above.

**ASSIGNOR:**

**Turnhart Acquisition Corporation,
a Virginia corporation**

By: _Dougla K Ratliff_
Name: Douglas R. Ratliff
Title:  President

COMMONWEALTH OF VIRGINIA

COUNTY OF _Washington_

I certify that the following person(s) personally appeared before me this day, and each acknowledging to me that he voluntarily signed the foregoing document for the purpose stated therein in the capacity listed above: **Douglas R. Ratliff**.

Witness my hand and official stamp or seal, this the _18th_ day of _October_ , 2019.

_____
Notary Public

My Commission Expires: _03-31-2022_ Name: _Tatjana C. Roush_, Notary Public

TATJANA C ROUSH
NOTARY PUBLIC
REG. #7609159
MY COMMISSION
EXPIRES
3-31-22
COMMONWEALTH OF VIRGINIA

**[SIGNATURES CONTINUE ON FOLLOWING PAGE]**

**ASSIGNEE:**

**Sofield Children's Limited Partnership**
**a North Carolina limited partnership**

By: _R. Th Sfw_

Name: R. Thomas Sofield, Jr.

Title: Manager

STATE OF _NC_

COUNTY OF _WATAUGA_

I certify that the following person(s) personally appeared before me this day, and each acknowledging to me that he voluntarily signed the foregoing document for the purpose stated therein in the capacity listed above: **R. Thomas Sofield, Jr.**

Witness my hand and official stamp or seal, this the 1st day of November, 2019.

_____
Notary Public

My Commission Expires: _12-21-2021_  Name: _C. Lesley Marsh_, Notary Public

[notary seal]

C. LESLEY MARSH
NOTARY PUBLIC
WATAUGA COUNTY
STATE OF NORTH CAROLINA

EXHIBIT "A"

BEGINNING on an iron set against the north edge of the existing concrete sidewalk on the north side of King Street, said iron being located South 86 degrees East 100.00 feet, from the intersection of the east margin of the street presently known as Cherry Drive and formerly known as Councill Street with the north margin of King Street, said iron also being a common corner to the Adventist Church lot and the B.J. Councill Heirs property; thence running with the line between the B. J. Councill Heirs property and the Adventist Church property North 1 degree 00 minutes East 228.00 feet to an iron set against the south edge of the existing concrete walk in the South edge of the existing concrete walk in the south margin of the street presently known as Councill Street and formerly known as Front Street; thence with the south margin of the street presently known as Council Street and formerly known as Front Street South 75 degrees 00 minutes East 337.70 feet to an iron set in the South margin of said street presently known as Councill Street and formerly known as Front Street; thence leaving the street presently known as Councill Street and formerly known as Front Street and running South 7 degrees 09 minutes West 179.64 feet to an iron against the north edge of the existing concrete sidewalk on the north side of King Street; thence with the north margin of said King Street North 83 degrees 02 minutes West 310.00 feet to the point of BEGINNING, containing 1.494 acres.