## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| EARTH FARE, INC., *et al.*,[1] | ) | Case No. 20-10256 (KBO) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | |

## DEBTORS' COMBINED DISCLOSURE STATEMENT AND
## JOINT CHAPTER 11 PLAN OF LIQUIDATION

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
Pauline K. Morgan (No. 3650)
M. Blake Cleary (No. 3614)
Sean T. Greecher (No. 4484)
Shane M. Reil (No. 6195)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1256
EF@ycst.com

*Counsel to the Debtors and Debtors-in-Possession*

Dated:  April 6, 2021

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Earth Fare, Inc. (3936) and EF Investment Holdings, Inc. (8084).  The mailing address for each of the Debtors is P.O. Box 1389, Fletcher, North Carolina 28732.

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

ARTICLE I DEFINED TERMS AND RULES OF INTERPRETATION .....................................2

ARTICLE II CLASSIFICATION OF CLAIMS AND INTERESTS AND
ESTIMATED RECOVERIES ......................................................................................13

2.1    Classification.................................................................................13

ARTICLE III BACKGROUND AND DISCLOSURES ................................................16

3.1    General Background ..........................................................16
3.2    Events Leading to Chapter 11 ...........................................18
3.3    The Chapter 11 Cases ......................................................21

ARTICLE IV CONFIRMATION AND VOTING PROCEDURES........................................31

4.1    Confirmation Procedure.....................................................31
4.2    Procedure for Objections ..................................................31
4.3    Requirements for Confirmation ........................................31
4.4    Classification of Claims and Interests.............................32
4.5    Impaired Claims or Interests.............................................33
4.6    Confirmation Without Necessary Acceptances; Cramdown ................................33
4.7    Feasibility..........................................................................35
4.8    Best Interests Test and Liquidation Analysis...................35
4.9    Acceptance of the Plan......................................................36

ARTICLE V CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO
VOTING ....................................................................................................................36

5.1    The Plan May Not Be Accepted ......................................37
5.2    The Plan May Not Be Confirmed ....................................37
5.3    Distributions to Holders of Allowed Claims under the Plan May Be
Inconsistent with Projections .....................................37
5.4    Objections to Classification of Claims .............................37
5.5    Failure to Consummate the Plan ......................................38
5.6    Plan Releases May Not Be Approved...............................38
5.7    The Total Amount of 503(b)(9) Claims and Initial Administrative
Claims May Exceed the Caps .....................................38
5.8    Reductions to Estimated Creditor Recoveries ................39
5.9    Certain Tax Considerations...............................................39

ARTICLE VI TREATMENT OF UNCLASSIFIED CLAIMS................................................43

6.1    Administrative Claims ......................................................43

6.2     Priority Tax Claims................................................................................44

ARTICLE VII TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS ........................44

7.1     Class 1:  Priority Non-Tax Claims......................................................44
7.2     Class 2:  Other Secured Claims .........................................................44
7.3     Class 3: First Lien Facility Claims......................................................44
7.4     Class 4: Second Lien Facility Claims .................................................44
7.5     Class 5:  General Unsecured Claims...................................................44
7.6     Class 6: Intercompany Claims ............................................................44
7.7     Class 7: Interests ................................................................................45
7.8     Reservation of Rights Regarding Claims and Interests ......................45

ARTICLE VIII ACCEPTANCE OR REJECTION OF THE PLAN ........................................45

8.1     Class Entitled to Vote ........................................................................45
8.2     Acceptance by Impaired Classes of Claims or Interests .....................45
8.3     Presumed Acceptance by Unimpaired Classes ...................................45
8.4     Presumed Rejections by Impaired Classes .........................................45
8.5     Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code....................45
8.6     Controversy Concerning Impairment .................................................45
8.7     Elimination of Vacant Classes ...........................................................46

ARTICLE IX IMPLEMENTATION OF THE PLAN ..............................................................46

9.1     Implementation of the Plan.................................................................46
9.2     Debtors' Members, Managers, and Officers.......................................46
9.3     Transition Services..............................................................................46
9.4     Wind-Down and Dissolution of the Debtors ......................................46
9.5     Wind-Down Reserve...........................................................................47
9.6     Abandonment, Disposal, and Destruction of Records ........................47
9.7     Distributions by Wind-Down Officer .................................................47
9.8     Limitation of Liability; Indemnification ............................................47
9.9     Company Action .................................................................................47
9.10    Avoidance Actions and Preference Actions .......................................48

ARTICLE X PROVISIONS GOVERNING DISTRIBUTIONS ...............................................48

10.1    Distributions for Allowed Claims.......................................................48
10.2    Interest of Claims.................................................................................48
10.3    Distributions by Wind-Down Officer as Disbursement Agent.....................48
10.4    Waterfall ............................................................................................49
10.5    Means of Cash Payment......................................................................49
10.6    Fractional Distributions ......................................................................49
10.7    De Minimis Distributions ...................................................................49
10.8    Application of Distribution Record Date .............................................49
10.9    Withholding, Payment and Reporting Requirements With Respect to Distributions..............................................................................49

10.10   Setoffs ................................................................................................50
10.11   No Distribution in Excess of Allowed Amounts ..............................50
10.12   Allocation of Distributions ..............................................................50
10.13   Delivery of Distributions; Forfeiture of Distributions .....................50

ARTICLE XI PROVISIONS FOR CLAIMS OBJECTIONS AND ESTIMATION
OF CLAIMS ...............................................................................................51

11.1   Claims Administration Responsibility ...............................................51
11.2   Claims Objections ..............................................................................51
11.3   Estimation of Contingent or Unliquidated Claims .............................51
11.4   Distributions on Account of Disputed Claims ...................................52
11.5   Amendments to Claims .......................................................................52
11.6   Claims Paid and Payable by Third Parties ........................................52
11.7   Adjustment to Claims Without Objection ...........................................52

ARTICLE XII EXECUTORY CONTRACTS ....................................................52

12.1   Executory Contracts Deemed Rejected ..............................................52
12.2   Asset Purchase Agreements ...............................................................53

ARTICLE XIII CONFIRMATION AND CONSUMMATION OF THE PLAN .......53

13.1   Conditions Precedent to the Effective Date.  Each of the following
       is a condition precedent to the occurrence of the Effective Date: .........53
13.2   Notice of Effective Date .....................................................................53
13.3   Waiver of Conditions Precedent to the Effective Date ......................54
13.4   Effect of Non-Occurrence of Effective Date .....................................54

ARTICLE XIV EFFECTS OF CONFIRMATION ............................................54

14.1   Exculpation, Releases, and Injunctions .............................................54
14.2   Term of Bankruptcy Injunction or Stays ............................................56
14.3   Approval of WARN Settlement ...........................................................56
14.4   Allocation Between Principal and Interest .........................................57

ARTICLE XV RETENTION OF JURISDICTION ...........................................57

15.1   Exclusive Jurisdiction of Bankruptcy Court ......................................57

ARTICLE XVI MISCELLANEOUS PROVISIONS ..........................................59

16.1   Modification of the Plan .....................................................................59
16.2   Revocation, Withdrawal, or Non-Confirmation of the Plan ...............59
16.3   Binding Effect ....................................................................................59
16.4   Subordination Rights ..........................................................................59
16.5   Severability of Plan Provisions ..........................................................60
16.6   Payment of Statutory Fees; Filing of Quarterly Reports ...................60

16.7     Dissolution of the Committee ...................................................................60
16.8     Exemption from Section 1146 ..................................................................60
16.9     Closing of Chapter 11 Cases ...................................................................61
16.10    Filing of Additional Documents ..............................................................61
16.11    Insurance ..................................................................................................61
16.12    Successors and Assigns.............................................................................61
16.13    Governing Law .........................................................................................61
16.14    Exhibits and Schedules .............................................................................61
16.15    Computation of Time ................................................................................62
16.16    Reservation of Rights................................................................................62

## DISCLAIMER

THIS COMBINED DISCLOSURE STATEMENT AND PLAN WAS COMPILED FROM INFORMATION OBTAINED FROM NUMEROUS SOURCES BELIEVED TO BE ACCURATE TO THE BEST OF THE DEBTORS' KNOWLEDGE, INFORMATION, AND BELIEF. NO GOVERNMENTAL AUTHORITY HAS PASSED ON, CONFIRMED OR DETERMINED THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED HEREIN.

NOTHING STATED HEREIN SHALL BE (I) DEEMED OR CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, (II) ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY, OR (III) DEEMED CONCLUSIVE EVIDENCE OF THE TAX OR OTHER LEGAL EFFECTS OF THE COMBINED DISCLOSURE STATEMENT AND PLAN ON THE DEBTORS OR HOLDERS OF CLAIMS OR INTERESTS. CERTAIN STATEMENTS CONTAINED HEREIN, BY NATURE, ARE FORWARD-LOOKING AND CONTAIN ESTIMATES AND ASSUMPTIONS. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL REFLECT ACTUAL OUTCOMES.

THE STATEMENTS CONTAINED HEREIN ARE MADE AS OF THE DATE HEREOF, UNLESS ANOTHER TIME IS SPECIFIED. THE DELIVERY OF THIS COMBINED DISCLOSURE STATEMENT AND PLAN SHALL NOT BE DEEMED OR CONSTRUED TO CREATE ANY IMPLICATION THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AT ANY TIME AFTER THE DATE HEREOF. HOLDERS OF CLAIMS OR INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS COMBINED DISCLOSURE STATEMENT AND PLAN AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL OR TAX ADVICE. THEREFORE, EACH SUCH HOLDER SHOULD CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL, AND TAX ADVISORS AS TO ANY SUCH MATTERS CONCERNING THIS COMBINED DISCLOSURE STATEMENT AND PLAN AND THE TRANSACTIONS CONTEMPLATED HEREBY.

NO PARTY IS AUTHORIZED TO GIVE ANY INFORMATION WITH RESPECT TO THIS COMBINED DISCLOSURE STATEMENT AND PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS COMBINED DISCLOSURE STATEMENT AND PLAN. NO REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY HAVE BEEN AUTHORIZED BY THE DEBTORS OTHER THAN AS SET FORTH IN THIS COMBINED DISCLOSURE STATEMENT AND PLAN. ANY INFORMATION, REPRESENTATIONS, OR INDUCEMENTS MADE TO OBTAIN AN ACCEPTANCE OF THIS COMBINED DISCLOSURE STATEMENT AND PLAN OTHER THAN, OR INCONSISTENT WITH, THE INFORMATION CONTAINED HEREIN SHOULD NOT BE RELIED UPON BY ANY HOLDER OF A CLAIM OR INTEREST. THE COMBINED DISCLOSURE STATEMENT AND PLAN HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(b) AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-APPLICABLE BANKRUPTCY LAWS.

SEE ARTICLE V HEREIN, ENTITLED "CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO VOTING," FOR A DISCUSSION OF CERTAIN CONSIDERATIONS IN CONNECTION WITH A DECISION BY A HOLDER OF AN IMPAIRED CLAIM TO ACCEPT THE COMBINED DISCLOSURE STATEMENT AND PLAN.

## INTRODUCTION[2]

The Debtors hereby jointly propose the following combined Disclosure Statement and Plan for the liquidation of the Debtors' remaining Assets and distribution of the proceeds of the Assets to the Holders of Allowed Claims against the Debtors as set forth herein.  Each Debtor is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code.

This combined Disclosure Statement and Plan contains, among other things, a discussion of the Debtors' history, businesses, properties, operations, the Chapter 11 Cases, risk factors, summary and analysis of the Plan, and certain other related matters.

**ALL HOLDERS OF CLAIMS AGAINST THE DEBTORS ARE ENCOURAGED TO READ THE COMBINED DISCLOSURE STATEMENT AND PLAN IN ITS ENTIRETY, AND TO CONSULT WITH AN ATTORNEY, BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.  SUBJECT TO CERTAIN RESTRICTIONS AND REQUIREMENTS SET FORTH IN SECTION 1127 OF THE BANKRUPTCY CODE, BANKRUPTCY RULE 3019, AND IN THE PLAN, THE DEBTORS RESERVE THE RIGHT TO ALTER, AMEND, MODIFY, REVOKE OR WITHDRAW THE PLAN, OR ANY PART THEREOF, PRIOR TO ITS SUBSTANTIAL CONSUMMATION.**

## ARTICLE I
## DEFINED TERMS AND RULES OF INTERPRETATION

**Defined Terms**

    **1.1**     **"503(b)(9) Claims"** shall mean Claims entitled to priority under section 503(b)(9) of the Bankruptcy Code.

    **1.2**     **"Administrative Claim"** shall mean a Claim for costs and expenses of administration of the Chapter 11 Cases allowed under sections 503(b), 507(b) or, if applicable, 1114(e)(2) of the Bankruptcy Code, including but not limited to: (a) any actual and necessary costs and expenses incurred after the Petition Date of preserving the Estates and operating the Debtors' business (including, but not limited to, wages, salaries, commissions for services and payments for inventories, leased equipment and premises) and Claims by Governmental Units for taxes (including Claims related to taxes which accrued after the Petition Date, but excluding Claims related to taxes which accrued on or before the Petition Date); (b) compensation for legal, financial, advisory, accounting and other services and reimbursement of expenses allowed by the Bankruptcy Court under sections 328, 330, 331, 363 or 503(b) of the Bankruptcy Code to the extent incurred on or prior to the Effective Date; (c) all fees and charges assessed against the

---

[2]  Capitalized terms not defined in this Introduction shall have the meanings ascribed below.

Estates under United States Code title 28 section 1930; (d) any 503(b)(9) Claims; and (e) any Claims that have been designated "Administrative Claims" by order of the Bankruptcy Court.

**1.3** **"Affiliate"** shall have the meaning given to such term in section 101(2) of the Bankruptcy Code.

**1.4** **"Allowed"** shall mean, with reference to any Claim or Administrative Claim against the Debtors: (i) any Claim that has been listed by the Debtors in their respective Schedules, as such Schedules have been or may be amended by the Debtors from time to time in accordance with Bankruptcy Rule 1009, as liquidated in amount and not disputed or contingent and for which no contrary proof of claim has been filed; *provided, however*, that any such Claim listed in the Schedules that has been paid by the Debtors after the Petition Date pursuant to an order of the Bankruptcy Court shall not be considered an Allowed Claim; (ii) any Claim or Administrative Claim allowed pursuant to the Plan; (iii) any Claim or Administrative Claim that is compromised, settled, or otherwise resolved pursuant to the authority granted to the Debtors pursuant to a Final Order of the Bankruptcy Court or under the Plan; (iv) any Claim or Administrative Claim that has been Allowed by Final Order; or (v) any Claim or Administrative Claim that has been Allowed by agreement of the Claimant and the Debtor or Wind-Down Officer (after consultation with the First Lien Agent) in writing. Claims allowed solely for the purpose of voting to accept or reject the Plan pursuant to an order of the Bankruptcy Court shall not be considered "Allowed Claims" hereunder. Unless otherwise specified herein or by order of the Bankruptcy Court, "Allowed Administrative Claim" or "Allowed Claim" shall not, for any purpose under the Plan, include interest on such Administrative Claim or Claim from and after the Petition Date. Any Distribution to the Holder of an Allowed Claim under this Plan shall be net of any setoff amount of any Cause of Action that may be asserted by any Debtor against the Holder of such Claim.

**1.5** **"Assets"** shall mean any and all right, title, and interest of the Debtors and the Estates in and to property of whatever type or nature.

**1.6** **"Avoidance Actions"** shall mean any and all Causes of Action of each Debtor and its estate to avoid or recover a transfer of property of any of the Debtors' estates or an interest of any of the Debtors in property, including, without limitation, actions arising under (i) sections 105, 502(d), 510, 542 through 551, and 553 of the Bankruptcy Code or (ii) any other applicable similar state or federal law concerning the avoidance of fraudulent transfers, fraudulent conveyances, preferential transfers, or prohibited distributions, in each case, whether or not litigation has been commenced with respect to such Causes of Action as of the Effective Date, except those Avoidance Actions previously waived by the Debtors pursuant to any Final Order.

**1.7** **"Ballot"** shall mean the ballot form distributed to each Holder of a Claim entitled to vote to accept or reject this Plan.

**1.8** **"Bankruptcy Code"** shall mean title 11 of the United States Code, 11 U.S.C. §§ 101–1532, and as such title has been, or may be, amended from time to time, to the extent that any such amendment is applicable to the Chapter 11 Cases.

**1.9    "Bankruptcy Court"** shall mean the United States Bankruptcy Court for the District of Delaware.

**1.10    "Bankruptcy Rules"** shall mean the Federal Rules of Bankruptcy Procedure, the Official Bankruptcy Forms, or the Local Rules, and as each has been, or may be, amended from time to time, to the extent that any such amendment is applicable to the Chapter 11 Cases.

**1.11    "Bar Date"** shall mean, with respect to any particular Claim, the specific date set by the Bankruptcy Court as the last day for Filing Proofs of Claim, motions for allowance of Administrative Claims, or proofs of Interest against the Debtors in the Chapter 11 Cases for that specific Claim or Interest.

**1.12    "Bar Date Order"** shall mean that certain Order (I) Establishing Bar Dates for Filing Proofs of Claim and (II) Approving the Form and Manner of Notice Thereof [D.I. 440].

**1.13    "Business Day"** shall mean any day, other than a Saturday, Sunday or a legal holiday (as that term is defined in Bankruptcy Rule 9006(a)).

**1.14    "Cash"** shall mean money that is legal tender of the United States of America and equivalents thereof.

**1.15    "Causes of Action"** shall mean, without limitation, any and all actions, Causes of Action, Avoidance Actions, controversies, liabilities, obligations, rights, suits, damages, judgments, Claims, and demands whatsoever owned by any of the Debtors, whether known or unknown, reduced to judgment, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, secured or unsecured, whether assertable directly, indirectly, derivatively or in any representative or other capacity, existing or hereafter arising, in law, equity, or otherwise, based in whole or in part upon any act, failure to act, error, omission, transaction, occurrence or other event arising or occurring prior to the Petition Date or during the course of the Chapter 11 Cases, including through the Effective Date.

**1.16    "Chapter 11 Cases"** shall mean the chapter 11 cases commenced by the Debtors and jointly administered under case number 20-10256 (KBO) in the Bankruptcy Court.

**1.17    "Claim"** shall mean a claim against any Debtor, as such term is defined in section 101(5) of the Bankruptcy Code.

**1.18    "Claims Agent"** shall mean the Debtors' claims agent, Epiq Bankruptcy Solutions, LLC.

**1.19    "Claims Objection Deadline"** shall mean ninety (90) days after the Effective Date, or such later date as may be ordered by the Bankruptcy Court; *provided however*, that the Wind-Down Officer may seek extensions of this date from the Bankruptcy Court.

**1.20    "Class"** shall mean each category of Holders of Claims or Interests that has been designated as a class in Article II of the combined Disclosure Statement and Plan.

**1.21**    **"Class 3 Effective Date Payment Amount"** shall mean the Cash held by the Debtors on the Effective Date, <u>less</u> the Satisfaction Amount, which Class 3 Effective Date Payment Amount shall be not less than $10,100,000.

**1.22**    **"Committee"** shall mean the Official Committee of Unsecured Creditors appointed in the Chapter 11 Cases.

**1.23**    **"Company"** shall mean both Earth Fare, Inc. and EF Investment Holdings, Inc.

**1.24**    **"Confirmation"** shall mean entry of the Confirmation Order by the Bankruptcy Court on the docket of the Chapter 11 Cases.

**1.25**    **"Confirmation Date"** shall mean the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

**1.26**    **"Confirmation Hearing"** shall mean the hearing held by the Bankruptcy Court to consider confirmation of the Plan and final approval of the Disclosure Statement, as such hearing may be adjourned or continued from time to time.

**1.27**    **"Confirmation Notice"** shall mean the notice of Confirmation Hearing to be delivered pursuant to Bankruptcy Rules 2002(c)(3) and 2002(f).

**1.28**    **"Confirmation Order"** shall mean an order of the Bankruptcy Court, in form and substance reasonably satisfactory to the Debtors and the First Lien Agent, confirming the Plan pursuant to, among others, section 1129 of the Bankruptcy Code.

**1.29**    **"Consummation"** shall mean the occurrence of the Effective Date.

**1.30**    **"Contingent"** shall mean, with reference to a Claim, a Claim that has not accrued or is not otherwise payable and the accrual of which, or the obligation to make payment on which, is dependent upon a future event that may or may not occur.

**1.31**    **"Creditor"** shall have the meaning ascribed to such term in section 101(10) of the Bankruptcy Code.

**1.32**    **"Debtors"** shall mean, collectively, Earth Fare, Inc. and EF Investment Holdings, Inc.

**1.33**    **"Disallowed"** shall mean, with respect to any Claim or Interest or portion thereof, any Claim against or Interest in a Debtor which:  (i) has been disallowed, in whole or part, by a Final Order; (ii) has been withdrawn, in whole or in part, by the Holder thereof; (iii) is listed in the Schedules in the amount of zero dollars or as Disputed, Contingent or unliquidated and in respect of which a proof of Claim or a proof of Interest, as applicable, has not been timely Filed or deemed timely Filed pursuant to the Plan, the Bankruptcy Code or any Final Order or other applicable law; (iv) has been reclassified, expunged, subordinated or estimated to the extent that such reclassification, expungement, subordination or estimation results in a reduction in the Filed amount of any proof of Claim or proof of Interest; (v) is evidenced by a proof of Claim or a

proof of Interest which has been Filed, or which has been deemed to be Filed under applicable law or order of the Bankruptcy Court or which is required to be Filed by order of the Bankruptcy Court but as to which such proof of Claim or proof of Interest was not timely or properly Filed; (vi) is unenforceable to the extent provided in section 502(b) of the Bankruptcy Code; or (vii) where the Holder of a Claim is an Entity from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 548, 549, or 724(a) of the Bankruptcy Code, unless such Entity or transferee has paid the amount, or turned over any such Property, for which such Entity or transferee is liable under section 522(i), 542, 543, 550, or 553 of the Bankruptcy Code, and if required by the Bankruptcy Court, an Objection or adversary proceeding has been Filed.  In each case a Disallowed Claim or a Disallowed Interest is disallowed only to the extent of disallowance, withdrawal, reclassification, expungement, subordination, or estimation.

      **1.34**    **"Disbursing Agent"** shall mean the Wind-Down Officer; *provided, however*, that the Wind-Down Officer may, in its discretion, retain a third party to act as Disbursing Agent.

      **1.35**    **"Disclosure Statement"** shall mean the disclosure statement, as amended, supplemented, or modified from time to time, that is embodied within the combined Disclosure Statement and Plan and distributed in accordance with, among others, sections 1125, 1126(b), and 1145 of the Bankruptcy Code, Bankruptcy Rule 3018, and other applicable law.

      **1.36**    **"Disputed"** shall mean any Claim or Interest which has not yet been Allowed or Disallowed in accordance with the terms of the Plan.

      **1.37**    **"Disputed Claim Reserve"** shall mean the reserve established and maintained by the Wind-Down Officer for payment of Disputed Claims in an amount equal to the face value of all Disputed Administrative Claims, Disputed Priority Tax Claims, Disputed Priority Non-Tax Claims, and Disputed Other Secured Claims, or such other amount as may be ordered by the Bankruptcy Court.

      **1.38**    **"Distribution"** shall mean distribution of Cash or other property pursuant to the Plan.

      **1.39**    **"Distribution Date"** shall mean the date on which a Distribution is made pursuant to the Plan.

      **1.40**    **"Distribution Record Date"** shall mean the date established for determining the Holders of Claims entitled to Distributions pursuant to the Plan, which shall be the General Bar Date or such other date established in the Confirmation Order.

      **1.41**    **"Earth Fare"** shall mean Earth Fare, Inc.

      **1.42**    **"Effective Date"** shall mean the first Business Day after the later of the date on which (a) all conditions to the occurrence of the Effective Date in Article XIII of the Plan have been satisfied or waived in accordance with that Article and (b) no stay of the Confirmation Order is in effect.

1.43    **"Effective Date Notice"** shall mean the notice of the Effective Date.

1.44    **"Entity"** shall have the meaning ascribed to such term in section 101(15) of the Bankruptcy Code.

1.45    **"Estate"** shall mean each of the Debtors' estates created, pursuant to section 541 of the Bankruptcy Code, upon the commencement of the Chapter 11 Cases on the Petition Date.

1.46    **"Exculpated Parties"** shall mean, in each case in their capacities as such, and together with their respected Related Parties, (a) the Debtors, and (b) the Committee.

1.47    **"Executory Contract"** shall mean a contract or unexpired lease to which the Debtor is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

1.48    **"Fifth Third"** shall mean Fifth Third Bank, National Association.

1.49    **"File," "Filed," or "Filing"** shall mean, respectively, file, filed, or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases.

1.50    **"Final Administrative Claim Bar Date"** shall mean the date that is forty-five (45) days after the date the Effective Date Notice is filed and served, which date shall be the deadline for filing requests for payment of Administrative Claims that arose after the date of entry of the Solicitation Procedures Order, but prior to the Effective Date.

1.51    **"Final Decree"** shall mean the Order entered pursuant to section 350 of the Bankruptcy Code, Bankruptcy Rule 3022, and Local Rule 5009-1 closing the Chapter 11 Cases.

1.52    **"Final Distribution"** shall mean the final Distributions to Holders of Allowed Claims.

1.53    **"Final Order"** shall mean order or judgment of the Bankruptcy Court, or other court of competent jurisdiction, as entered on the docket in the Chapter 11 Cases or the docket of any other court of competent jurisdiction, that has not been reversed, stayed, modified or amended, and as to which the time to appeal or seek certiorari or move for a new trial, reargument or rehearing has expired, and no appeal or petition for certiorari or other proceedings for a new trial, reargument or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been timely Filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument or rehearing has been denied or resulted in no modification of such order, provided, however, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or applicable state court rules of civil procedure, may be Filed with respect to such order, shall not cause such order not to be a Final Order.

1.54    **"First Day Declaration"** shall mean the *Declaration of Charles Goad in Support of Chapter 11 Petitions and First Day Motions* [D.I. 18].

1.55    **"First Lien Agent"** shall mean Fifth Third, in its capacity as Administrative Agent, Swing Lien Lender, L/C Issuer and Sole Lead Arranger under the First Lien Credit Agreement.

1.56    **"First Lien Credit Agreement"** shall mean that certain credit and guarantee agreement, dated as of April 16, 2010 (as amended, restated, supplemented or otherwise modified), among Earth Fare, as borrower, the First Lien Lenders, and the First Lien Agent.

1.57    **"First Lien Credit Facility"** shall mean the First Lien Credit Agreement and all related guarantee, security, and collateral agreements and documents, and all exhibits and other ancillary documentation in respect thereof, and any other "Loan Documents" (as defined in the First Lien Credit Agreement) and the credit facility contemplated thereunder and all loans, credit or other advances provided thereunder.

1.58    **"First Lien Facility Claim"** shall mean all Claims arising under or relating to the First Lien Credit Agreement, including, without limitation, any and all interest, fees, legal fees, expenses and other amounts accruing thereunder as of the Petition Date, which, upon Confirmation, shall be Allowed in full in the amount of $62,992,438.86 and shall not be subject to any avoidance, reductions, setoff, offset, recharacterization, subordination (whether equitable, contractual or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection, or any other challenges to the extent permitted under applicable law.

1.59    **"First Lien Lenders"** shall mean Fifth Third and Wells Fargo, each in their capacity as revolving lenders under the First Lien Credit Facility.

1.60    **"General Bar Date"** shall mean the August 24, 2020 deadline established by the Bar Date Order for filing proofs of Claim for (a) Initial Administrative Claims, (b) 503(b)(9) Claims, (c) Secured Claims (other than the First Lien Facility Claim), (d) Priority Tax Claims, and (e) Priority Non-Tax Claims.

1.61    **"General Unsecured Claim"** shall mean an unsecured nonpriority Claim against a Debtor which is not an Other Secured Claim, an Administrative Claim (including Professional Fee Claims), a Priority Claim, a Priority Tax Claim, a First Lien Facility Claim, a Second Lien Facility Claim, an Intercompany Claim, or an Interest.

1.62    **"Governmental Unit"** shall have the meaning ascribed to such term in section 101(27) of the Bankruptcy Code.

1.63    **"Holder"** shall mean the Person that is the owner of record of a Claim or Interest, as applicable.

1.64    **"Holdings"** shall mean EF Investment Holdings, Inc.

1.65    **"Impaired"** shall mean, when used in reference to a Claim or Interest, a Claim or Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code.

1.66    **"Impaired Class"** shall mean a Class of Claims or Interests that is Impaired.

**1.67** **"Initial Administrative Claims"** shall mean Administrative Claims, other than 503(b)(9) Claims and Professional Fee Claims, incurred on or after the Petition Date through and including March 31, 2021.

**1.68** **"Intercompany Claim"** shall mean a Claim by a Debtor against another Debtor.

**1.69** **"Intercreditor Agreement"** shall mean that certain intercreditor agreement, as of July 16, 2019, by and among Earth Fare, Holdings, Fifth Third, in its capacity as the First Lien Agent and as a First Lien Lender, and the Second Lien Lender.

**1.70** **"Interest"** shall mean either (i) the legal, equitable, contractual or other rights of any Person with respect to the preferred or common stock, or any other equity interest in any of the Debtors, including any other unexercised options, interest in or right to convert into such equity interest or (ii) the legal, equitable, contractual or other right of any Person to acquire or receive any of the foregoing.

**1.71** **"Insurance Contract"** shall mean all insurance policies that have been issued at any time to or provide coverage to any of the Debtors and all agreements, documents or instruments relating thereto.

**1.72** **"Insurer"** means any company or other entity that issued an Insurance Contract, any third party administrator, and any respective predecessors and/or affiliates thereof.

**1.73** **"Internal Revenue Code"** shall mean the United States Internal Revenue Code 1986, as amended.

**1.74** **"IRS"** shall mean the Internal Revenue Service.

**1.75** **"Local Rules"** shall mean the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware.

**1.76** **"Objection"** shall mean any objection, application, motion, complaint or any other legal proceeding seeking, in whole or in part, to disallow, determine, liquidate, classify, reclassify, or establish the priority, expunge, subordinate or estimate any Claim (including the resolution of any request for payment of any Administrative Claim).

**1.77** **"Other Secured Claim"** shall mean any Secured Claim other than the First Lien Facility Claims and Second Lien Facility Claims.

**1.78** **"Paid in Full," "Payment in Full," or "Pay in Full"** shall mean, with respect to an Allowed Claim, payment in Cash or other consideration in an aggregate amount equal to the Allowed amount thereof.

**1.79** **"Petition Date"** shall mean February 4, 2020, the date on which the Debtors Filed the Chapter 11 Cases in the Bankruptcy Court.

**1.80** **"Plan"** shall mean this joint plan of liquidation under chapter 11 of the Bankruptcy Code, as it may be altered, amended, modified or supplemented from time to time,

including in accordance with any documents submitted in support hereof and the Bankruptcy Code or the Bankruptcy Rules.

1.81 **"Plan Supplement"** shall mean the ancillary documents necessary to the implementation and effectuation of the Plan, which shall be Filed on or before the date that is seven (7) days prior to the Voting Deadline, *provided, however*, that the Debtors shall have the right to amend documents contained in, and exhibits to, the Plan Supplement in accordance with the terms of the Plan.

1.82 **"Preference Actions"** shall mean any right, claim, or cause of action of the Debtors arising under section 547 of the Bankruptcy Code.

1.83 **"Priority Non-Tax Claim"** shall mean any and all Claims accorded priority in right of payment under section 507(a) of the Bankruptcy Code, other than Priority Tax Claims and Administrative Claims.

1.84 **"Priority Tax Claim"** shall mean a Claim or a portion of a Claim for which priority is asserted under section 507(a)(8) of the Bankruptcy Code.

1.85 **"Professional"** shall mean any professional employed in the Chapter 11 Cases pursuant to sections 327, 328, 330 or 1103 of the Bankruptcy Code or any Professional or other Person seeking compensation or reimbursement of expenses in connection with the Chapter 11 Cases pursuant to section 503(b)(4) of the Bankruptcy Code.

1.86 **"Professional Fee Claims"** shall mean all fees and expenses (including but not limited to, transaction fees and success fees) for services rendered by Professionals in connection with the Chapter 11 Cases from the Petition Date through and including the Effective Date.

1.87 **"Professional Fee Claims Bar Date"** shall mean the deadline for Filing all applications for Professional Fee Claims, which shall be twenty-one (21) days after the Wind-Down Officer files and serves the Effective Date Notice.

1.88 **"Related Parties"** shall mean with respect to any entity, such entity's predecessors, successors, assigns, and present and former affiliates (whether by operation of law or otherwise) and subsidiaries, and each of their respective managed accounts or funds or investment vehicles, and each of their respective current and former direct and indirect equity holders, officers, directors, managers, principals, direct and indirect shareholders, members, partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors, chief restructuring officers, and other professionals, in each case acting in such capacity.

1.89 **"Released Parties"** shall mean, collectively, (a) the Debtors, (b) all of the Debtors' respective direct and indirect shareholders and owners, as well as their, and each of their direct and indirect shareholders' and owners' respective officers, directors, members, employees, partners, managers, advisors, attorneys, financial advisors, accountants, and other professionals and representatives, (c) the First Lien Agent, (d) the First Lien Lenders who vote to

accept the Plan as set forth on the relevant Ballot, (e) the Debtors' equity sponsors, and (h) the Related Parties of each of the foregoing entities in clauses (a) through (e) of this definition.

    **1.90**   **"Releasing Parties"** shall mean (a) all Holders of Claims or Interests who are Unimpaired, (b) the Committee, (c) the First Lien Agent, (d) the First Lien Lenders, (e) the Debtors' equity sponsors, and (f) with respect to each of the foregoing, their Related Parties.

    **1.91**   **"Retained Causes of Action"** shall mean all Causes of Actions against third parties, but excluding all Avoidance Actions, Preference Actions and those Causes of Action released pursuant to Section 14.1(b) hereof.

    **1.92**   **"Revenue Procedure"** shall mean an official statement of a procedure published by the IRS in the Internal Revenue Bulletin.

    **1.93**   **"Sales"** shall mean, collectively, the sales of certain of the Debtors' intellectual property, leases of nonresidential real property and related personal property of the Debtors located in such leased premises, as described more fully in section 3.3(d) of this Plan.

    **1.94**   **"Schedules"** shall mean the schedules of assets and liabilities and statements of financial affairs Filed by the Debtors pursuant to section 521 of the Bankruptcy Code and in substantial accordance with the Official Bankruptcy Forms, as the same may have been amended, modified, or supplemented from time to time.

    **1.95**   **"Second Lien Lender"** shall mean the lender party under the Second Lien Credit Facility.

    **1.96**   **"Second Lien Credit Agreement"** shall mean that certain second lien credit and guaranty agreement, dated as of July 16, 2019, by and among Earth Fare, as borrower, and the lender party thereto.

    **1.97**   **"Second Lien Credit Facility"** shall mean the Second Lien Credit Agreement and all related guarantee, security, and collateral agreements and documents, and all exhibits and other ancillary documentation in respect thereof.

    **1.98**   **"Second Lien Facility Claim"** shall mean all Claims arising under or relating to the Second Lien Credit Agreement.

    **1.99**   **"Secured Claim"** shall mean, either (i) a Claim that is secured by a lien on property in which the Debtors have an interest, which lien is valid, perfected and enforceable under applicable law or pursuant to a Final Order, or that is subject to setoff under section 553 of the Bankruptcy Code, to the extent of the value of the Creditor's interest in such property or to the extent of the amount subject to setoff, as applicable, all as determined pursuant to section 506(a) of the Bankruptcy Code; or (ii) a Claim which is Allowed under the Plan as a Secured Claim.

    **1.100** **"Solicitation Procedures Order"** shall mean that certain order entered by the Bankruptcy Court approving the Disclosure Statement, entered on [April 8, 2021] [D.I. [●]].

**1.101** **"Taxes"** shall mean all income, gross receipts, sales, use, transfer, payroll, employment, franchise, profits, property, excise, or other similar taxes, estimated import duties, fees, stamp taxes, and duties, value added taxes, assessments, or charges of any kind whatsoever (whether payable directly or by withholding), together with any interest and any penalties, additions to tax, or additional amounts imposed by any taxing authority of a Governmental Unit with respect thereto.

**1.102** **"Treasury Regulations"** shall mean the regulations (including temporary regulations) promulgated by the United States Department of the Treasury pursuant to and in respect of provisions of the Internal Revenue Code.  All references herein to sections of the Treasury Regulations shall include any corresponding provision or provisions of succeeding, similar or substitute, temporary or final Treasury Regulations.

**1.103** **"Unclassified Claims"** shall mean any Administrative Claims, Professional Fee Claims, and Priority Tax Claims.

**1.104** **"Unimpaired"** shall mean, when used in reference to a Claim or Interest, any Claim or Interest that is not impaired within the meaning of section 1124 of the Bankruptcy Code.

**1.105** **"U.S. Trustee Fees"** shall mean fees payable pursuant to 28 U.S.C. § 1930 and any interest accruing thereon pursuant to 31 U.S.C. § 3717.

**1.106** **"Voting Deadline"** shall mean **May 17, 2021 at 5:00 p.m. (prevailing Eastern Time)**, the date and time by which ballots to accept or reject the Plan must be received to be counted, as set forth by the Solicitation Procedures Order.

**1.107** **"WARN Settlement"** shall have the meaning given to such term in section 3.3. of this Combined Plan and Disclosure Statement.

**1.108** **"Wells Fargo"** shall mean Wells Fargo Bank, National Association.

**1.109** **"Wind-Down Officer"** shall mean Charles Goad, the Debtors' Chief Restructuring Officer, and a Senior Managing Director of FTI Consulting, Inc.

**1.110** **"Wind-Down Reserve"** shall have the meaning set forth in Section 9.5 of the Plan.

**Rules of Interpretation**

**1.111** For purposes of the Plan, except as expressly provided or unless the context otherwise requires, (a) any capitalized term used in the combined Disclosure Statement and Plan that is not defined herein, but is defined in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning ascribed to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable, (b) whenever the context requires, each term stated in either the singular or the plural shall include the singular and the plural, and pronouns stated in the masculine, feminine, or neuter shall include the masculine, feminine and the neuter, (c) any reference in the Plan to a

contract, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions, (d) any reference in the Plan to an existing document or exhibit means such document or exhibit as it may be amended, modified, or supplemented from time to time, (e) unless otherwise specified, all references in the Plan to sections, articles, schedules, and exhibits are references to sections, articles, schedules, and exhibits of or to the Plan, (f) the words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to the Plan in its entirety rather than to any particular paragraph, subparagraph, or clause contained in the Plan, (g) captions and headings to articles and sections are inserted for convenience of reference only and shall not limit or otherwise affect the provisions hereof or the interpretation of the Plan, and (h) the rules of construction set forth in section 102 of the Bankruptcy Code and in the Bankruptcy Rules shall apply.

## ARTICLE II
## CLASSIFICATION OF CLAIMS AND INTERESTS AND ESTIMATED RECOVERIES

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND ARE THEREFORE SUBJECT TO CHANGE.**

**2.1     Classification**.  The information in the table below is provided in summary form for illustrative purposes only and is subject to material change based on certain contingencies, including those related to the claims reconciliation process.  Actual recoveries may vary widely within these ranges, and any changes to any of the assumptions underlying these amounts could result in material adjustments to recovery estimates provided herein and/or the actual distribution received by Creditors.  The projected recoveries are based on information available to the Debtors as of the date hereof and reflect the Debtors' estimates as of the date hereof only.  In addition to the cautionary notes contained elsewhere in the combined Disclosure Statement and Plan, it is underscored that the Debtors make no representation as to the accuracy of these recovery estimates.  The Debtors expressly disclaim any obligation to update any estimates or assumptions after the date hereof on any basis (including new or different information received and/or errors discovered).

A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes.  A Claim or Interest is also placed in a particular Class for the purpose of receiving Distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim in that Class and such Claim or Interest has not been paid, released, or otherwise settled prior to the Effective Date.

All Claims and Interests, except Administrative Claims, Professional Fee Claims, and Priority Tax Claims, are placed in the Classes set forth below.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims (including Professional Fee Claims) and Priority Tax Claims, as described herein, have not been classified, and the respective treatment of such unclassified Claims is set forth below in Article VI of the Plan.  The categories of Claims and Interests listed below classify Claims and Interests for all purposes, including

voting, confirmation and distribution pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.

| Class/ Designation | Allowance and Treatment | Estimated Amount of Claims | Status | Projected Recovery |
|---|---|---|---|---|
| **Class 1:** Priority Non-Tax Claims | _Allowance._  Class 1 Claims shall be allowed or disallowed in accordance with this Combined Disclosure Statement and Plan and applicable provisions of the Bankruptcy Code and Bankruptcy Rules.<br><br>_Treatment._  Subject to the terms of this Combined Disclosure Statement and Plan, holders of Class 1 Claims, in full and final satisfaction, settlement, release and compromise and in exchange for their Allowed Priority Non-Tax Claims, shall receive Cash in an amount equal to such Allowed Priority Non-Tax Claims on or as soon as reasonably practicable after the later of the date such claim is Allowed and the Effective Date. | $1,100,000 | Unimpaired / Deemed to accept Plan | 100% |
| **Class 2:** Other Secured Claims | _Allowance._  Class 2 Claims shall be allowed or disallowed to the extent permitted by section 506 of the Bankruptcy Code and other applicable provisions of the Bankruptcy Code and Bankruptcy Rules in accordance with this Combined Disclosure Statement and Plan.<br><br>_Treatment._  Subject to the terms of this Combined Disclosure Statement and Plan, holders of Class 2 Claims, in full and final satisfaction, settlement, release and compromise and in exchange for their Allowed Other Secured Claims, shall receive, at the option of the Debtors, either (i) Cash in an amount equal to such Allowed Other Secured Claim or (ii) the collateral securing such Allowed Other Secured Claim, on or as soon as reasonably practicable after the later of the date such Claim is Allowed and the Effective Date. | $0.00 | Unimpaired /Deemed to accept Plan | 100% |
| **Class 3:** First Lien Facility Claims | _Allowance._  Class 3 Claims shall be Allowed Claims pursuant to this Combined Disclosure Statement and Plan in the aggregate amount of $62,992,438.86 plus (and including) all other amounts which may be outstanding | $62,992,438.86 | Impaired/ Entitled to vote | 20 - 25% |

| Class/ Designation | Allowance and Treatment | Estimated Amount of Claims | Status | Projected Recovery |
|---|---|---|---|---|
| | under the First Lien Facility as of the Petition Date.<br><br>      _Treatment_.  Subject to the terms of this Combined Disclosure Statement and Plan, Holders of Class 3 Claims, in full and final satisfaction, settlement, release and compromise and in exchange for their Allowed First Lien Facility Claims, shall receive, (a) by no later than the Effective Date, the Class 3 Effective Date Payment Amount, plus (b) after satisfaction of or reserve for all payments required to be made under the Plan, including to Holders of all Allowed Unclassified Claims, Allowed Class 1 Priority Non-Tax Claims and Allowed Class 2 Other Secured Claims, and including the funding of the 503(b)(9) Reserve and an appropriate Wind-Down Reserve (the amount of cash necessary to satisfy in full all of the foregoing payments and/or reserves, the "**Satisfaction Amount**"), any cash of the Debtors that exceeds the Satisfaction Amount (including any cash that remains from the 503(b)(9) Reserve and the Wind-Down Reserve after payment of all amounts covered by each such reserve), up to the full face amount of the Allowed First Lien Facility Claims. | | | |
| **Class 4:** Second Lien Facility Claims |       _Allowance_.  Class 4 Claims shall be Allowed Claims pursuant to this Combined Disclosure Statement and Plan in the aggregate amount of $14,800,000 plus (and including) all other amounts which may be outstanding under the Second Lien Facility Agreement as of the Petition Date.<br><br>      _Treatment_.  Holders of Allowed Second Lien Facility Claims are not entitled to receive any Distribution or retain any property under the Plan on account of such Claims. | $14,800,000 | Impaired/ Deemed to reject Plan | 0% |
| **Class 5:** General Unsecured |       _Allowance_.  Class 5 Claims shall be Allowed in the amounts set forth in the Debtors' Schedules or disallowed to the extent | $132,019,597.62 (estimated) | Impaired/ Deemed to reject Plan | 0% |

| Class/ Designation | Allowance and Treatment | Estimated Amount of Claims | Status | Projected Recovery |
|---|---|---|---|---|
| Claims | permitted by section 502 of the Bankruptcy Code and other applicable provisions of the Bankruptcy Code and Bankruptcy Rules in accordance with this Combined Disclosure Statement and Plan.<br><br>Treatment. Holders of General Unsecured Claims are not entitled to receive any Distribution or retain any property under the Plan on account of such Claims. | | | |
| Class 6: Intercompany Claims | Holders of Claims in this Class will not receive any recovery on their Claims. | N/A | Impaired/ Deemed to reject Plan | 0% |
| Class 7: Interests | Holders of Interests in the Debtors will retain no ownership interests in the Debtors under the Plan and such Interests shall be cancelled effective as of the Effective Date. | N/A | Impaired/ Deemed to reject Plan | 0% |

## ARTICLE III
## BACKGROUND AND DISCLOSURES

### 3.1    General Background[3]

#### (a)    The Debtors' Business

Prior to completion of the Store Closing Sales and consummation the Sales, the Debtors were a leading natural and organic food retailer with store locations in the Southeastern, Mid-Atlantic, and Midwestern United States. Founded in Asheville, North Carolina in 1975 as a modest, natural food store, then named "Dinner for the Earth," the Company, over the last half century, had built a leading reputation in the natural and organic supermarket industry by offering a carefully curated selection of organic, natural, fresh, and wellness products guided by a unique food philosophy ensuring the cleanest assortment and the highest quality standards in the industry.

In 2012, the Company's current majority equity sponsors and co-investors acquired their majority equity interest in the Company. Holdings is a holding company and the direct parent of Earth Fare, owning 100% of the equity in Earth Fare.

---

[3] Additional information regarding the Debtors' business, assets, capital structure, and the circumstances leading to the filing of the Chapter 11 Cases is set forth in detail in the First Day Declaration, which is incorporated herein by reference.

Headquartered in Fletcher, North Carolina, the Company operated fifty (50) stores in ten (10) states in the Southeastern, Mid-Atlantic, and Midwestern United States as of the Petition Date, emphasizing a consistent "full shop" experience with a focus on selection, convenience and competitive pricing.

The Company's business was driven by a commitment to convenient and affordable healthy food. Accordingly, the Company boasted a wide assortment of organic and locally sourced products and the most stringent food philosophy in the industry. Indeed, the Debtors' unique and dedicated approach to high-quality food standards, health and wellness included a "Boot List" of ingredients, including added hormones, artificial fats, trans fats, antibiotics, and artificial preservatives, that were banned from all products sold at its stores.

As of the Petition Date, the Debtors employed, in the aggregate, approximately 3,270 full or part-time employees.

    *(b)*        ***The Debtors' Capital Structure***

On April 16, 2010, Earth Fare entered into the First Lien Credit Facility with Fifth Third as Administrative Agent, Swing Line Lender, L/C Issuer and Sole Lead Arranger, pursuant to which the First Lien Lenders (Fifth Third and Wells Fargo) provided a revolving line of credit to finance the Company's operations with initial commitments of $40,000,000 in the aggregate. On April 9, 2012, the First Lien Credit Facility was amended and restated to provide for, among other things, an increase in the First Lien Lenders' aggregate lending commitments to $65,000,000, and a guaranty of Earth Fare's obligations under the First Lien Credit Facility by Holdings.

On May 15, 2017, Earth Fare executed revolving notes under the terms of the First Lien Credit Facility with (i) Fifth Third, in the original principal of $43,333,333.33, and (ii) Wells Fargo, in the original principal amount of $21,666,666.67. As of the Petition Date, the outstanding balances owed to Fifth Third and Wells Fargo under the First Lien Credit Facility were $41,994,962 and $20,997,478, respectively, in each case inclusive of accrued and unpaid interest (all such amounts, the "**First Lien Obligations**").

The First Lien Obligations are secured by a first-priority lien on and security interest in substantially all of Earth Fare's assets, including accounts receivable, cash and cash equivalents, chattel paper, deposit accounts, equipment and fixtures, general intangibles, goods, inventory, investment property, contract rights and other rights to payment, software, trademarks, copyrights, and the proceeds and products thereof (the "**Collateral**")

On July 16, 2019, Earth Fare entered into the Second Lien Credit Agreement with the Second Lien Lender, pursuant to which the Second Lien Lender extended to Earth Fare a loan in the original principal amount of $14,800,000 and incremental capacity for an additional $4,000,000 in loans. As of the Petition Date, the Debtors' obligation under the Second Lien Credit Agreement is approximately $14,800,000, inclusive of accrued but unpaid interest (all such amounts the "**Second Lien Obligations**"). The Second Lien Obligations matured on June 30, 2020, and are secured by a second-priority lien on and security interest in the Collateral, subject to the Intercreditor Agreement.

26186273.10

Earth Fare, Fifth Third, as lender and agent under the First Lien Credit Agreement, and the Second Lien Lender are parties to the Intercreditor Agreement, which governs the respective rights, obligations and priorities of the First Lien Lenders and the Second Lien Lender with respect to the matters referred to therein, including the lenders' relative rights in the Collateral.

Lastly, as a grocery chain with fifty (50) stores, the Debtors had, as of the Petition Date, certain obligations in respect of their leased facilities and approximately $60 million in outstanding trade liabilities and other unsecured obligations.

## 3.2    Events Leading to Chapter 11

### (a)    *Circumstances Leading to Prepetition Liquidity Challenges*

Following its formation in 1975, Dinner for the Earth evolved and expanded, becoming Earth Fare in 1994, and opening new locations in South Carolina and Florida in 1997 and 2010, respectively.  Ultimately, Earth Fare grew into a business with more than fifty (50) locations in the Midwest, Mid-Atlantic, and Southeast United States and approximately $465,000,000 in annual revenues.

Earth Fare was committed to realizing the growth and expansion of its operations into new markets with a multi-faceted strategy including: (i) remodeling efforts to implement a new store format featuring wider aisles, a superior product mix, and a new layout design; (ii) in-store initiatives such as grab-and-go meals, affordable family meals, enhanced marketing, order automation, and inventory tracking; (iii) an e-commerce campaign which included Earth Fare's Instacart rollout, completed in December 2018; and (iv) a loyalty program offering approximately 1.3 million customers competitive pricing and rewards, while providing Earth Fare with enhanced data to be used for further improvement of the customer experience and more efficient marketing capabilities.

These efforts improved Earth Fare's appearance, efficiency, profitability, and customer relations.  While many of the Company's expansions were successful, others have struggled for a variety of reasons unique to store location or competition in certain markets.  At the same time, many of Earth Fare's legacy stores required significant capital improvements, which caused a strain on liquidity.  All of these factors coincided with the maturity of the Company's obligations under the First Lien Credit Facility at the end of 2019, resulting in the significant liquidity challenges facing the Company as of the Petition Date.

### (b)    *Prepetition Marketing and Restructuring Efforts*

Cognizant of its liquidity challenges as well as the maturity of the First Lien Obligations at year-end, the Company, with the support of its equity sponsor, spent a significant amount of time engaged in a process of soliciting interest in a refinancing of the Company's secured indebtedness, or a sale of substantially all of the Company's assets.

The Company was able to obtain numerous extensions of the maturity date under the First Lien Credit Agreement.  On May 15, 2017, the Company entered into an amendment to the First Lien Credit Agreement that provided for a reduction in the commitments thereunder and

extended the maturity date to April 9, 2019. As a condition precedent to the closing of the amendment, the equity sponsors contributed an additional $10 million in capital to the Company.

On August 29, 2018, the Company entered into another amendment to the First Lien Credit Agreement that further reduced the commitments thereunder, provided for certain accommodations with respect to the financial covenants, and extended the maturity date to July 9, 2019. As a condition precedent to the closing of the amendment, the equity sponsors contributed an additional $9 million in capital to the Company.

On April 12, 2019, the Company entered into another amendment to the First Lien Credit Agreement that suspended testing under the financial covenants. As a condition precedent to the closing of the amendment, the equity sponsors contributed an additional $5 million in capital to the Company and were required to retain Piper Jaffray & Co. ("**Piper**") as financial advisor to solicit interest from new lenders or co-investors and explore potential refinancing options. Piper's retention was completed in March 2019, and the terms of the engagement were amended in December 2019 to reflect current circumstances and to remove certain provisions no longer relevant to the Company's financing process.

In April 2019, Piper began investor outreach (the "**Refinancing Effort**") in connection with the Company's refinancing effort, which included contacting approximately ninety (90) potential investors. A confidential information memorandum and financial model were prepared and made available to potential investors who signed a non-disclosure agreement. Then in November 2019, Piper launched a second capital raising process featuring an updated confidential information memorandum, financial model, and other due diligence information for parties who signed a non-disclosure agreement. In this process, Piper reached out to approximately seventy-five (75) potential capital providers (some of which were contacted and active during the first round of outreach as well). Ultimately, the Company received three (3) proposals across both rounds of outreach. The Company considered the proposals and ultimately determined not to proceed with any proposal, given none were for an amount of capital sufficient to refinance its existing indebtedness.

In May 2019, the Company informally engaged Deutsche Bank Securities Inc. ("**Deutsche Bank**") as their investment banker to assist the Company in exploring potential strategic transactions, including a potential sale of substantially all of the Company's assets (the "**Prepetition Sale Process**"), as an alternative to the Refinancing Effort. Also in May, Deutsche Bank held introductory meetings with two major retailers to discuss a potential sale.

In June 2019, the Company formally engaged Deutsche Bank as their investment banker. Beginning in September 2019, Deutsche Bank contacted forty-one (41) parties, consisting of eighteen (18) financial buyers and twenty-three (23) strategic buyers, concerning a potential purchase of all or a portion of the Company's assets. A confidential information memorandum and financial model were prepared and made available to twenty-two (22) potential investors who signed a non-disclosure agreement, from September through December. In November 2019, Deutsche Bank delivered management presentations to two potential investors. One of the investors later submitted a proposal to the Company for the purchase of a significant portion of the Company's assets and held advanced negotiations with the Company to provide a going-

concern bid.  However, as discussed in further detail below, these negotiations ultimately proved unsuccessful

In addition to the Refinancing Effort and Prepetition Sale Process undertaken by Piper and Deutsche Bank, respectively, the Company engaged FTI in July 2019 to provide certain financial advisory services and to assist the Company with an analysis of their capital needs and the development and implementation of budgeting and other operational initiatives to improve financial performance and liquidity.  On July 16, 2019, the Company also entered into another amendment to the First Lien Credit Agreement providing for suspension of testing under certain financial covenants, permitting the Company to enter into the Second Lien Credit Agreement, which provided the Company with an additional $14.8 million in capital, and extending the maturity date to December 31, 2019

In November 2019, the Company engaged Young Conaway Stargatt & Taylor, LLP ("**Young Conaway**") as counsel in connection with a potential out-of-court restructuring or chapter 11 filing.

In December 2019, facing tightening liquidity and the imminent maturity of the First Lien Obligations, the Company initiated the sale of five (5) of its underperforming stores.  The proceeds of these sales, as well as other cost-saving operational initiatives, provided the Company with sufficient liquidity to continue canvassing the market for potential strategic partners for a refinancing or going concern sale.

>    *(c)*      ***The Store Closing Sales***

As discussed above, the Debtors negotiated tirelessly with potential acquisition partners with respect to agreements for the sale of substantially all of the Debtors' store locations as a going concern.  On January 8, 2020, the Debtors received a non-binding term sheet from a potential purchaser (the "**Potential Bidder**") for the acquisition of thirty-three (33) of the Debtors' stores as well as the Debtors' headquarters operations.  The Debtors and Potential Bidder engaged in significant additional negotiations and conducted various rounds of additional diligence in the subsequent weeks including an in-person meeting at the Debtors' headquarters on January 28, 2020 in hopes of finalizing the terms of a definitive agreement.  However, late in the day on January 29, 2020, the Potential Bidder advised the Debtors that it was no longer interested in any transaction to acquire the Debtors' assets as a going concern.

At the same time as the Debtors were negotiating with the Potential Bidder, the Debtors also had reached out to four nationally recognized liquidation firms so that such parties could provide proposals for the liquidation of the inventory at the Debtors' stores in the event that the Prepetition Sale Process did not generate an executable going-concern bid.  The Debtors provided the liquidation firms with access to a data room with all of the relevant information necessary to build a liquidation model and for the liquidation firms to evaluate the potential transaction.  The Debtors obtained two proposals from liquidators.

Swiftly after obtaining notice from the Potential Bidder that it no longer intended to pursue a going-concern bid, the Debtors retained Malfitano Advisors, LLC ("**Malfitano**") on January 30, 2020 to serve as asset disposition advisor and consultant to negotiate optimal

liquidation proposals from the liquidators.  The Debtors, through Malfitano, sent a request for proposals ("**RFP**") to the bidding groups, providing the deadline to submit final, binding bids and related materials (the "**Bid Deadline**").  The RFP set forth particular instructions for submitting bids, including the structure and format for such bids.  After evaluating the bids and providing each of the bidders with the opportunity to submit their best and final proposals, the Debtors determined that the bid submitted by a contractual joint venture comprised of Hilco Merchant Resources, LLC and Gordon Brothers Retail Partners, LLC (together, the "**Agent**") was in the best interests of the Debtors and their estates.  The Debtors made this determination after considering numerous factors, including, but not limited to, (i) the Agent's prior experience handling the liquidation of various similar retailers, (ii) the amount and experience of supervisors designated by the Agent to handle the project, (iii) potential upside that could be realized under a "fee" based structure, (iv) the ability of the Agent to source and supplement the Debtors' inventory with staples such as milk, bread, eggs, meat, *etc.* (the "**DSD Merchandise**"), and (v) overall economics.  The Debtors and the Agent entered into that certain Consulting Agreement (the "**Consulting Agreement**") on January 30, 2020 and store-closing sales began on February 3, 2020.

In short, the Debtors determined that entering into the Consulting Agreement and commencing store closing sales immediately was essential to ensure that the liquidation of the Store Assets would be managed efficiently and effectively.  This became even more important when, on January 31, 2020, the Debtors' largest supplier advised them that it would no longer be shipping goods to the Debtors on account of the unpaid balances owed.  The lack of new supply in the closing stores created additional pressure to engage a third-party liquidator like the Agent who has the ability to immediately source and supplement the Debtors' inventory with DSD Merchandise.

The Debtors negotiated the terms and conditions of the Consulting Agreement in good faith and at arms' length, and entered into the Consulting Agreement on January 30, 2020.  In order to avoid, among other potential negative outcomes, a disorganized "self-liquidation" scenario, *i.e.*, a scenario in which more desirable items sell faster than items with a slower turnover, the closing sales began on February 3, 2020.

### 3.3    The Chapter 11 Cases

#### (a)    *Generally*

As set forth above, on the Petition Date (February 4, 2020), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court.

The commencement of a chapter 11 case creates an estate that is composed of all of the legal and equitable interests of the debtor as of that date.  The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."  Prior to the Store Closing Sales and consummation of the Sales, the Debtors continued to operate their businesses and manage their properties as debtors and debtors in possession.  By order entered on February 6, 2020 [D.I. 46], the Chapter 11 Cases are being jointly administered for procedural purposes only.  No trustee or examiner has been appointed in

the Chapter 11 Cases.  On February 11, 2020, the Office of the United States Trustee for the District of Delaware appointed the Committee.

The filing of the Debtors' bankruptcy petitions on the Petition Date triggered the immediate imposition of the automatic stay under section 362 of the Bankruptcy Code, which, with limited exceptions, enjoins all collection efforts and actions by creditors, the enforcement of liens against property of the Debtors and both the commencement and the continuation of prepetition litigation against the Debtors.  With certain limited exceptions and/or modifications as permitted by order of the Bankruptcy Court, the automatic stay will remain in effect from the Petition Date until the Effective Date of the Plan, at which time it will, in effect, be replaced by the injunction provisions set forth in this Combined Disclosure Statement and Plan.

> *(b)*      ***"First Day" Motions and Related Applications***

Commencing on the Petition Date, the Debtors filed the following "first-day" motions and applications designed to ease the Debtors' transition into chapter 11, maximize the value of the Assets, and minimize the effects of the commencement of the Chapter 11 Cases (collectively, the "***First Day Motions***"):

> i.      Debtors' Motion for an Order Authorizing the Joint Administration of the Debtors' Chapter 11 Cases ("**Joint Administration Motion**") [D.I. 2].
>
> ii.      Debtors' Application for Entry of an Order (I) Approving the Retention and Appointment of Epiq Corporate Restructuring, LLC as the Claims and Noticing Agent to the Debtors, Effective *Nunc Pro Tunc* to the Petition Date and (II) Granting Related Relief ("**Claims Agent Retention Motion**") [D.I. 3].
>
> iii.      Debtors' Motion for Interim and Final Orders (I) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Utility Services, (II) Deeming Utility Companies Adequately Assured of Future Payment, (III) Establishing Procedures for Determining Additional Adequate Assurance of Payment, and (IV) Setting a Final Hearing Related Thereto ("**Utility Motion**") [D.I. 4].
>
> iv.      Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Payment of Prepetition Obligations Incurred in the Ordinary Course of Business in Connection with Insurance Programs, Including Payment of Policy Premiums, and (II) Authorizing Banks to Honor and Process Check and Electronic Transfer Requests Related Thereto ("**Insurance Motion**") [D.I. 5].
>
> v.      Debtors' Motion for Entry of Interim and Final Orders Authorizing (I) the Debtors to Pay Certain Prepetition Taxes and Fees and Related Obligations and (II) Banks to Honor and Process Check and Electronic Transfer Requests Related Thereto ("**Tax Motion**") [D.I. 6].

vi.     Debtors' Motion for an Order (A) Authorizing (I) Payment of Prepetition Employee Wages, Salaries and Other Compensation; (II) Reimbursement of Prepetition Employee Business Expenses; (III) Contributions to Prepetition Employee Benefit Programs and Continuation of Such Programs in the Ordinary Course; (IV) Payment of Workers' Compensation Obligations; (V) Payments for Which Prepetition Payroll Deductions Were Made; (VI) Payment of All Costs and Expenses Incident to the Foregoing Payments and Contributions; and (VII) Payment to Third Parties of All Amounts Incident to the Foregoing Payments and Contributions; and (B) Authorizing Banks to Honor and Process Check and Electronic Transfer Requests Related Thereto ("**Employee Wage Motion"**) [D.I. 8].

vii.    Debtors' Motion for an Order Authorizing (I) the Debtors to Honor Prepetition Obligations Related to Customer Programs and Otherwise Continue Customer Programs in the Ordinary Course of Business and (II) Banks to Honor and Process Check and Electronic Transfer Requests Related Thereto ("**Customer Programs Motion**") [D.I. 9].

viii.   Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing and Approving (A) Continued Use of Cash Management System and (B) Use of Prepetition Bank Accounts and Business Forms; (II) Authorizing Banks to Honor Certain Transfers and Charge Certain Amounts; (III) Waiving the Requirements of Section 345(b) of the Bankruptcy Code on an Interim Basis; and (IV) Granting Related Relief ("**Cash Management Motion**") [D.I. 10].

ix.     Debtors' Motion for Interim and Final Orders (A) Authorizing Postpetition Use of Cash Collateral, (B) Granting Adequate Protection, (C) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001(b), and (D) Granting Related Relief ("**Cash Collateral Motion**") [D.I. 14].

x.      Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Payment of Prepetition Claims Arising Under the Perishable Agricultural Commodities Act and the Packers and Stockyards Act of 1921, and (II) Authorizing Banks to Honor and Process Check and Electronic Transfer Requests Related to the Foregoing ("**PACA/PASA Motion**") [D.I. 15].

xi.     Debtors' Emergency Motion for Interim and Final Orders (A)(1) Confirming, on an Interim Basis, That the Store Closing Agreement is Operative and Effective and (2) Authorizing, on a Final Basis, the Debtors to Assume the Store Closing Agreement, (B) Authorizing and Approving Store Closing Sales Free and Clear of All Liens, Claims, and Encumbrances, (C) Approving Dispute Resolution Procedures, (D) Authorizing Customary Bonuses to Employees Essential to Store Closings, and (E) Approving the Debtors' Store Closing Plan ("**Store Closing Motion**") [D.I. 16].

On February 6, 2020, the Bankruptcy Court entered orders: (i) approving the relief requested in the Joint Administration Motion [D.I. 46], the Claims Agent Retention Application [D.I. 47], and the Customer Programs Motion [D.I. 53], on a final basis; and (ii) approving the relief requested in the Utilities Motion [D.I. 48], the Insurance Motion [D.I. 49], the Taxes Motion [D.I. 51], the Cash Management Motion [D.I. 55], the PACA/PASA Motion [D.I. 57], the Employee Wage Motion [D.I. 59], the Cash Collateral Motion [D.I. 60], and the Store Closing Motion [D.I. 61], on an interim basis.

On February 26, 2020, the Bankruptcy Court entered orders approving, on a final basis, the relief requested in the Insurance Motion [D.I. 212], the Employee Wage Motion [D.I. 213], the Taxes Motion [D.I. 214], the Cash Management Motion [D.I. 216], the PACA/PASA Motion [D.I. 218], and the Store Closing Motion [D.I. 221].

On March 3, 2020, the Bankruptcy Court entered orders approving, on a final basis, the relief requested in the Utility Motion [D.I. 239] and the Cash Collateral Motion [D.I. 240].

*(c)*     ***Retention of Professional Advisors***

Pursuant to orders entered on February 26, 2020, the Bankruptcy Court authorized the Debtors to retain and employ (i) Young Conaway Stargatt & Taylor, LLP, as bankruptcy counsel [D.I. 223]; (ii) FTI, as financial advisor [D.I. 219]; (iii) Epiq, as administrative agent [D.I. 217]; (iv) Malfitano, as asset disposition advisor [D.I. 215]; (v) Hilco IP Services, LLC d/b/a Hilco Streambank ("**Hilco Streambank**"), as intellectual property sale advisor [D.I. 225]; and (vi) A&G Realty Partners, LLC ("**A&G**"), as real property sale advisor [D.I. 226].   The Bankruptcy Court also authorized the Debtors to retain and employ certain professionals utilized by the Debtors in the ordinary course of business prior to the Petition Date [D.I. 224].

Pursuant to an order entered on March 27, 2020, the Bankruptcy Court authorized the Committee to retain and employ Pachulski Stang Ziehl & Jones LLP, as bankruptcy counsel [D.I. 317], and pursuant to an order entered on April 1, 2020, the Bankruptcy Court authorized the Committee to retain and employ Alvarez & Marsal North America, LLC as their financial advisor [D.I. 324].

*(d)*     ***The Sales***

    i.     <u>The Bidding Procedures</u>

As set forth in the First Day Declaration, the Debtors' paramount goal in the Chapter 11 Cases was to maximize the value of the Estates for the benefit of the Debtors' creditor constituencies and other stakeholders through the Store Closing Sales and the subsequent sale of their remaining assets, including their leases, furniture, fixtures, and equipment, and intellectual property.

On February 5, 2020, the Debtors filed the *Debtors' Motion for Entry of: (I) an Order (A) Approving De Minimis Asset Sale Procedures; (B) Approving Certain Bidding Procedures, Assumption and Assignment Procedures, and the Form and Manner of Notice Thereof; (C) Authorizing the Debtors to Enter into Asset Purchase Agreements with Stalking Horse Bidders;*

*and (D) Scheduling a Hearing on the Approval of the Sale of the Debtors' Remaining Assets Free and Clear of All Encumbrances as Well as the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases and (II) an Order (A) Authorizing the Sale of the Debtors' Remaining Assets Free and Clear of All Encumbrances, (B) Approving Asset Purchase Agreements, (C) Authorizing the Assumption of Certain Executory Contracts and Unexpired Leases, and (D) Waiving Stay Provisions Pursuant to Bankruptcy Rules 6004(h) and 6006(d)* [D.I. 33] (the "**Bidding Procedures/De Minimis Asset Sale Motion**").

On February 14, 2020, the Court entered an order approving the Bidding Procedures/De Minimis Asset Sale Motion [D.I. 122] (the "**Bidding Procedures/De Minimis Asset Sale Order**").

ii.    <u>The Sales Process</u>

The Debtors entered chapter 11 with the belief that a robust, public sale process would result in the highest and best price for the Assets and would best allow the Debtors to maximize the value of their Estates. As such, since the Petition Date, the Debtors, with the aid of their advisors, specifically A&G, Hilco Streambank, and Hilco/Gordon Brothers, engaged in a wholesale effort to market and sell all of the Debtors' Assets, from the merchandise in the Debtors' stores, to all of the Debtors' more significant Assets, such as the Debtors' unexpired real property leases, the furniture, fixtures, and equipment contained in the Debtors' stores and used in the operation of the Debtors' grocery business, and the Debtors' intellectual property. In short, the Debtors' efforts during the Chapter 11 Cases were intently focused on, among other things, selling the Debtors' assets and, thereby, maximizing the recovery to the Debtors' estates.

On February 7, 2020, in accordance with the Bidding Procedures Order, the Debtors filed the *Notice of Entry of Bidding Procedures/De Minimis Asset Sale Order and Proposed Sale* [D.I. 12] (the "**Sale Notice**"). The Sale Notice disclosed the following key dates and deadlines, which were approved by the Bidding Procedures/De Minimis Asset Sale Order (the "**Original Sale Deadlines**"):

| <u>Event</u> | <u>Date</u> |
|---|---|
| Stalking Horse Designation Deadline | February 19, 2020 |
| Bid Deadline | February 21, 2020, at 5:00 p.m. (ET) |
| Deadline to Object to Sale (other than with respect to the conduct of the Auction and designation of a Successful Bidder) | February 24, 2020, at 4:00 p.m. (ET) |
| Auction Commencement | February 25, 2020, at 10:00 a.m. (ET) |
| Deadline to Object to Conduct of Auction, Designation of Successful Bidders, and Adequate Assurance | At the commencement of the Sale Hearing |

| Event | Date |
|---|---|
| Sale Hearing | February 27, 2020, at 2:00 p.m. (ET) |

However, over the course of the month of February, it became clear to the Debtors and their professionals that there was sufficient interest in at least certain of the Debtors' more valuable assets to extend the Original Deadlines.  In the judgment of the Debtors' professionals and advisors, with added time, there was the potential to unlock significant additional value for the Debtors' assets.  As such, in consultation with the Consultation Parties, the Debtors decided to extend the Original Deadlines by approximately one month and, on February 24, 2020, the Debtors filed the *Notice of (I) Revised Proposed Bid Deadline, Auction Date, and Other Sale-Related Deadlines and (II) Sale Hearing* [Docket No. 197] (the "**Supplemental Sale Notice**" and, with the Sale Notice, the "**Sale Notices**").  The Supplemental Sale Notice set forth the following revised dates and deadlines (the "**Revised Deadlines**"):

| Event | Original Date | Modified Date |
|---|---|---|
| Deadline to Serve Additional Assumption Notices | February 14, 2020 | March 3, 2020 |
| Stalking Horse Designation Deadline | February 19, 2020 | March 6, 2020 |
| Deadline to Serve Stalking Horse Purchaser Adequate Assurance Information | Within one (1) day of the entry of any order approving a Stalking Horse Purchaser | Within one (1) day of the entry of any order approving a Stalking Horse Purchaser |
| Deadline to file proposed Sale Order | February 20, 2020, at 4:00 p.m. (ET) | Two (2) weeks before the Sale Hearing |
| Bid Deadline | February 21, 2020, at 5:00 p.m. (ET) | March 16, 2020, at 5:00 p.m. (ET) |
| Deadline to Object to Additional Assumption Notices | February 21, 2020, at 4:00 p.m. (ET) | March 17, 2020, at 4:00 p.m. (ET) |
| Deadline to Serve Adequate Assurance Information | February 22, 2020 | March 17, 2020 |
| Deadline to Object to Sale (other than with respect to the conduct of the Auction and designation of a Successful Bidder) | February 24, 2020, at 4:00 p.m. (ET) | March 17, 2020, at 4:00 p.m. (ET) |

| **Event** | **Original Date** | **Modified Date** |
|---|---|---|
| Deadline to Object to Adequate Assurance of Stalking Horse Purchaser | February 26, 2020, at 4:00 p.m. (ET) | March 20, 2020, at 4:00 p.m. (ET) |
| Auction Commencement | February 25, 2020, at 10:00 a.m. (ET) | March 23, 2020, at 10:00 a.m. (ET) |
| Deadline to Object to Conduct of Auction, Designation of Successful Bidders, and Adequate Assurance | At the commencement of the Sale Hearing | At the commencement of the Sale Hearing |
| Sale Hearing | February 27, 2020, at 2:00 p.m. (ET) | March 24, 2020, at 1:00 p.m. (ET) |

Subsequent to the entry of the Bidding Procedures Order as well as the filing of the Sale Notices, the Debtors' professionals, in particular A&G and Hilco Streambank, continued to communicate, and work, with potential bidders. A&G and Hilco Streambank provided potential bidders with copies of the approved Bidding Procedures, notified them of the Bid Deadline, both the original and the revised, and invited them to continue to discuss acquisition of the Debtors' assets and subgroups thereof.

With respect to the potential sale of the Debtors' intellectual property assets, Hilco Streambank contacted one hundred and thirty-six (136) parties, six (6) of which executed non-disclosure agreements and were granted access to the Debtors' data room of relevant information to conduct diligence. Of those parties, one bidder (the "**Qualified IP Bidder**") submitted a qualified bid for the Debtors' intellectual property asset portfolio, including personally identifiable information of the Debtors' customers ("**PII**"). One other party submitted a bid for the same assets, but requested that the Debtors obtain approval of certain bid protections.[4]

As to the Debtors' leases in particular, overall A&G contacted fifty-three (53) prospective purchasers and fifty-seven (57) lease counterparties, of which twenty-six (26) engaged in some level of diligence. Ultimately, the Debtors received five (5) Qualified Bids for the Acquired Assets and Leases: (i) the bid of DJ3 Delaware ("**DJ3**") for five (5) stores, one of which was ultimately designated a Back-Up Bid, in addition to the Debtors' intellectual property assets but specifically excluding any PII; (ii) the bid of Winn-Dixie Stores, Inc. ("**Winn-Dixie**") for four (4) stores; (iii) the bid of ALDI, Inc. ("**ALDI**") for one store; (iv) the bid of Whole Foods Market Group, Inc. ("**Whole Foods**") for two (2) stores; and (v) the bid of Hendersonville Community Cooperative for one store.

Based on the Qualified Bids received and discussions with the Qualified Bidders, the Debtors determined, in consultation with the Consultation Parties, that it was unnecessary to hold

---

[4] The Debtors also received a bid in a de minimis amount for certain PII maintained by the Debtors. The Debtors determined that such bid was not qualified given the costs that would be required to obtain authority to enter into such sale transaction.

an Auction because either there was only one Qualified Bid for the applicable Acquired Lease and related Acquired Assets or, where there were multiple Qualified Bids for the applicable Acquired Lease, the Qualified Bidders indicated that they were not willing to increase their bid. As such, the Debtors designated the Qualified Bids as Successful Bids or Back-Up Bids, as described above, and requested at the Sale Hearing authority to consummate the transactions contemplated by the Successful Bids with DJ3, Winn-Dixie, ALDI, and Whole Foods. Additionally, the Debtors contacted the Qualified IP Bidder to determine whether such bidder intended to increase its bid at an auction in order to compete with the combined value to the estates that will be realized by the DJ3 bid. The Qualified IP Bidder declined to increase its bid. As such, the Debtors determined that there was no need to conduct the Auction.

With respect to the balance of the Debtors' properties, the Debtors did not obtain bids from third party acquirers to accept an assignment of the underlying leases. As part of the marketing process, the Debtors, through A&G, contacted the landlords for each of the Debtors' remaining former store locations in order to determine whether such landlords had interest in executing lease termination agreements with the Debtors and negotiated and entered into lease termination agreements (collectively, the "**Lease Termination Agreements**") with the landlord counterparties. Under the Lease Termination Agreements, the landlords acquired the Debtors' furniture, fixtures, and equipment remaining in the store locations in addition to possession of the store facilities in exchange for termination of the underlying leases, waivers of various claims (particularly administrative expense claims for February "stub rent"), and in certain cases, additional cash consideration.

The Court approved the Debtors' Lease Termination Agreement with 5070 South Westnedge, LLC on March 12, 2020 [Docket No. 255]. On March 24, 2020, the Bankruptcy Court held the Sale Hearing to consider approval of the Sales and the Debtors' entry into the balance of the Lease Termination Agreements.

After the Sale Hearing, the Court entered the following orders approving the Sales and the Debtors' entry into the Lease Termination Agreements, as applicable:

- Charlotte, North Carolina Lease Termination Agreement [D.I. 295];

- Gainesville, Florida Lease Termination Agreement [D.I. 296];

- Ocala, Florida Lease Termination Agreement [D.I. 297];

- Carmel, Indiana Lease Termination Agreement [D.I. 298]

- Williamsburg, Virginia Lease Termination Agreement [D.I. 299];

- Palm Beach Gardens, Florida Lease Termination Agreement [D.I. 300];

- ALDI Inc. Sale [D.I. 302];

- Winn-Dixie Stores, Inc. Sale [D.I. 303];

- Whole Foods Market Group, Inc. Sale [D.I. 304];

- DJ3 Delaware, LLC Sale [D.I. 305];

- Columbia, South Carolina Lease Termination Agreement [D.I. 308];

- Rock Hill, South Carolina Lease Termination Agreement [D.I. 315]; and

- Boone, North Carolina Lease Termination Agreement [D.I. 321].

All of the Sales had closed as of March 31, 2020.

*(e)*     ***Schedules and Bar Dates***

On March 11, 2020, the Debtors filed the Schedules.  Among other things, the Schedules set forth the Claims of known or putative creditors against the Debtors as of the Petition Date, based upon the Debtors' books and records.

On July 23, 2020, the Bankruptcy Court entered the Bar Date Order that, among other things, established the General Bar Date as August 24, 2020 at 5:00 p.m. (prevailing Eastern Time).  As described in detail below, the Plan contemplates the establishment of a Final Administrative Claim Bar Date and Professional Fee Bar Date pursuant to the Confirmation Order.

The projected recoveries set forth in the Plan are based on certain assumptions, including the Debtors' estimates of the Claims that will eventually be Allowed in various Classes.  There is no guarantee that the ultimate amount of each of such categories of Claims will correspond to the Debtors' estimates.  The Debtors or the Wind-Down Officer, as applicable, and their professionals will investigate Claims filed against the Debtors to determine the validity of such Claims.  The Debtors or the Wind-Down Officer, as applicable, may file objections to Claims that are filed in improper amounts or classifications, or are otherwise subject to objection under the Bankruptcy Code or other applicable law.

*(f)*     ***Global Resolution with the Committee and Establishment of the 503(b)(9) Reserve***

Since the Committee was appointed, the Debtors, First Lien Agent and Committee engaged in negotiations with the goal of consensually resolving the Chapter 11 Cases.  These negotiations were ultimately successful and accomplished several goals expressed by the Committee.  The Committee was part of the Debtors' Sales efforts and supported the Sales of several of the Debtors' leases and the entry into lease termination agreements with multiple landlords.  While the Sales were insufficient to satisfy the First Lien Obligations, leaving the estate with insufficient funds for a distribution to holders of Allowed General Unsecured Claims, the Committee and First Lien Lenders reached agreement on the sharing of Sales proceeds in which the First Lien Lenders agreed to the Class 3 Effective Date Payment Amount that is estimated to pay approximately 20% of the First Lien Obligations and, in turn, made available the monies to establish a reserve fund, not to exceed $4,000,000, as the sole source for the

payment and satisfaction of Allowed 503(b)(9) Claims (the "**503(b)(9) Reserve**").  Second, the Committee sought and received confirmation that the Preference and Avoidance Actions would not be prosecuted and would be waived and released by the Debtors, First Lien Lenders, Second Lien Lenders and Wind-Down Officer, and their respective successors and assigns.

(g)      **The WARN Adversary and Settlement**

On February 5, 2020, Kelsi Cornett, Amy Hile, Karen Bauer, James Gordon Bryant, and Judith Tarrant-Milliman (each, a "Plaintiff" and, collectively, the "Plaintiffs"), on behalf of themselves and those similarly situated, filed their *Class Action Adversary Proceeding Complaint* in adversary proceeding No. 20-50451 in these chapter 11 cases.  Adv. D.I. 1.  On August 24, 2020, the Plaintiffs filed their *First Amended Class Action Adversary Proceeding Complaint* (the "Amended Complaint").  Adv. D.I. 4.

Through the Amended Complaint, Plaintiffs assert claims against the Debtors for damages under the Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101 *et seq.* (the "WARN Act") in connection with the closing of certain of the Debtors' locations on or about February 3, 2020 and thereafter.

The Debtors dispute the allegations made in the Amended Complaint and do not believe that any violations of the WARN Act occurred.  However, in an effort to avoid the delay, cost and uncertainty of litigation in connection with the Amended Complaint, the Debtors agreed on March 16, 2021 to a settlement (the "WARN Settlement") of the Amended Complaint, which is to be effectuated pursuant to and in accordance with this Combined Plan and Disclosure Statement and Bankruptcy Rule 9019.

Pursuant to the WARN Settlement: (i) the Debtors' former employees who hold Class 1, Allowed Priority Non-Tax Claims (as reflected in the Schedules) will receive payment in full of such Allowed Priority Non-Tax Claims (in the aggregate amount of $1,100,000) in full and final satisfaction thereof; (ii) upon the occurrence of the Effective Date, Plaintiffs' counsel, The Gardner Firm, P.C., Lankenau & Miller, LLP, Margolis Edelstein, and Wenzel Fenton Cabassa, P.A. (collectively, "Plaintiffs' Counsel") will receive a payment of $97,500 from the Debtors via wire transfer to The Gardner Firm, P.C. according to instructions to be supplied, on account of the services Plaintiffs' Counsel provided in connection with these chapter 11 cases, plus $500 to be allocated to each Plaintiff ($2,500 in the aggregate) on account of their contributions to this matter, which shall also be wired to The Gardner Firm, P.C. and shall be in addition to any Class 1, Allowed Priority Non-Tax Claims which the Plaintiffs may have; and (iii) upon the occurrence of the Effective Date and upon payment of the amounts set forth in this section, the Amended Complaint will be deemed withdrawn with prejudice without need for further notice to, or action or approval of, the Bankruptcy Court.  Plaintiffs' Counsel, Plaintiffs, and, to the extent not included therein, any employees receiving payment of an Allowed Priority Non-Tax Claim shall, upon receipt of the payments specified herein, be deemed to have provided to the Released Parties and their respective Related Parties the releases set forth in Article XIV of this Combined Disclosure Statement and Plan.

(h)      **The Wind-down of the Estates**

Following the Sales, the Debtors are focused principally on efficiently winding down their businesses, preserving Cash held in the Estates, and monetizing their remaining Assets. The remaining Assets include, among other things, Cash, certain deposits, prepayments, credits and refunds, insurance policies or rights to proceeds thereof, Holdings' equity interests in Earth Fare, and certain Causes of Action.

This combined Disclosure Statement and Plan provides for the Assets, to the extent not already liquidated, to be liquidated over time and the proceeds thereof to be distributed to Holders of Allowed Claims in accordance with the terms of the Plan and the treatment of Allowed Claims described more fully herein. The Wind-Down Officer will effect such liquidation and distributions. The Debtors will be dissolved as soon as practicable after the Effective Date.

## ARTICLE IV
## CONFIRMATION AND VOTING PROCEDURES

**4.1    Confirmation Procedure**. The Solicitation Procedures Order, among other things, conditionally approves the combined Disclosure Statement and Plan for solicitation purposes only and authorizes the Debtors to solicit votes to accept or reject the Plan. The Confirmation Hearing has been scheduled for May 26, 2021 at 11:00 a.m. (prevailing Eastern Time) at the Bankruptcy Court, 824 North Market Street, 6th Floor, Courtroom 3, Wilmington, Delaware 19801 to consider (a) final approval of the Disclosure Statement as providing adequate information pursuant to section 1125 of the Bankruptcy Code and (b) confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code. The Confirmation Hearing may be adjourned from time to time by the Debtors without further notice, except for an announcement of the adjourned date made at the Confirmation Hearing or by filing a notice with the Bankruptcy Court.

**4.2    Procedure for Objections**. Any objection to final approval of the combined Disclosure Statement and Plan as providing adequate information pursuant to section 1125 of the Bankruptcy Code or confirmation of the Plan must be made in writing and filed with the Bankruptcy Court and served on: (a) counsel to the Debtors, Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington, DE 19801, Attn: Sean T. Greecher, Esq. (sgreecher@ycst.com), and Shane M. Reil, Esq. (sreil@ycst.com); (b) counsel to the First Lien Agent, Chapman & Cutler LLP, 111 West Monroe Street, Chicago, IL 60603-4080, Attn.: Stephen R. Tetro II, Esq. (**stetro@chapman.com**) and Aaron M. Krieger, Esq. (akrieger@chapman.com); (c) counsel for the Committee, Pachulski Stang Ziehl & Jones LLP, 919 N. Market Street, 17th Floor, Wilmington, DE 19801, Attn.: Bradford J. Sandler, Esq. (bsandler@pszjlaw.com), Robert J. Feinstein, Esq. (rfeinstein@pszjlaw.com), and Colin R. Robinson, Esq. (crobinson@pszjlaw.com); and (d) the U.S. Trustee, 855 King Street, Suite 2207, Lockbox 35, Wilmington, DE 19801, Attn.: Jane M. Leamy, Esq. (Jane.M.Leamy@usdoj.gov) (collectively, the "Objection Recipients"); in each case, by no later than May 19, 2021 at 4:00 p.m. (prevailing Eastern Time). Unless an objection is timely filed and served, it may not be considered by the Bankruptcy Court at the Confirmation Hearing.

**4.3    Requirements for Confirmation**. The Bankruptcy Court will confirm the Plan only if it meets all the applicable requirements of section 1129 of the Bankruptcy Code. Among

other requirements, the Plan (i) must be accepted by all Impaired Classes of Claims or Interests or, if rejected by an Impaired Class, the Plan must not "discriminate unfairly" against, and be "fair and equitable" with respect to, such Class; and (ii) must be feasible.  The Bankruptcy Court must also find that: (i) the Plan has classified Claims and Interests in a permissible manner; (ii) the Plan complies with the technical requirements of chapter 11 of the Bankruptcy Code; and (iii) the Plan has been proposed in good faith.

### 4.4    Classification of Claims and Interests

Section 1123 of the Bankruptcy Code provides that a plan must classify the claims and interests of a debtor's creditors and equity interest holders.  In accordance with section 1123 of the Bankruptcy Code, the Plan divides Claims and Interests into Classes and sets forth the treatment for each Class (other than those claims which pursuant to section 1123(a)(1) of the Bankruptcy Code need not be and have not been classified).  The Debtors also are required, under section 1122 of the Bankruptcy Code, to classify Claims and Interests into Classes that contain Claims or Interests that are substantially similar to the other Claims or Interests in such Class.

The Bankruptcy Code also requires that a plan provide the same treatment for each claim or interest of a particular class unless the claim holder or interest holder agrees to a less favorable treatment of its claim or interest.  The Debtors believe that the Plan complies with such standard. If the Bankruptcy Court finds otherwise, however, it could deny confirmation of the Plan if the Holders of Claims or Interests affected do not consent to the treatment afforded them under the Plan.

A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes.  A Claim also is placed in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class and such Claim has not been paid, released, or otherwise settled prior to the Effective Date.

The Debtors believe that the Plan has classified all Claims and Interests in compliance with the provisions of section 1122 of the Bankruptcy Code and applicable case law.  It is possible that a Holder of a Claim or Interest may challenge the Debtors' classification of Claims or Interests and that the Bankruptcy Court may find that a different classification is required for the Plan to be confirmed.  If such a situation develops, the Debtors intend, in accordance with the terms of the Plan, to make such permissible modifications to the Plan as may be necessary to permit its confirmation.  Any such reclassification could adversely affect Holders of Claims by changing the composition of one or more Classes and the vote required of such Class or Classes for approval of the Plan.

**EXCEPT AS SET FORTH IN THE PLAN, UNLESS SUCH MODIFICATION OF CLASSIFICATION MATERIALLY ADVERSELY AFFECTS THE TREATMENT OF A HOLDER OF A CLAIM AND REQUIRES RE-SOLICITATION, ACCEPTANCE OF THE PLAN BY ANY HOLDER OF A CLAIM PURSUANT TO THIS SOLICITATION WILL BE DEEMED TO BE A CONSENT TO THE PLAN'S TREATMENT OF SUCH**

**HOLDER OF A CLAIM REGARDLESS OF THE CLASS AS TO WHICH SUCH HOLDER ULTIMATELY IS DEEMED TO BE A MEMBER.**

The amount of any Impaired Claim that ultimately is Allowed by the Bankruptcy Court may vary from any estimated Allowed amount of such Claim and, accordingly, the total Claims that are ultimately Allowed by the Bankruptcy Court with respect to each Impaired Class of Claims may also vary from any estimates contained herein with respect to the aggregate Claims in any Impaired Class. Thus, the actual recovery ultimately received by a particular Holder of an Allowed Claim may be adversely or favorably affected by the aggregate amount of Claims Allowed in the applicable Class. Additionally, any changes to any of the assumptions underlying the estimated Allowed amounts could result in material adjustments to recovery estimates provided herein or the actual Distribution received by Creditors. The projected recoveries are based on information available to the Debtors as of the date hereof and reflect the Debtors' views as of the date hereof only.

The classification of Claims and Interests and the nature of distributions to members of each Class are summarized herein. The Debtors believe that the consideration, if any, provided under the Plan to Holders of Claims reflects an appropriate resolution of their Claims taking into account the differing nature and priority (including applicable contractual subordination) of such Claims and Interests. The Bankruptcy Court must find, however, that a number of statutory tests are met before it may confirm the Plan. Many of these tests are designed to protect the interests of Holders of Claims or Interests who are not entitled to vote on the Plan, or do not vote to accept the Plan, but who will be bound by the provisions of the Plan if it is confirmed by the Bankruptcy Court.

### 4.5    Impaired Claims or Interests

Pursuant to the provisions of the Bankruptcy Code, only classes of claims or interests that are "impaired" (as defined in section 1124 of the Bankruptcy Code) under a plan may vote to accept or reject such plan. Generally, a claim or interest is impaired under a plan if the holder's legal, equitable, or contractual rights are changed under such plan. In addition, if the Holders of claims or interests in an impaired class do not receive or retain any property under a plan on account of such claims or interests, such impaired class is deemed to have rejected such plan under section 1126(g) of the Bankruptcy Code and, therefore, such Holders are not entitled to vote on such plan.

Under the Plan, Holders of Claims in Class 3 are Impaired and are entitled to vote on the Plan. Under the Plan, Holders of Claims or Interests in Classes 4 through 7 are Impaired and will not receive or retain any property under the Plan on account of such Claims or Interests and, therefore, are not entitled to vote on the Plan and deemed to reject the Plan. Under the Plan, Holders of Claims in Classes 1 and 2 are Unimpaired and, therefore, not entitled to vote on the Plan and are deemed to accept the Plan.

**ACCORDINGLY, ONLY HOLDERS OF CLAIMS IN CLASS 3 ARE BEING PROVIDED A BALLOT TO ACCEPT OR REJECT THE PLAN.**

### 4.6    Confirmation Without Necessary Acceptances; Cramdown

In the event that any impaired class of claims or interests does not accept a plan, a debtor nevertheless may move for confirmation of a plan. A plan may be confirmed, even if it is not accepted by all impaired classes, if the plan has been accepted by at least one impaired class of claims, and the plan meets the "cramdown" requirements set forth in section 1129(b) of the Bankruptcy Code. Section 1129(b) of the Bankruptcy Code requires that a court find that a plan (a) "does not discriminate unfairly" and (b) is "fair and equitable," with respect to each non-accepting impaired class of claims or interests. Here, because Holders of Claims and Interests in Classes 4 through 7 are deemed to reject the Plan, the Debtors will seek confirmation of the Plan from the Bankruptcy Court by satisfying the "cramdown" requirements set forth in section 1129(b) of the Bankruptcy Code. The Debtors believe that such requirements are satisfied, as no Holder of a Claim or Interest junior to those in Classes 5 through 7 is entitled to receive any property under the Plan.

A plan does not "discriminate unfairly" if (a) the legal rights of a nonaccepting class are treated in a manner that is consistent with the treatment of other classes whose legal rights are similar to those of the nonaccepting class and (b) no class receives payments in excess of that which it is legally entitled to receive for its claims or interests. The Debtors believe that, under the Plan, all Impaired Classes of Claims or Interests are treated in a manner that is consistent with the treatment of other Classes of Claims or Interests that are similarly situated, if any, and no Class of Claims or Interests will receive payments or property with an aggregate value greater than the aggregate value of the Allowed Claims or Allowed Interests in such Class. Accordingly, the Debtors believe that the Plan does not discriminate unfairly as to any Impaired Class of Claims or Interests.

The Bankruptcy Code provides a nonexclusive definition of the phrase "fair and equitable." To determine whether a plan is "fair and equitable," the Bankruptcy Code establishes "cramdown" tests for secured creditors, unsecured creditors and equity holders, as follows:

*(a)* Secured Creditors. Either (i) each impaired secured creditor retains its liens securing its secured claim and receives on account of its secured claim deferred Cash payments having a present value equal to the amount of its allowed secured claim, (ii) each impaired secured creditor realizes the "indubitable equivalent" of its allowed secured claim or (iii) the property securing the claim is sold free and clear of liens with such liens to attach to the proceeds of the sale and the treatment of such liens on proceeds to be as provided in clause (i) or (ii) above.

*(b)* Unsecured Creditors. Either (i) each impaired unsecured creditor receives or retains under the plan property of a value equal to the amount of its allowed claim or (ii) the Holders of Claims and interests that are junior to the claims of the dissenting class will not receive any property under the plan.

*(c)* Interests. Either (i) each holder of an equity interest will receive or retain under the plan property of a value equal to the greatest of the fixed liquidation preference to which such holder is entitled, the fixed redemption price to which such holder is entitled or the value of the interest or (ii) the holder of an interest that is junior to the nonaccepting class will not receive or retain any property under the plan.

26186273.10

As discussed above, the Debtors believe that the distributions provided under the Plan satisfy the absolute priority rule, where required.

### 4.7    Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan not be likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors (unless such liquidation or reorganization is proposed in the Plan).  Inasmuch as the Assets have been, or will be, liquidated and the Plan provides for the Distribution of all of the Cash proceeds of the Assets to Holders of Claims that are Allowed in accordance with the Plan, for purposes of this test, the Debtors have analyzed the ability of the Debtors to meet its obligations under the Plan upon the Effective Date.  Based on the Debtors' analysis, the Wind-Down Officer will have sufficient assets to accomplish the necessary tasks under the Plan.  Therefore, the Debtors believe that the liquidation pursuant to the Plan will meet the feasibility requirements of the Bankruptcy Code.

### 4.8    Best Interests Test and Liquidation Analysis

Even if a plan is accepted by the Holders of each class of claims and interests, the Bankruptcy Code requires the Bankruptcy Court to determine that such plan is in the best interests of all Holders of claims or interests that are impaired by that plan and that have not accepted the plan.  The "best interests" test, as set forth in section 1129(a)(7) of the Bankruptcy Code, requires a court to find either that all members of an impaired class of claims or interests have accepted the plan or that the plan will provide a member who has not accepted the plan with a recovery of property of a value, as of the effective date of the plan, that is not less than the amount that such holder would recover if the debtor were liquidated under chapter 7 of the Bankruptcy Code.

To calculate the probable distribution to Holders of each impaired class of claims and interests if the debtor was liquidated under chapter 7, a court must first determine the aggregate dollar amount that would be generated from a debtor's assets if its chapter 11 cases were converted to cases under chapter 7 of the Bankruptcy Code.  To determine if a plan is in the best interests of each impaired class, the present value of the distributions from the proceeds of a liquidation of the debtor's unencumbered assets and properties, after subtracting the amounts attributable to the costs, expenses and administrative claims associated with a chapter 7 liquidation, must be compared with the value offered to such impaired classes under the plan.  If the hypothetical liquidation distribution to Holders of claims or interests in any impaired class is greater than the distributions to be received by such parties under the plan, then such plan is not in the best interests of the Holders of claims or interests in such impaired class.

Because the Plan is a liquidating plan, the "liquidation value" in the hypothetical chapter 7 liquidation analysis for purposes of the "best interests" test is substantially similar to the estimates of the results of the chapter 11 liquidation contemplated by the Plan.  However, the Debtors believe that in a chapter 7 liquidation, there would be additional costs and expenses that the Estates would incur as a result of liquidating the Estates in a chapter 7 case.

The costs of liquidation under chapter 7 of the Bankruptcy Code would include the compensation of a trustee, as well as the costs of counsel and other professionals retained by the trustee. The Debtors believe such amount would exceed the amount of expenses that would be incurred in implementing the Plan and winding up the affairs of the Debtors. Conversion also would likely delay the liquidation process and ultimate distribution of the Assets. The Estates would also be obligated to pay all unpaid expenses incurred by the Debtors during the Chapter 11 Cases (such as compensation for professionals) that are allowed in the chapter 7 cases.

Accordingly, the Debtors believe that Holders of Allowed Claims would receive less than anticipated under the Plan if the Chapter 11 Cases were converted to chapter 7 cases, and therefore, the classification and treatment of Claims and Interests in the Plan complies with section 1129(a)(7) of the Bankruptcy Code.

### 4.9     Acceptance of the Plan

The rules and procedures governing eligibility to vote on the Plan, solicitation of votes, and submission of ballots are set forth in the Solicitation Procedures Order.

For the Plan to be accepted by an Impaired Class of Claims, a majority in number and two-thirds in dollar amount of the Claims voting in such Class must vote to accept the Plan. At least one voting Class, excluding the votes of insiders, must actually vote to accept the Plan.

**IF YOU ARE ENTITLED TO VOTE ON THE PLAN, YOU ARE URGED TO COMPLETE, DATE, SIGN, AND PROMPTLY MAIL THE BALLOT YOU RECEIVE. PLEASE BE SURE TO COMPLETE ALL BALLOT ITEMS PROPERLY AND LEGIBLY. IF YOU ARE A HOLDER OF A CLAIM ENTITLED TO VOTE ON THE PLAN AND YOU DID NOT RECEIVE A BALLOT, YOU RECEIVED A DAMAGED BALLOT, OR YOU LOST YOUR BALLOT, OR IF YOU HAVE ANY QUESTIONS CONCERNING THE PLAN OR PROCEDURES FOR VOTING ON THE PLAN, PLEASE CONTACT THE CLAIMS AGENT AT EARTHFARE@EPIQGLOBAL.COM OR (646) 282-2400. THE CLAIMS AGENT IS NOT AUTHORIZED TO, AND WILL NOT, PROVIDE LEGAL ADVICE.**

### ARTICLE V
### CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO VOTING

THE PLAN AND ITS IMPLEMENTATION ARE SUBJECT TO CERTAIN RISKS, INCLUDING, BUT NOT LIMITED TO, THE RISK FACTORS SET FORTH BELOW. HOLDERS OF CLAIMS WHO ARE ENTITLED TO VOTE ON THE PLAN SHOULD READ AND CAREFULLY CONSIDER THE RISK FACTORS, AS WELL AS THE OTHER INFORMATION SET FORTH IN THE PLAN AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH OR REFERRED TO OR INCORPORATED BY REFERENCE HEREIN, BEFORE DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN. THESE FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.

### 5.1    The Plan May Not Be Accepted

The Debtors can make no assurances that the requisite acceptances to the Plan will be received, and the Debtors may need to obtain acceptances to an alternative plan of liquidation for the Debtors, or otherwise, that may not have the support of the requisite Creditors, in which case the Debtors may be required to liquidate the Estates under chapter 7 of the Bankruptcy Code. There can be no assurance that the terms of any such alternative restructuring arrangement or plan would be similar to or as favorable to Creditors as those proposed in the Plan.

### 5.2    The Plan May Not Be Confirmed

Even if the Debtors receive the requisite acceptances, there is no assurance that the Bankruptcy Court, which may exercise substantial discretion as a court of equity, will confirm the Plan. Even if the Bankruptcy Court determined that the combined Disclosure Statement and Plan and the balloting procedures and results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it finds that any of the statutory requirements for confirmation had not been met. Moreover, there can be no assurance that modifications to the combined Disclosure Statement and Plan will not be required for Confirmation or that such modifications would not necessitate the re-solicitation of votes. If the Plan is not confirmed, it is unclear what distributions Holders of Claims or Interests ultimately would receive with respect to their Claims or Interests in a subsequent plan of liquidation.

If the Plan is not confirmed and an alternative cannot be agreed to, it is possible that the Debtors would have to liquidate their remaining assets, if any, in chapter 7, in which case it is likely that the Holders of Allowed Claims would receive substantially less favorable treatment than they would receive under the Plan. There can be no assurance that the terms of any such alternative would be similar to or as favorable to the Debtors' creditors as those proposed in the Plan.

### 5.3    Distributions to Holders of Allowed Claims under the Plan May Be Inconsistent with Projections

Projected Distributions are based upon good faith estimates of the total amount of Claims ultimately Allowed and the funds available for Distribution. There can be no assurance that the estimated Claim amounts set forth in the Plan are correct. These estimated amounts are based on certain assumptions with respect to a variety of factors. Both the actual amount of Allowed Claims in a particular Class and the funds available for distribution to such Class may differ from the Debtors' estimates. If the total amount of Allowed Claims in a Class is higher than the Debtors' estimates, or the funds available for distribution to such Class are lower than the Debtors' estimates, the percentage recovery to Holders of Allowed Claims in such Class will be less than projected.

### 5.4    Objections to Classification of Claims

Section 1122 of the Bankruptcy Code requires that the Plan classify Claims and Interests. The Bankruptcy Code also provides that the Plan may place a Claim or Interest in a particular Class only if such Claim or Interest is substantially similar to the other Claims or Interests of

such Class.  The Debtors believe that all Claims and Interests have been appropriately classified in the Plan.   To the extent that the Bankruptcy Court finds that a different classification is required for the Plan to be confirmed, the Debtors would seek to (i) modify the Plan to provide for whatever classification might be required for Confirmation and (ii) use the acceptances received from any Holder of Claims pursuant to this solicitation for the purpose of obtaining the approval of the Class or Classes of which such Holder ultimately is deemed to be a member. Any such reclassification of Claims, although subject to the notice and hearing requirements of the Bankruptcy Code, could adversely affect the Class in which such Holder was initially a member, or any other Class under the Plan, by changing the composition of such Class and the vote required for approval of the Plan.   There can be no assurance that the Bankruptcy Court, after finding that a classification was inappropriate and requiring a reclassification, would approve the Plan based upon such reclassification.   Except to the extent that modification of classification in the Plan requires re-solicitation, the Debtors will, in accordance with the Bankruptcy Code and the Bankruptcy Rules, seek a determination by the Bankruptcy Court that acceptance of the Plan by any Holder of Claims pursuant to this solicitation will constitute a consent to the Plan's treatment of such Holder, regardless of the Class as to which such Holder is ultimately deemed to be a member.  The Debtors believe that under the Bankruptcy Rules, they would be required to resolicit votes for or against the Plan only when a modification adversely affects the treatment of the Claim or Interest of any Holder.

The Bankruptcy Code also requires that the Plan provide the same treatment for each Claim or Interest of a particular Class unless the Holder of a particular Claim or Interest agrees to a less favorable treatment of its Claim or Interest.  The Debtors believe that the Plan complies with the requirement of equal treatment.  To the extent that the Bankruptcy Court finds that the Plan does not satisfy such requirement, the Bankruptcy Court could deny confirmation of the Plan.  Issues or disputes relating to classification and/or treatment could result in a delay in the confirmation and consummation of the Plan and could increase the risk that the Plan will not be consummated.

### 5.5    Failure to Consummate the Plan

The Plan provides for certain conditions that must be satisfied (or waived) prior to the Confirmation Date and for certain other conditions that must be satisfied (or waived) prior to the Effective Date.   As of the date of the Plan, there can be no assurance that any or all of the conditions in the Plan will be satisfied (or waived).  Accordingly, there can be no assurance that the Plan will be confirmed by the Bankruptcy Court.  Further, if the Plan is confirmed, there can be no assurance that the Plan will be consummated.

### 5.6    Plan Releases May Not Be Approved

There can be no assurance that the releases, as provided in Article XIV of the Plan, will be granted.   Failure of the Bankruptcy Court to grant such relief may result in a plan of liquidation that differs from the Plan or the Plan not being confirmed.

### 5.7    The Total Amount of 503(b)(9) Claims and Initial Administrative Claims May Exceed the Caps

As set forth in Section 13.1(e), in order for the Plan to become effective, the total amount of Allowed 503(b)(9) Claims shall be no greater than $4,000,000, and the total amount of Allowed Initial Administrative Claims shall be no greater than $100,000.  If the total amount of Allowed 503(b)(9) Claims is higher than $4,000,000, or the total amount of Allowed Initial Administrative Claims is higher than $100,000, the Debtors may not be able to satisfy the conditions for this Plan to become effective.

### 5.8    Reductions to Estimated Creditor Recoveries

The Allowed amount of Claims in any Class could be greater than projected, which, in turn, could cause the amount of distributions to creditors in such Class to be reduced substantially.  The amount of cash realized from the liquidation of the Debtors' remaining assets could be less than anticipated, which could cause the amount of distributions to creditors to be reduced substantially.

### 5.9    Certain Tax Considerations

The following discussion summarizes certain U.S. federal income tax considerations relevant to the implementation of the Plan to the Debtors and to holders of certain Claims.  This discussion does not address the U.S. federal income tax consequences to (i) creditors whose Claims are unimpaired or otherwise entitled to payment in full in cash under the Plan, (ii) public entities or Governmental Units, including the U.S. Government, states, municipalities, and Native American Tribes, or (iii) holders who are deemed to reject the Plan, such as holders of equity interests.

The discussion of U.S. federal income tax consequences below is based on the Internal Revenue Code, Treasury regulations, judicial authorities, published positions of the IRS, and other applicable authorities, all as in effect on the date of this Plan and Disclosure Statement and all of which are subject to change or differing interpretations, possibly with retroactive effect. The U.S. federal income tax consequences of the Plan are complex and subject to significant uncertainties.  The Debtors have not requested an opinion of counsel or a ruling from the IRS with respect to any of the tax aspects of the Plan.  No assurance can be given that the IRS will not take a position contrary to the description of U.S. federal income tax consequences of the Plan described below.

This discussion does not address non-U.S., state, or local tax consequences of the Plan, nor does it purport to address the U.S. federal income tax consequences of the Plan to special classes of taxpayers (e.g., public entities and Governmental Units (including the U.S. Government, states, municipalities, and Native American Tribes), foreign taxpayers, small business investment companies, regulated investment companies, real estate investment trusts, banks and certain other financial institutions, insurance companies, tax-exempt organizations, retirement plans, individual retirement and other tax-deferred accounts, holders that are, or hold Claims through, S corporations, partnerships, or other pass-through entities for U.S. federal income tax purposes, persons whose functional currency is not the U.S. dollar, dealers in securities or foreign currency, traders that mark-to-market their securities, persons subject to the alternative minimum tax or the "Medicare" tax on unearned income, persons who use the accrual method of accounting and report income on an "applicable financial statement," and persons

holding Claims that are part of a straddle, hedging, constructive sale, or conversion transaction). In addition, this discussion does not address U.S. federal taxes other than income taxes, nor does it address the Foreign Account Tax Compliance Act.

The following discussion generally assumes that the Plan implements the liquidation of the Debtors for U.S. federal income tax purposes, and that all distributions by the Debtors will be taxed accordingly.  Additionally, this discussion assumes that (i) the various arrangements to which any of the Debtors is a party will be respected for U.S. federal income tax purposes in accordance with their form and (ii) except if otherwise indicated, the Claims are held as "capital assets" (generally, property held for investment) within the meaning of section 1221 of the Internal Revenue Code.

The following discussion of certain U.S. federal income tax consequences is for general informational purposes only and is not a substitute for careful tax planning and advice based upon your individual tax circumstances.  Each holder of a Claim or Interest is urged to consult its own tax advisor for the U.S. federal, state, local, and other tax consequences applicable under the Plan.

> *(a)*  **Consequences to the Debtors.**

As of the Petition Date, the Debtors may have had consolidated net operating losses ("**NOLs**") for U.S. federal income tax purposes.  However, the amount of any NOLs and other tax attributes, as well as the application of any limitations on their use, remain subject to review and adjustment by the IRS.  Moreover, the Debtors may recognize additional losses as a result of the Sales, and anticipate having NOLs carrying forward into 2021.

> i.  <u>Limitations on NOL Carryforwards and Other Tax Attributes</u>.  The Debtors' ability to utilize any NOLs and certain other tax attributes could be subject to limitation if the Debtors underwent or were to undergo an ownership change within the meaning of section 382 of the Internal Revenue Code after the Petition Date.  The Debtors believe that no ownership change for section 382 purposes has occurred to date and expect that no such ownership change will occur prior to the liquidation of the Debtors pursuant to the Plan, anticipated to occur in 2021.  If, however, the Debtors were to undergo an ownership change for purposes of section 382 of the Internal Revenue Code, the Debtors' utilization of any NOLs or other tax attributes could be meaningfully impaired.

> ii.  <u>Cancellation of Debt</u>.  In general, the Internal Revenue Code provides that a debtor must recognize cancellation of debt ("***COD***") income upon the elimination or reduction of debt for insufficient consideration.  The Internal Revenue Code provides an exception to such income recognition treatment for any COD arising by reason of the discharge of the debtor's indebtedness in the bankruptcy case or to the extent of the debtor's insolvency immediately before the cancellation of the debt.  In such case, the Internal Revenue Code generally requires the debtor to reduce certain of its tax attributes—such as current year NOLs, NOL carryforwards, tax credits, capital losses and tax basis in assets—by the amount of any such excluded COD income.  COD income generally is the amount by which the adjusted issue price of cancelled debt exceeds the sum of the amount of cash and the fair market value of any other property transferred in exchange therefor.  In general, any reduction in tax attributes under the COD rules

does not occur until the end of the tax year, after such attributes have been applied to determine the tax for the year or, in the case of asset basis reduction, the first day of the taxable year following the tax year in which the COD occurs.

Consistent with the intended treatment of the Plan as a plan of liquidation for U.S. federal income tax purposes, the Debtors believe that no COD should be incurred by a Debtor as a result of the implementation of the Plan prior to the distribution by such Debtor of all of its assets. In such case, the reduction of tax attributes resulting from such COD (which, as indicated above, only occurs as of the end of the tax year in which the COD occurs) generally should not have a material impact on the Debtors. However, there can be no assurance that the IRS will agree to such characterization, due to, among other things, a lack of direct authoritative guidance as to when COD occurs in the context of a liquidating Chapter 11 plan, and thus there can be no assurance that all or a substantial amount of the COD will not be incurred earlier.

    *(b)*    ***Consequences to Holders of Allowed Class 3 Claims.***  Pursuant to the Plan, each Holder of an Allowed Claim in Class 3 will receive, in full and final satisfaction of its Claim, its pro rata share of the Debtors' remaining Cash after accounting for the Satisfaction Amount. As discussed in Section 2.1 of the Plan, each holder of a First Lien Facility Claim shall receive its pro rata share of (i) by no later than the Effective Date, the Class 3 Effective Date Payment Amount, plus (ii) any cash of the Debtors that exceeds the Satisfaction Amount (including any cash that remains from the Wind-Down Reserve and the 503(b)(9) Reserve after payment of all amounts covered by each such reserve), up to the full face amount of the Allowed First Lien Facility Claims.

In the event of the subsequent disallowance of any Disputed Claim, it is possible that a holder of a previously Allowed Claim may receive additional distributions in respect of its Claim. Accordingly, it is possible that the recognition of any loss realized by a holder with respect to an Allowed Claim may be deferred until all Claims are Allowed or Disallowed. Alternatively, it is possible that a holder will have additional gain in respect of any additional distributions received.

If gain or loss is recognized, such gain or loss may be long-term capital gain or loss if the Allowed Claim disposed of is a capital asset in the hands of the holder and has been held for more than one year. Each holder of an Allowed Claim should consult its own tax advisor to determine whether gain or loss recognized by such holder will be long-term capital gain or loss and the specific tax effect thereof on such holder. The character of any gain or loss depends on a variety of factors, including, among other things, the origin of the holder's Allowed Claim, when the holder receives payment (or is deemed to receive payment) in respect of such Allowed Claim, whether the holder reports income using the accrual or cash method of tax accounting, whether the holder acquired its Allowed Claim at a discount, whether the holder has taken a bad debt deduction with respect to such Allowed Claim, and/or whether (as intended and herein assumed) the Plan implements the liquidation of the Debtors for U.S. federal income tax purposes.

    i.   <u>Distributions in Respect of Accrued but Unpaid Interest</u>. In general, to the extent any amount received (whether cash or other property) by a Holder of a debt instrument is received in satisfaction of interest that accrued during its holding period, such amount will be

taxable to the Holder as ordinary interest income (if not previously included in the holder's gross income under the holder's normal method of accounting).   Conversely, a holder generally recognizes a deductible loss to the extent any accrued interest was previously included in its gross income and is not paid in full.

Pursuant to Section 14.4 of the Plan below, except as otherwise required by law (as reasonably determined by the Wind-Down Officer), distributions in respect of any Allowed Claim shall be allocated first to the principal amount of such Allowed Claim (as determined for U.S. federal income tax purposes) and, thereafter, to the remaining portion of such Allowed Claim, if any.  However, there is no assurance that such allocation would be respected by the IRS for U.S. federal income tax purposes.  You are urged to consult your own tax advisor regarding the allocation of consideration received under the Plan, as well as the deductibility of accrued but unpaid interest and the character of any loss claimed with respect to accrued but unpaid interest previously included in gross income for U.S. federal income tax purposes.

*(c)*      ***Withholding Tax Requirements.***  All distributions to holders of Allowed Claims under the Plan are subject to any applicable tax withholding, including employment tax withholding.   Under U.S. federal income tax law, interest, dividends, and other reportable payments may, under certain circumstances, be subject to "backup withholding" at the then applicable withholding rate.  Backup withholding generally applies if the holder (a) fails to furnish its social security number or other taxpayer identification number, (b) furnishes an incorrect taxpayer identification number, (c) fails properly to report interest or dividends, or (d) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the tax identification number provided is its correct number and that it is not subject to backup withholding.  Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax.  Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions.  Holders of Allowed Claims are urged to consult their own tax advisors regarding the Treasury Regulations governing backup withholding and whether the transactions contemplated by the Plan would be subject to these Treasury Regulations.

In addition, Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds.  Holders are urged to consult their tax advisors regarding these Treasury Regulations and whether the transactions contemplated by the Plan would be subject to these Treasury Regulations and require disclosure on the holder's tax returns.

**THE FOREGOING TAX SUMMARY HAS BEEN PROVIDED FOR GENERAL INFORMATIONAL PURPOSES ONLY.   THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX.   NOTHING HEREIN SHALL CONSTITUTE TAX ADVICE.   THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S PARTICULAR CIRCUMSTANCES.    ACCORDINGLY, HOLDERS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS ABOUT THE UNITED STATES FEDERAL, STATE**

AND LOCAL, AND APPLICABLE FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.

## ARTICLE VI
## TREATMENT OF UNCLASSIFIED CLAIMS

    **6.1**    **Administrative Claims**.  Except as otherwise set forth in this Article VI, or as soon as practicable after the Final Administrative Claim Bar Date, each Holder of an Allowed Administrative Claim shall receive in exchange for such Allowed Administrative Claim: (i) Cash equal to the amount of such Allowed Administrative Claim; or (ii) such other treatment as to which the Debtors or the Wind-Down Officer, as applicable, and the Holder of such Allowed Administrative Claim shall have agreed upon in writing.

    *(a)*    **Final Administrative Claim Bar Date**.  Holders of Administrative Claims, other than Professional Fee Claims, accruing after the date of entry of the Bar Date Order through and including the Effective Date ("Final Administrative Claims") shall file with the Claims Agent and serve on the Wind-Down Officer requests for payment, in writing, together with supporting documents, substantially complying with the Bankruptcy Code, the Bankruptcy Rules and the Local Rules, so as to actually be received on or before the Final Administrative Claim Bar Date. The Effective Date Notice shall set forth the Final Administrative Claim Bar Date and shall constitute notice of such Bar Date.  Absent further Court order, any Final Administrative Claim not filed by the Final Administrative Claim Bar Date shall be deemed waived and the Holder of such Final Administrative Claim shall be forever barred from receiving payment on account thereof.

    *(b)*    **Objections to Administrative Claims**.  Objections to requests for payment of Administrative Claims, other than requests for payment of Professional Fee Claims, must be Filed and served on the requesting party by the Claims Objection Deadline.

    *(c)*    **Professional Fee Claims.**  All applications for allowance and payment of Professional Fee Claims shall be Filed on or before the Professional Fee Claims Bar Date.  If an application for a Professional Fee Claim is not Filed by the Professional Fee Claims Bar Date, such Professional Fee Claim shall be deemed waived and the Holder of such Claim shall be forever barred from receiving payment on account thereof.  The Effective Date Notice shall set forth the Professional Fee Claims Bar Date and shall constitute notice of such Bar Date. Objections to any Professional Fee Claims must be Filed and served on the Wind-Down Officer and the requesting party by no later than twenty-one (21) days after service of the applicable final application for allowance and payment of Professional Fee Claims.  Allowed Professional Fee Claims shall be paid in full, in Cash, in such amounts as are Allowed by the Bankruptcy Court upon the earlier of (i) the Effective Date or (ii) the date upon which an order relating to any such Allowed Professional Fee Claim is entered, and in each case, as soon as reasonably practicable.

    *(d)*    **U.S. Trustee Fees**.  All fees payable on or before the Effective Date, pursuant to United States Code title 28 section 1930, shall be paid in full in Cash by the Debtors on or before the Effective Date.  All fees payable after the Effective Date shall be paid in full in cash by the Wind-Down Officer until the cases are converted, dismissed, or closed, whichever occurs first.

Notwithstanding anything to the contrary in the Plan, the U.S. Trustee shall not be required to file a request for Administrative Claims.

**6.2    Priority Tax Claims**.  Within the time period provided in Article X of the Plan, each Holder of an Allowed Priority Tax Claim shall receive in exchange for such Allowed Priority Tax Claim: (i) Cash equal to the amount of such Allowed Priority Tax Claim; or (ii) such other treatment as to which the Debtors or the Wind-Down Officer, as applicable, and the Holder of such Allowed Priority Tax Claim shall have agreed upon in writing.

## ARTICLE VII
## TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS

Unless the Holder of an Allowed Claim and the Debtors or the Wind-Down Officer, as applicable, agree to a different treatment, each Holder of an Allowed Claim shall receive the following Distributions in accordance with Article X of the Plan:

**7.1    Class 1:  Priority Non-Tax Claims**.  Each Holder of an Allowed Priority Non-Tax Claim shall receive in exchange for such Allowed Class 1 Claim: (A) Cash equal to the amount of such Allowed Priority Non-Tax Claim; or (B) such other treatment which the Debtors or the Wind-Down Officer, as applicable, and the Holder of such Allowed Priority Non-Tax Claim have agreed upon in writing.

**7.2    Class 2:  Other Secured Claims**.  Each Holder of an Allowed Other Secured Claim shall receive in exchange for such Allowed Class 2 Claim: (A) return of the collateral securing such Allowed Other Secured Claim; or (B) Cash equal to the amount of such Allowed Other Secured Claim; or (C) such other treatment which the Debtors or the Wind-Down Officer, as applicable, and the Holder of such Allowed Other Secured Claim have agreed upon in writing.

**7.3    Class 3: First Lien Facility Claims**.  Holders of Class 3 Claims, in full and final satisfaction, settlement, release and compromise and in exchange for their Allowed First Lien Facility Claims, shall receive (a) by no later than the Effective Date, the Class 3 Effective Date Payment Amount, plus (b) any cash of the Debtors that exceeds the Satisfaction Amount (including any cash that remains from the Wind-Down Reserve and the 503(b)(9) Reserve after payment of all amounts covered by each such reserve), up to the full face amount of the Allowed First Lien Facility Claims.

**7.4    Class 4: Second Lien Facility Claims**.  Holders of Allowed Second Lien Facility Claims are not entitled to receive any Distribution or retain any property under the Plan on account of such Claims.

**7.5    Class 5:  General Unsecured Claims**.  Holders of General Unsecured Claims are not entitled to receive any Distribution or retain any property under the Plan on account of such Claims.

**7.6    Class 6: Intercompany Claims**.  Holders of Intercompany Claims shall receive no Distribution on account of their Intercompany Claims.

**7.7    Class 7: Interests**.  On the Effective Date, all Interests shall be extinguished as of the Effective Date, and owners thereof shall receive no Distribution on account of such Interests.

**7.8    Reservation of Rights Regarding Claims and Interests**.  Except as otherwise explicitly provided in the Plan, nothing shall affect the Debtors' rights and defenses, both legal and equitable, with respect to any Claims or Interests, including, but not limited to, all rights with respect to legal and equitable defenses to alleged rights of setoff or recoupment.

## ARTICLE VIII
## ACCEPTANCE OR REJECTION OF THE PLAN

**8.1    Class Entitled to Vote**.  Because Claims in Class 3 are Impaired and Holders thereof will receive or retain property or an interest in property under the Plan, only a Holder of Claims in Class 3 shall be entitled to vote to accept or reject the Plan.

**8.2    Acceptance by Impaired Classes of Claims or Interests**.  In accordance with section 1126(c) of the Bankruptcy Code, and except as provided in section 1126(e) of the Bankruptcy Code, an Impaired Class of Claims shall have accepted the Plan if the Plan is accepted by the Holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Allowed Claims in such Class that have timely and properly voted to accept or reject the Plan.  In accordance with section 1126(d) of the Bankruptcy Code and except as provided in section 1126(e) of the Bankruptcy Code, an Impaired Class of Interests shall have accepted the Plan if such Plan is accepted by Holders of at least two-thirds (2/3) in amount of the Allowed Interests in such Class that have timely and properly voted to accept or reject the Plan.

**8.3    Presumed Acceptance by Unimpaired Classes**.  Because Claims in Classes 1 and 2 are Unimpaired pursuant to section 1126(f) of the Bankruptcy Code, Holders of Claims in Classes 1 and 2 are deemed to have accepted the Plan and, therefore, such Holders of Claims are not entitled to vote to accept or reject the Plan.

**8.4    Presumed Rejections by Impaired Classes**.  Because Holders of Claims or Interests in Classes 4-7 are not entitled to receive or retain any property under the Plan, pursuant to section 1126(g) of the Bankruptcy Code, such Holders of Claims or Interests are presumed to have rejected the Plan and are not entitled to vote to accept or reject the Plan.

**8.5    Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code**.  To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtors reserve the right to request confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code.  The Debtors reserve the right to alter, amend, modify, revoke, or withdraw the Plan, the documents submitted in support thereof or any schedule or exhibit, including to amend or modify it to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary.

**8.6    Controversy Concerning Impairment**.  If a controversy arises as to whether any Claim or Interest is Impaired under the Plan, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

**8.7    Elimination of Vacant Classes**.  Any Class of Claims or Interests that does not contain, as of the date of the commencement of the Confirmation Hearing, a Holder of an Allowed Claim or Interest, or a Holder of a Claim temporarily allowed under Bankruptcy Rule 3018, shall be deemed deleted from the Plan for all purposes, including for purposes of determining acceptance of the Plan by such Class under section 1129(a)(8) of the Bankruptcy Code.

## ARTICLE IX
## IMPLEMENTATION OF THE PLAN

**9.1    Implementation of the Plan**.  The Plan will be implemented by, among other things, the continued existence of one of the Debtors solely for purposes of monetizing any remaining non-Cash Assets and any valuable Causes of Action, and the making of Distributions in accordance with the Plan.

**9.2    Debtors' Members, Managers, and Officers**.  As of the Effective Date, any director or officer of a Debtor shall be deemed to have been terminated automatically without the need for any action or approval and without the need for any company filings, and shall have no continuing obligations to the Debtors following the occurrence of the Effective Date.  From and after the Effective Date, the Wind-Down Officer shall be deemed to be the sole officer and director of each Debtor (and all organic documents are deemed amended by this combined Disclosure Statement and Plan to permit and authorize such admission and appointment), and shall serve in such capacity through the earlier of the date the applicable Debtor is dissolved in accordance with this combined Disclosure Statement and Plan and the date that such Wind-Down Officer resigns, is terminated, or is otherwise unable to serve, *provided that* any successor Wind-Down shall serve in such capacities after the effective date of such appointment as the Wind-Down.

**9.3    Transition Services**.  Notwithstanding the foregoing, the Wind-Down Officer may make transition services payments, in a total amount not to exceed $7,500 in the aggregate, to the Debtors' Chief Financial Officer in exchange for ongoing corporate and support services rendered to the Debtors and the Wind-Down Officer following the Effective Date, which services shall be completed no later than ninety (90) days after the Effective Date, unless otherwise agreed to by such executive officer and the Wind-Down Officer. The terms governing any such services and the amount of any related transition services payments shall be determined by the Wind-Down Officer, in consultation with the First Lien Agent. Any transition services payments paid in accordance with the Plan shall constitute Wind-Down Expenses.

**9.4    Wind-Down and Dissolution of the Debtors**.  From and after the Effective Date, the Debtors shall continue in existence pursuant to the terms of this combined Disclosure Statement and Plan.  The Wind-Down Officer is authorized and empowered to effect the dissolution of any of the Debtors as soon as practicable after the Effective Date without the need for any company action or approval, and neither the Debtors nor the Wind-Down Officer shall be required to pay any taxes or fees to cause such dissolution.  On the Effective Date or as soon thereafter as is reasonably practicable, the Wind-Down Officer shall wind-down the affairs of the Debtors and file final tax returns for the Debtors.  All company governance activities of a Debtor shall be exercised by the Wind-Down Officer, and the Wind-Down Officer shall be authorized

and empowered to take or cause to be taken all company actions necessary or appropriate to implement and consummate the Plan, including, but not limited to, pursuing any Retained Causes of Action. The cost and expense of the wind-down of the affairs of the Debtors and the cost and expense of the preparation and filing of the final tax returns for the Debtors shall constitute Wind-Down Expenses.

9.5     **Wind-Down Reserve**.   The Wind-Down Officer shall establish a reserve (the "Wind-Down Reserve") and fund it with up to the amount of Cash remaining in the Professional Fee Escrow (as defined in the final order approving the Cash Collateral Motion [Docket No. 240]) as of the Effective Date, to pay (i) all Allowed Professional Fee Claims in full, (ii) transition services payments under the Plan, (iii) the costs of administering and implementing the Plan following the Effective Date, including the payment of fees and expenses of the Wind-Down Officer and its professionals, (iv) the costs of distributing Assets to Holders of Allowed Claims, and (v) fees owing to the U.S. Trustee pursuant to 28 U.S.C. § 1930.

9.6     **Abandonment, Disposal, and Destruction of Records**.   The Wind-Down Officer shall be authorized pursuant to section 554 of the Bankruptcy Code, in his or her sole discretion, without any further notice to any party or action, order or approval of the Bankruptcy Court, to abandon, dispose of, or destroy in any commercially reasonable manner all originals and/or copies of any documents, books and records, including any electronic records, of the Debtors that the Wind-Down Officer reasonably concludes are burdensome or of inconsequential value and benefit to the Debtors.

9.7     **Distributions by Wind-Down Officer**.   The Wind-Down Officer shall make continuing reasonable efforts to liquidate all Assets in accordance with the Plan, *provided* that the timing of all Distributions made by the Wind-Down Officer shall be at the discretion of the Wind-Down Officer, and, *provided, further*, that Distributions may only be made after the Final Administrative Claim Bar Date.

9.8     **Limitation of Liability; Indemnification**.   The Wind-Down Officer may, in connection with the performance of its functions, consult with attorneys, accountants, financial advisors and agents, which consultation may act as a defense for any act taken, omitted to be taken, or suffered to be done in accordance with advice or opinions rendered by such persons. Notwithstanding such authority, the Wind-Down Officer shall not be under any obligation to consult with attorneys, accountants, financial advisors or agents, and their determination not to do so shall not result in the imposition of liability, unless such determination is based on willful misconduct, gross negligence or fraud.   The Debtors shall indemnify and hold harmless the Wind-Down Officer and its designees and professionals, and all duly designated agents and representatives thereof (in their capacity as such), from and against and in respect of all liabilities, losses, damages, claims, costs and expenses, including, but not limited to attorneys' fees and costs arising out of or due to such actions or omissions, or consequences of their actions or omissions with respect or related to the performance of their duties or the implementation or administration of the Plan; *provided, however*, that no such indemnification will be made to such persons for such actions or omissions as a result of willful misconduct, gross negligence or fraud.

9.9     **Company Action**.   All matters expressly provided for under this Plan that would otherwise require approval of the members or managers of one or more of the Debtors, including

but not limited to, the dissolution or merger of any of the Debtors, shall be deemed to be in effect from and after the Effective Date pursuant to the applicable law of the states in which the Debtors are organized without any requirement of action by the directors or officers of the Debtors.

**9.10     Avoidance Actions and Preference Actions**.  Except as otherwise provided in this Plan, as of the Effective Date, the Debtors, together with any successor or successors in interest and assigns, including, without limitation, the Wind-Down Officer, and any other person or entity that claims or might claim through, on behalf of, or for the benefit of any of the foregoing, shall be deemed to have preserved all Retained Causes of Action.  For the avoidance of doubt, all Preference Actions are hereby waived and released by the First Lien Lenders, the Second Lien Lender, the Debtors, the Wind-Down Officer, together with any successor or successors in interest and assigns, and any other person or entity that claims or might claim through, on behalf of, or for the benefit of any of the foregoing.

**ARTICLE X**
**PROVISIONS GOVERNING DISTRIBUTIONS**

**10.1     Distributions for Allowed Claims**

Except as otherwise provided herein or as ordered by the Bankruptcy Court, all Distributions to Holders of Allowed Claims as of the applicable distribution date shall be made on or as soon as practicable after the applicable distribution date.  Distributions on account of Claims that first become Allowed Claims after the applicable distribution date shall be made pursuant to the terms of this Plan and on the day selected by the Wind-Down Officer.

The Wind-Down Officer may accelerate any Distribution date with respect to Distributions other than the initial distribution date if the facts and circumstances so warrant and to the extent not inconsistent with the Plan.

Distributions made as soon as reasonably practicable after the Effective Date or such other date set forth herein shall be deemed to have been made on such date.

**10.2     Interest of Claims**.  Expect to the extent provided in section 506(b) of the Bankruptcy Code, the Plan, or the Confirmation Order, post-petition interest shall not accrue or be paid on Claims, and no Holder of an Allowed Claim shall be entitled to interest accruing on any Claim from and after the Petition Date.

**10.3     Distributions by Wind-Down Officer as Disbursement Agent**.  From and after the Effective Date, the Wind-Down Officer shall serve as the Disbursement Agent under the Plan with respect to Distributions to Holders of Allowed Claims (provided that the Wind-Down Officer may hire professionals or consultants to assist with making disbursements or to act as the Disbursement Agent).  The Wind-Down Officer shall cause to be made all Distributions required to be made to such Holders of Allowed Claims pursuant to the Plan.  The Wind-Down Officer shall not be required to give any bond or surety or other security for the performance of the Wind-Down Officer's duties as Disbursement Agent unless otherwise ordered by the Bankruptcy Court.

**10.4    Waterfall**.  The Wind-Down Officer shall cause the proceeds of the Assets, net of the Wind-Down Expenses and amounts payable pursuant to Section 16.7 of this combined Disclosure Statement and Plan, to be distributed to Holders of Allowed Claims as follows (to the extent that such Claims have not been paid on or prior to the Effective Date):

*(a)*    **first, to satisfy the Satisfaction Amount; and**

*(b)*    **second, to satisfy the First Lien Facility Claims.**

**10.5    Means of Cash Payment**.  Cash payments under the Plan shall be made, net of any applicable withholding taxes at the option, and in the sole discretion, of the Wind-Down Officer, by wire, check, or such other method as the Wind-Down Officer deems appropriate under the circumstances.  Cash payments to foreign creditors may be made, at the option, and in the sole discretion, of the Wind-Down Officer, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

For purposes of effectuating Distributions under the Plan, any Claim denominated in foreign currency shall be converted to U.S. Dollars pursuant to the applicable published exchange rate in effect on the Petition Date.

**10.6    Fractional Distributions**.  Notwithstanding anything in the Plan to the contrary, no payment of fractional cents shall be made pursuant to the Plan.  Whenever any payment of a fraction of a cent under the Plan would otherwise be required, the actual Distribution made shall reflect a rounding of such fraction to the nearest whole penny (up or down), with half cents or more being rounded up and fractions less than half of a cent being rounded down.

**10.7    De Minimis Distributions**.  Notwithstanding anything to the contrary contained in the Plan, the Wind-Down Officer shall not be required to distribute, and shall not distribute, Cash or other property to the Holder of any Allowed Claim if the amount of Cash or other property to be distributed on account of such Claim is less than $100.  Any Holder of an Allowed Claim on account of which the amount of Cash or other property to be distributed is less than $100 shall be forever barred from asserting such Claim.

**10.8    Application of Distribution Record Date**.  At the close of business on the Distribution Record Date, the Debtors' claims registers shall be closed, and there shall be no further changes in the record Holders of Claims or Interests.  Except as may be provided to the extent of applicable law, Claims shall be non-transferable except upon death of the interest holder or by operation of law.  Except as provided herein, the Wind-Down Officer and the Wind-Down Officer's respective agents, successors, and assigns shall have no obligation to recognize any transfer of any Claim or Interest occurring after the Distribution Record Date and shall be entitled instead to recognize and deal for all purposes hereunder with only those record Holders stated on the claims registers as of the close of business on the Distribution Record Date irrespective of the number of Distributions to be made under the Plan to such Entities or the date of such Distributions.

**10.9    Withholding, Payment and Reporting Requirements With Respect to Distributions**.  All Distributions under the Plan shall, to the extent applicable, comply with all

tax withholding, payment, and reporting requirements imposed by any federal, state, provincial, local, or foreign taxing authority, and all Distributions shall be subject to any such withholding, payment, and reporting requirements.  The Wind-Down Officer shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding, payment, and reporting requirements.  The Wind-Down Officer may require, in the Wind-Down Officer's sole and absolute discretion and as a condition to the receipt of any Distribution, that the Holder of an Allowed Claim complete and return to the Wind-Down Officer the appropriate Form W-8 or Form W-9, as applicable, to each Holder.  Notwithstanding any other provision of the Plan, (a) each Holder of an Allowed Claim that is to receive a Distribution pursuant to the Plan shall have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding, and other tax obligations, on account of such Distribution, and including, in the case of any Holder of a Disputed Claim that has become an Allowed Claim, any tax obligation that would be imposed upon the Debtors in connection with such Distribution, and (b) no Distribution shall be made to or on behalf of such Holder pursuant to the Plan unless and until such Holder has made arrangements reasonably satisfactory to the Wind-Down Officer for the payment and satisfaction of such withholding tax obligations or such tax obligation that would be imposed upon the Debtors in connection with such Distribution.

**10.10   Setoffs**.  The Debtors may, but shall not be required to, set off against any Claim or any Allowed Claim, and the payments or other Distributions to be made pursuant to the Plan in respect of such Claim, claims of any nature whatsoever that the Debtors may have against the Holder of such Claim; *provided, however,* that neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors of any such claim that it may have against such Holder.

**10.11   No Distribution in Excess of Allowed Amounts**.  Notwithstanding anything to the contrary herein, no Holder of an Allowed Claim shall receive in respect of such Claim any Distribution of a value as of the Effective Date in excess of the Allowed amount of such Claim.

**10.12   Allocation of Distributions**.  The Wind-Down Officer may, in the Wind-Down Officer's sole discretion, make Distributions jointly to any Holder of a Claim and any other Entity who has asserted, or whom the Wind-Down Officer has determined to have, an interest in such Claim; *provided, however*, that the Wind-Down dating Officer shall provide notice of such Distribution to any Holder of a Claim or other Entity that has asserted an interest in such Claim.

**10.13   Delivery of Distributions; Forfeiture of Distributions**.  All Distributions to Holders of Allowed Claims not made by wire transfer shall be made at the address of such Holder as set forth in the claims register maintained in the Chapter 11 Cases (subject to any transfer effectuated pursuant to Bankruptcy Rule 3001(e) or, after the Effective Date, a change of address notification provided by a Holder in a manner reasonably acceptable to the Wind-Down Officer) or, in the absence of a Filed proof of Claim, the Schedules.  The responsibility to provide the Wind-Down Officer a current address of a Holder of Claims shall always be the responsibility of such Holder and at no time shall the Wind-Down Officer have any obligation to determine a Holder's current address.  Nothing contained in the Plan shall require the Wind-Down Officer to attempt to locate any Holder of an Allowed Claim.

Amounts in respect of undeliverable Distributions made by the Wind-Down Officer shall be held in trust on behalf of the Holder of the Claim to which they are payable until the earlier of the date that such undeliverable Distributions are claimed by such Holder and the date ninety (90) days after the date the undeliverable Distributions were made.

If the Holder of a Claim fails to cash a check payable to it or otherwise fails to claim an undeliverable Distribution within the ninety (90) day time limit set forth herein, or fails to complete and return to the Debtors the appropriate Form W-8 or Form W-9 within ninety (90) days of the request by the Wind-Down Officer for the completion and return of the appropriate form pursuant to Section 10.9, then such Holder shall be deemed to have forfeited its right to any reserved and future Distributions, and the Claims of such Holder shall be forever barred. The forfeited Distributions shall be redistributed to the Beneficiaries after reserving as necessary for payment of Wind-Down Expenses and otherwise in compliance with the Plan. In the event the Wind-Down Officer determines that any such amounts are too small in total to redistribute cost-effectively, the Wind-Down Officer may instead donate them to a charitable organization(s) free of any restrictions thereon, notwithstanding any federal or state escheat laws to the contrary.

## ARTICLE XI
## PROVISIONS FOR CLAIMS OBJECTIONS AND ESTIMATION OF CLAIMS

**11.1    Claims Administration Responsibility**.    Except as otherwise specifically provided in the Plan, after the Effective Date, the Wind-Down Officer shall have the sole authority (a) to file, withdraw, or litigate to judgment objections to Claims, (b) to settle, compromise, or Allow any Claim or Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court, (c) to amend the Schedules in accordance with the Bankruptcy Code, and (d) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court. Any agreement entered into by the Wind-Down Officer (acting in accordance with the terms of this Plan) with respect to the Allowance of any Claim shall be conclusive evidence and a final determination of the Allowance of such Claim, *provided, however*, that the United States Trustee for the District of Delaware's rights to object to Administrative Claims and Professional Fee Claims are reserved.

**11.2    Claims Objections**.  All objections to Claims shall be Filed by the Wind-Down Officer on or before the Claim Objection Deadline, which date may be extended by the Bankruptcy Court upon a motion filed by the Wind-Down Officer on or before the Claim Objection Deadline with notice only to those parties entitled to notice in the Chapter 11 Cases pursuant to Bankruptcy Rule 2002 as of the filing of such motion. If a timely objection has not been Filed to a proof of Claim or the Schedules have not been amended with respect to a Claim that was scheduled by the Debtors but was not set forth in the Schedules by the Debtors as contingent, unliquidated, or disputed, then the Claim to which the proof of Claim or the Claim set forth in the Schedules relates will be treated as an Allowed Claim.

**11.3    Estimation of Contingent or Unliquidated Claims**.    Except as specifically provided for in this Plan, the Wind-Down Officer may, at any time, request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to section 502(c) of the Bankruptcy Code, regardless of whether the Debtors have previously objected to such Claim or

whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection.  In the event the Bankruptcy Court so estimates any contingent or unliquidated Claim, that estimated amount shall constitute the Allowed amount of such Claim.  All of the aforementioned Claims objection, estimation, and resolution procedures are cumulative and are not necessarily exclusive of one another.

**11.4    Distributions on Account of Disputed Claims**.  Distributions may be made on account of an undisputed portion of a Disputed Claim.  The Wind-Down Officer shall, on the applicable distribution date, make Distributions on account of any Disputed Claim (or portion thereof) that has become an Allowed Claim.  Such Distributions shall be based upon the Distributions that would have been made to the Holder of such Claim under the Plan if such Claim had been an Allowed Claim on the Effective Date in the amount ultimately Allowed.

**11.5    Amendments to Claims**.  On or after the Effective Date, a Claim may not be filed or amended to increase liability or to assert new liabilities without the prior authorization of the Bankruptcy Court or the Wind-Down Officer, and any such new or amended Claim filed without prior authorization shall be deemed Disallowed in full without any further action.

**11.6    Claims Paid and Payable by Third Parties**.  A Claim shall be Disallowed without an Objection thereto having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not the Debtors or the Wind-Down Officer.  Distributions under the Plan shall be made on account of any Allowed Claim that is payable pursuant to one of the Insurance Contract(s) solely up to the amount of the portion of such Allowed Claim that is (i) within the self-insured retention under such Insurance Contract(s) and/or (ii) in excess of any aggregate limits under such Insurance Contract(s).  No Entity shall have any other recourse against the Debtors, the Estates, or any of their respective properties or assets on account of a self-insured retention under an Insurance Contract; *provided, however*, that, except as otherwise required under the applicable Insurance Contracts and applicable non-bankruptcy law, an Insurer shall not be obligated to pay amounts within any self-insured retention or other self-insured layer.

**11.7    Adjustment to Claims Without Objection**.  Any Claim that has been paid or otherwise satisfied may be designated on the Claims Register as such at the direction of the Wind-Down Officer by the Filing of a Notice of Satisfaction by the Wind-Down Officer, and without any further notice to or action, order, or approval of the Bankruptcy Court.

**ARTICLE XII**
**EXECUTORY CONTRACTS**

**12.1    Executory Contracts Deemed Rejected**.  On the Effective Date, all Executory Contracts will be deemed rejected as of the Effective Date in accordance with, and subject to, the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, except to the extent: (a) the Debtors previously have assumed, assumed and assigned or rejected such Executory Contract, or (b) prior to the Effective Date, the Debtors have Filed a motion to

assume, assume and assign, or reject an Executory Contract on which the Bankruptcy Court has not ruled.  Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of all rejections of Executory Contracts pursuant to this Article and sections 365(a) and 1123 of the Bankruptcy Code.

**12.2    Asset Purchase Agreements**.  To the extent executory, any asset purchase agreements, lease termination agreements, and any other documents related to the Sales, shall be assumed.

**ARTICLE XIII**
**CONFIRMATION AND CONSUMMATION OF THE PLAN**

**13.1    Conditions Precedent to the Effective Date**.  Each of the following is a condition precedent to the occurrence of the Effective Date:

*(a)*    the Confirmation Order shall have become a Final Order in full force and effect with no stay thereof then in effect, and shall be in form and substance satisfactory to the Debtors;

*(b)*    all actions, documents, and agreements necessary to implement this combined Disclosure Statement and Plan, including, without limitation, all actions, documents, and agreements necessary to implement any transactions contemplated under this combined Disclosure Statement and Plan, shall have been effectuated or executed;

*(c)*    the absence of any pending or threatened government action or any law that has the effect of or actually does prevent Consummation of any transaction contemplated under this combined Disclosure Statement and Plan;

*(d)*    the Holders of Class 3 Claims are paid the Class 3 Effective Date Payment Amount.

*(e)*    the total amount of Allowed 503(b)(9) Claims shall be no greater than $4,000,000, and the total amount of Allowed Initial Administrative Claims shall be no greater than $100,000;

*(f)*    the Satisfaction Amount, in amounts acceptable to the First Lien Agent and Committee, shall have been established and funded in accordance with the terms of this combined Disclosure Statement and Plan; and

*(g)*    the 503(b)(9) Reserve shall have been established and funded in accordance with the terms of this combined Disclosure Statement and Plan.

**13.2    Notice of Effective Date**.  **On or before five (5) Business Days after the Effective Date, the** Wind-Down Officer **shall mail or cause to be mailed to all Holders of Claims a notice that informs such Entities of (a) the occurrence of the Effective Date, (b) notice of the Final Administrative Claim Bar Date and Professional Fee Claim Bar Date, and (c) such other matters as the** Wind-Down Officer **deems appropriate or as may be ordered by the Bankruptcy Court.**

**13.3    Waiver of Conditions Precedent to the Effective Date**.  The Debtors may at any time, without notice or authorization of the Bankruptcy Court, waive, in writing, any or all of the conditions precedent to the Effective Date set forth in this Article with the consent of the First Lien Agent, whereupon the Effective Date shall occur without further action by any Entity, *provided, however*, that (i) the condition specified in section 13.1(a) may not be waived, and (ii) the condition specified in section 13.1(f) and (g) may not be waived without the consent of both the First Lien Agent and Committee.  The Debtors reserve the right to assert that any appeal from the Confirmation Order shall be moot after the Effective Date of the Plan.

**13.4    Effect of Non-Occurrence of Effective Date**.  If each of the conditions specified in this Article have not been satisfied or waived in the manner provided herein within ninety (90) calendar days after the Confirmation Date (or such later date as may be agreed to by the Debtors and the First Lien Agent), then: (i) the Confirmation Order shall be vacated and of no further force or effect; (ii) no Distributions under the Plan shall be made; (iii) the Debtors and all Holders of Claims against or Interests in the Debtors shall be restored to the status quo as of the day immediately preceding the Confirmation Date as though the Confirmation Date had never occurred; and (iv) all of the Debtors' obligations with respect to Claims and Interests shall remain unaffected by the Plan and nothing contained herein shall be deemed to constitute a waiver or release of any Claims by or against the Debtors or any other Entity or to prejudice in any manner the rights of the Debtors or any Entity in any further proceedings involving the Debtors, and the Plan shall be deemed withdrawn.  Upon such occurrence, the Debtors shall File a written notification with the Bankruptcy Court and serve it upon such parties as the Bankruptcy Court may direct.

### ARTICLE XIV
### EFFECTS OF CONFIRMATION

**14.1    Exculpation, Releases, and Injunctions**

**Nothing contained in Section 14.1 of the Plan shall prohibit the Holder of a Claim from litigating its right to seek to have such Claim declared an Allowed Claim and paid in accordance with the Distribution provisions of the Plan, or enjoin or prohibit the enforcement by the Holder of such Claim of any of the obligations of the Wind-Down Officer under the Plan.  The exculpations, releases, and injunctions provided for in Section 14.1 of the Plan shall be effective upon the Effective Date.**

**(a)    Exculpation and Limitation of Liability.    Notwithstanding any other provision of the Plan, subject to the occurrence of the Effective Date, the Debtors, the Committee, and any of such parties' respective Related Parties, are hereby released and exculpated from, and shall have no liability whatsoever for, any claim, obligation, suit, judgment, damage, demand, debt, right, cause of action, remedy, loss, and liability for any claim in connection with or arising out of the administration of the Chapter 11 Cases, including to any holder or purported holder of an Administrative Claim, a Claim, or an Interest,  for any act or omission in connection with, or arising out of, the Combined Disclosure Statement and Plan, the negotiation, formulation, or preparation, of the Combined Disclosure Statement and Plan, the pursuit of approval of the Combined Disclosure Statement and Plan, or the solicitation of votes for confirmation of the Plan, the**

Chapter 11 Cases, the consummation of the Plan, the administration and implementation of the Plan or the property to be distributed under the Plan, or any transaction contemplated by the Combined Disclosure Statement and Plan or in furtherance thereof, except for any act or omission that constitutes willful misconduct or gross negligence as determined by a Final Order.  This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations and any other applicable law or rules protecting such Released Parties from liability.

(b)     <u>Mutual Releases by the Debtors and non-Debtors</u>.  On the Effective Date, for good and valuable consideration received, the Debtors, on behalf of themselves and their Estates, and each Released Party shall be deemed, by virtue of their receipt of Distributions and/or other treatment contemplated under the Plan and/or their written agreement, to have forever released themselves and each other Released Party from any and all claims, interests, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, remedies, losses and liabilities whatsoever, including any derivative claims, contract claims, claims under ERISA and all other statutory claims, claims for contributions, withdrawal liability, reallocation liability, redetermination liability, interest on any amounts, liquidated damages, claims for attorneys' fees or any costs or expenses whatsoever, whether known or unknown, asserted or unasserted, foreseen or unforeseen, liquidated or unliquidated, matured or unmatured, contingent or fixed, existing or hereafter arising, in law, equity or otherwise (including, without limitation, those arising under 11 U.S.C. §§ 541-550 and interest or other carrying costs, penalties, legal, accounting and other professional fees and expenses and incidental, consequential and punitive damages payable to third parties), based in whole or in part upon actions taken solely in their respective capacities described above or any omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to, or in any manner arising from, in whole or in part, the Debtors, any successor to the Debtors, the Chapter 11 Cases, the Combined Disclosure Statement and Plan, the First Lien Credit Facility, the Second Lien Credit Facility, the Sales, the conduct of the Debtors' business, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements among the Released Parties, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, or any related agreements, instruments, or other documents, and the negotiation, formulation, or preparation thereof, the solicitation of votes with respect to the Plan, or any other act or omission, in all cases based upon or relating to, or in any manner arising from, in whole or in part, any act omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, except that (i) no individual shall be released from any act or omission that constitutes gross negligence, willful misconduct or actual fraud, as determined by a Final Order, (ii) the Debtors shall not relinquish or waive the right to assert any of the foregoing as a legal or equitable defense or right of setoff or recoupment against any Claims of any such persons asserted against the Debtors, (iii) the foregoing release shall not apply to any obligations that remain outstanding in respect of loans or advances made to individuals by the Debtors, (iv) the foregoing release applies to the Released Parties solely in their respective capacities described above, and (v) the foregoing release shall not apply to the right to enforce the Plan.

(c)     <u>Non-Discharge of the Debtors; Injunction</u>.  In accordance with section 1141(d)(3) of the Bankruptcy Code, the Plan does not discharge the Debtors.  Section 1141(c) of the Bankruptcy Code nevertheless provides, among other things, that the property dealt with by the Plan is free and clear of all Claims and Interests against the Debtors.  As such, no Entity holding a Claim against the Debtors may receive any payment from, or seek recourse against, any assets that are to be distributed under the Plan other than assets required to be distributed to that Entity under the Plan.  All parties are precluded from asserting against any property to be distributed under the Plan any Claims, rights, Causes of Action, liabilities, or Interests based upon any act, omission, transaction, or other activity that occurred before the Effective Date, except as expressly provided in the Plan or the Confirmation Order.

Except as otherwise expressly provided in the Plan, the Confirmation Order, or a separate order of the Bankruptcy Court, all entities who have held, hold, or may hold Claims against or Interests in the Debtors or their Estates, and their respective Related Parties, that arose before or were held as of the Effective Date, are permanently enjoined, on and after the Effective Date, from (a) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Debtors or the property of any of the Debtors, with respect to any such Claim or Interest, (b) the enforcement, levy, attachment (including prejudgment attachment), collection, or recovery by any manner or means, whether directly or indirectly, of any judgment, award, decree, or order against the Debtors or the property of any of the Debtors on account of any such Claim or Interest, (c) creating, perfecting, or enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Debtors or against the property or interests in property of the Debtors on account of any such Claim or Interest, (d) asserting any right of setoff or subrogation, directly or indirectly, of any kind against any obligation due from the Debtors or against the property or interests in property of the Debtors on account of any such Claim or Interest, (e) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan,  and (f) taking any actions to interfere with the implementation or consummation of the Plan.  Such injunction shall extend to successors of the Debtors and their respective properties and interests in property.

Any Entity injured by any willful violation of such injunction may seek actual damages and, in appropriate circumstances, may seek punitive damages from the willful violator.

14.2    **Term of Bankruptcy Injunction or Stays**.  All injunctions or stays provided for in the Chapter 11 Cases under sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the closing of the Chapter 11 Cases.

14.3    **Approval of WARN Settlement**.   Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the WARN Settlement pursuant to Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that the WARN Settlement, as described herein, is fair, equitable, reasonable, and in the best interests of the Debtors and the Estates.

26186273.10

**14.4    Allocation Between Principal and Interest**.  For United States federal income tax purposes, distributions in full or partial satisfaction of Allowed Claims shall be allocated first to the principal amount (as determined for U.S. federal income tax purposes) of Allowed Claims, until paid in full, with any excess allocated to unpaid interest that has accrued on such Claims and remains unpaid.

**ARTICLE XV**
**RETENTION OF JURISDICTION**

**15.1    Exclusive Jurisdiction of Bankruptcy Court**.  Pursuant to sections 105(a) and 1142 of the Bankruptcy Code, and notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, and related to, the Chapter 11 Cases and the Plan to the fullest extent permitted by law, including, among other things, jurisdiction to:

*(a)*    allow, disallow, determine, subordinate, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim or Interest (whether filed before or after the Effective Date and whether or not Contingent, Disputed or unliquidated or for contribution, indemnification or reimbursement), including the compromise, settlement and resolution of any request for payment of any Claims or Interests, the resolution of any Objections to the allowance or priority of Claims or Interests and to hear and determine any other issue presented hereby or arising hereunder, including during the pendency of any appeal relating to any Objection to such Claim or Interest to the extent permitted under applicable law;

*(b)*    grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan, for periods ending on or before the Effective Date;

*(c)*    hear and determine any and all adversary proceedings, motions, applications, and contested or litigated matters, including, but not limited to, all Causes of Action, and consider and act upon the compromise and settlement of any Claim or Interest, or Cause of Action;

*(d)*    determine and resolve any matters related to the assumption, assumption and assignment or rejection of any Executory Contract to which the Debtors are a party or with respect to which the Debtors may be liable, and to hear, determine and, if necessary, liquidate any Claims arising therefrom;

*(e)*    ensure that all Distributions to Holders of Allowed Claims under the Plan and the performance of the provisions of the Plan are accomplished as provided herein and resolve any issues relating to Distributions to Holders of Allowed Claims pursuant to the provisions of the Plan;

*(f)*    construe, take any action and issue such orders, prior to and following the Confirmation Date and consistent with section 1142 of the Bankruptcy Code, as may be necessary for the enforcement, implementation, execution and Consummation of the Plan

and all contracts, instruments, releases, other agreements or documents created in connection with the Plan, including, without limitation, the Disclosure Statement and the Confirmation Order, for the maintenance of the integrity of the Plan in accordance with sections 524 and 1141 of the Bankruptcy Code following the occurrence of the Effective Date;

(g)     determine and resolve any cases, controversies, suits or disputes that may arise in connection with the Consummation, interpretation, implementation or enforcement of the Plan (and all exhibits and schedules to the Plan) or the Confirmation Order, including the releases and injunction provisions set forth in and contemplated by the Plan or the Confirmation Order, or any entity's rights arising under or obligations incurred in connection therewith;

(h)     modify the combined Disclosure Statement and Plan or the Confirmation Order before or after the Effective Date, pursuant to section 1127 of the Bankruptcy Code, as well as any contract, instrument, release, or other agreement or document created in connection with the Plan, the Disclosure Statement or the Confirmation Order, or remedy any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, or other agreement or document created in connection with the combined Disclosure Statement and Plan or the Confirmation Order, in such manner as may be necessary or appropriate to consummate the Plan, to the extent authorized by the Bankruptcy Code and the Plan;

(i)     issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any entity with Consummation, implementation or enforcement of the Plan or the Confirmation Order;

(j)     enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated;

(k)     determine any other matters that may arise in connection with or relating to the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, or other agreement or document created in connection with the combined Disclosure Statement and Plan or the Confirmation Order;

(l)     hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code;

(m)     enforce all orders, judgments, injunctions, releases, exculpations, indemnifications and rulings entered in connection with the Chapter 11 Cases;

(n)     determine and resolve controversies related to the Estates or the Debtors from and after the Effective Date;

(o)     hear and determine any other matter relating to the combined Disclosure Statement and Plan; and

    *(p)*      enter a final decree closing any or all the Chapter 11 Cases.

## ARTICLE XVI
## MISCELLANEOUS PROVISIONS

**16.1    Modification of the Plan**.  The Debtors may alter, amend, or modify the Plan or any exhibits or schedules hereto under section 1127(a) of the Bankruptcy Code at any time prior to or after the Confirmation Date but prior to the substantial Consummation of the Plan, *provided, however*, that any such alteration, amendment or modification does not materially and adversely affect the treatment of Holders of Claims or Interests under the Plan.  Any Holder of a Claim that has accepted the Plan shall be deemed to have accepted the Plan, as altered, amended, or modified, if the proposed alteration, amendment, or modification does not materially and adversely change the treatment of the Claim of such Holder.

**16.2    Revocation, Withdrawal, or Non-Confirmation of the Plan**.  The Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Hearing with the prior written consent of the First Lien Agent.  If the Plan is revoked or withdrawn prior to the Confirmation Hearing, or if the Plan is not confirmed by the Bankruptcy Court, then:

    *(a)*      the Plan shall be null and void in all respects, and

    *(b)*      nothing contained in the combined Disclosure Statement and Plan shall (i) constitute a waiver or release of any Claims by or against, or any Interests in, the Debtors or any other Entity, (ii) prejudice in any manner the rights of the Debtors or any other Entity, or (iii) constitute an admission of any sort by the Debtors or any other Entity.

**16.3    Binding Effect**.  Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code and subject to the occurrence of the Effective Date, on and after the Confirmation Date, the provisions of the Plan shall bind any Holder of a Claim against, or Interest in, the Debtors and such Holder's respective successors and assigns, whether or not the Claim or Interest of such Holder is Impaired under the Plan and whether or not such Holder has accepted the Plan.

**16.4    Subordination Rights**.  The classification and manner of satisfying all Claims and the respective Distributions and treatments hereunder take into account and/or conform to the relative priority and rights of the Claims in each Class in connection with the contractual, legal and equitable subordination rights relating thereto, whether arising under contract, general principles of equitable subordination, section 510(b) of the Bankruptcy Code or otherwise.  All subordination rights that a Holder of a Claim may have with respect to any Distribution to be made under the Plan shall be implemented through the Plan, and all actions by such Holder of a Claim related to the enforcement of such subordination rights shall be enjoined permanently.  The provisions of any contractual or structural subordination of Claims shall remain enforceable by the Wind-Down Officer on behalf of the Estates after the occurrence of the Effective Date.  Without limitation hereunder, the Wind-Down Officer, on behalf of the Estates, may likewise enforce any right of the Debtors or the Estates to equitably or otherwise subordinate Claims under section 510 of the Bankruptcy Code, except as otherwise expressly set

26186273.10

forth herein or as expressly provided in a Final Order of the Bankruptcy Court in the Chapter 11 Cases.

**16.5     Severability of Plan Provisions**.  If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court, at the request of the Debtors, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such holding, alteration or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may be altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

**16.6     Payment of Statutory Fees; Filing of Quarterly Reports**.  Notwithstanding any other provision of this Plan to the contrary, all U.S. Trustee Fees shall be paid in full in Cash on or before the Effective Date.  On and after the Effective Date, the Liquidating Trust shall file with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the U.S. Trustee for each Debtor until its case is close, dismissed, or converted.  All U.S. Trustee Fees that arise after the Effective Date shall be paid in full in Cash when due.  The Debtors shall have the obligation to pay U.S. Trustee Fees pursuant to United States Code title 28 section 1930 for each Debtor until its particular case is closed, dismissed, or converted.  Notwithstanding anything to the contrary in the Plan, the U.S. Trustee shall not be required to file any proofs of Claim with respect to U.S. Trustee Fees.

**16.7     Dissolution of the Committee**.  The Committee shall dissolve on the Effective Date and the members of such Committee shall be released and discharged from all further rights and duties arising from or related to the Chapter 11 Cases, except with respect to, and to the extent of any applications for Professional Fee Claims or expense reimbursements for members of such Committee.  The Committee and its retained Professionals may also participate in any appeal pending as of the Effective Date or filed thereafter, the outcome of which could affect the treatment of prepetition unsecured creditors (including Holders of Allowed Priority Claims and 503(b)(9) Claims), including, but not limited to, any cases, controversies, suits or disputes arising in connection with the Consummation, interpretation, implementation or enforcement of the Plan or the Confirmation Order that could affect the treatment of prepetition unsecured creditors.  The Professionals retained by the Committee shall not be entitled to assert any Administrative Claims nor shall they have an Allowed Administrative Claims for any services rendered or expenses incurred after the Effective Date except in respect of the preparation and prosecution of or any objection to any Filed fee application and participation in any appeals.

**16.8     Exemption from Section 1146**.  Pursuant to section 1146(a) of the Bankruptcy Code, under the Plan, (i) the issuance, distribution, transfer or exchange of any debt, equity security or other interest in the Debtors; or (ii) the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be

taxed under any law imposing a stamp tax or similar tax.  To the maximum extent permitted pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant hereto shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, sales or use tax, mortgage recording tax, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents pursuant to such transfers of property without the payment of any such tax, recordation fee, or governmental assessment. All subsequent issuances, transfers or exchanges of securities, or the making or delivery of any instrument of transfer by the Debtors in the Chapter 11 Cases or by the Wind-Down Officer shall be deemed to be or have been done in furtherance of the Plan.

**16.9    Closing of Chapter 11 Cases**.  As of the Effective Date, the Wind-Down Officer may submit an order to the Bankruptcy Court under certification of counsel closing the Chapter 11 Case of Holdings.  Upon the Filing of a motion to close the Chapter 11 Case of Earth Fare, the Wind-Down Officer shall file a final report with respect to the Chapter 11 Cases pursuant to Local Rule 3022-1(c).

**16.10    Filing of Additional Documents**.  On or before the Effective Date of the Plan, the Debtors may issue, execute, deliver, and File with the Bankruptcy Court or record any agreements and other documents, and take any action as may be necessary or appropriate to effectuate, consummate and further evidence the terms and conditions of the Plan.

**16.11    Insurance**. Confirmation of this Plan and the occurrence of the Effective Date shall have no effect on insurance policies of the Debtors in which the Debtors are or were insured parties.  Each insurance company is prohibited from, and the Confirmation Order shall include an injunction against, denying, refusing, altering or delaying coverage on any basis regarding or related to these Chapter 11 Cases, this Plan or any provision within this Plan, including the treatment or means of liquidation set out within this Plan for insured Claims.

**16.12    Successors and Assigns**.    The rights, benefits and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor, or assign of such Entity.

**16.13    Governing Law**.    Except to the extent that the Bankruptcy Code or Bankruptcy Rules or other federal laws is applicable, and subject to the provisions of any contract, instrument, release, or other agreement or document entered into in connection with the Plan, the construction, implementation and enforcement of the Plan and all rights and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware, without giving effect to conflicts of law principles which would apply the law of a jurisdiction other than the State of Delaware or the United States of America.

**16.14    Exhibits and Schedules**.    All exhibits and schedules annexed hereto, and all documents submitted in support hereof, are incorporated into and are a part of the Plan as if set forth in full herein.  Holders of Claims and Interests may obtain copies of the Filed exhibits and schedules upon written request to the Debtors. Upon their Filing, the exhibits and schedules may

be inspected in the Office of the Clerk of the Bankruptcy Court or its designee during normal business hours.  The documents contained in the exhibits and schedules shall be approved by the Bankruptcy Court pursuant to the Confirmation Order.  To the extent any exhibit or schedule annexed hereto is inconsistent with the Plan, the contents of the Plan shall control.

**16.15   Computation of Time**.  In computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

**16.16   Reservation of Rights**.  The Filing of the combined Disclosure Statement and Plan, any statement or provision contained in the combined Disclosure Statement and Plan, or the taking of any action by the Debtors with respect to the Plan shall not be, and shall not be deemed to be, an admission or waiver of any rights of the Debtors with respect to the Holders of Claims and Interests.

Dated:  April 6, 2021

**Earth Fare, Inc., et al.**

*/s/ Charles Goad*
Name: Charles Goad
Title: Chief Restructuring Officer